ORIGINAL

300021873



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 16 2026

CLERK, U.S. DISTRICT COURT
By ___KCR___
Deputy

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

JAMES DE LOS SANTOS,

    Plaintiff,

v.

CHARLES EDWIN SHOFFNER, individually;

SHERWOOD SOUTHWEST, LLC;

CVB INC., a Utah corporation, f/k/a and/or

d/b/a CVBUT Inc. and Malouf Companies; and

WEST CREEK FINANCIAL, INC., a Virginia

corporation, d/b/a Koalafi.

    Defendants.

CIVIL ACTION NO. _____

$3 - 26 CV - 122 - K$

---

## VERIFIED COMPLAINT FOR DAMAGES

### JURY TRIAL DEMANDED

---

Plaintiff James De Los Santos, by and for himself, complaining of the Defendants, states and alleges as follows:

## EVIDENTIARY FOUNDATION

Plaintiff has compiled extensive documentary evidence spanning 2009 through 2024, including hundreds of exhibits documenting Defendants' fraudulent and anticompetitive conduct. The exhibits attached to this Complaint represent evidence sufficient to demonstrate the validity and merit of Plaintiff's claims and to establish that this action is brought in good faith based on substantial factual foundation. This is not a business dispute between dissatisfied parties—this is a case about illegal restraints of trade, systematic fraud, and a multi-defendant conspiracy that has operated for over a decade. Plaintiff stands ready to produce comprehensive evidentiary support at such time as the Court deems appropriate, whether through discovery, motion practice, evidentiary hearings, or trial. Plaintiff respectfully requests the opportunity to present this evidence to the Court.

## NATURE OF THE ACTION

1. This is an action for damages arising from a fifteen-year unlawful and fraudulent enterprise orchestrated by Defendant Charles Edwin Shoffner and implemented through a conspiracy with corporate co-conspirators Sherwood Southwest, LLC, CVB Inc. (operating as Malouf Companies), and West Creek Financial, Inc. d/b/a Koalafi. The enterprise was built upon adjudicated trade secret theft, concealed through judicial perjury, admitted through regulatory consent orders, and perpetuated through systematic fraud and anticompetitive restraints of trade in violation of federal and state law.

2. This lawsuit is not about any contract between Plaintiff and Mattress By Appointment LLC. It is about independent torts and statutory violations committed by Defendant Shoffner personally and his co-conspirators—conduct that would exist and would harm the public even if no contract had ever been signed. Plaintiff's claims arise from fraud, conspiracy, and violations of federal and state antitrust laws. These antitrust claims protect public rights in free competition that cannot be waived, modified, or governed by private agreement. Defendant Shoffner cannot hide behind MBA's corporate form, any contractual provision, or any arbitration agreement because he is sued individually for his personal fraudulent conduct and for orchestrating a multi-defendant conspiracy to restrain trade in violation of public law.

## JURISDICTION AND VENUE

3.    This Court has federal question jurisdiction over Plaintiff's claims under the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, pursuant to 28 U.S.C. § 1331. Defendants' conduct substantially affected interstate commerce, including the interstate sale of mattresses, accessories, and consumer financing across multiple states from at least 2009 to the present.

4.    This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Defendant Sherwood Southwest, LLC operates a large mattress manufacturing and distribution facility at 400A Tittle Drive, Lewisville, Texas (Denton County), located within the Northern District of Texas, Dallas Division. Defendant CVB Inc. operates a major 1 million square foot distribution center in Midlothian, Texas (Ellis County), located within the Northern District of Texas, Dallas Division. As documented in the Opening Order sent to Plaintiff by Defendant Shoffner (attached as Exhibit B), every product Plaintiff was permitted to purchase—every mattress, foundation, and accessory—came exclusively from Defendants Sherwood Southwest's Lewisville facility and CVB Inc.'s Midlothian facility, both located within this District. The conspiracy to restrain trade alleged herein was implemented and executed through these Northern District facilities. The exclusive dealing requirements that form the basis of Plaintiff's antitrust claims were imposed through Opening Orders originating from these facilities within this District. The anticompetitive conduct directly harmed Plaintiff through operations conducted from these locations within this District. Three of the five parties to this action—Plaintiff and Defendants Sherwood Southwest, LLC and CVB Inc.—are Texas residents or entities. All Defendants have substantial contacts with Texas and have purposefully availed themselves of the privilege of conducting business here, including through the tortious conduct alleged in this Complaint.

5A.    The propriety of this forum is further demonstrated by Defendant Mattress By Appointment LLC's own prior conduct, as documented in Exhibit M, wherein it voluntarily invoked the jurisdiction of a Texas court in Tarrant County to domesticate an arbitration award.

6.    Texas substantive law governs Plaintiff's state law claims. The exclusive dealing requirements were imposed on Plaintiff's Texas business operations, the injury occurred in

Texas, the fraudulent conduct was directed at Plaintiff in Texas, and the conspiracy restrained trade in Texas markets. Texas has the most significant relationship to the parties and claims.

Federal antitrust claims are governed by federal law. No contractual choice-of-law provision can override the application of Texas law to the independent tort and statutory claims that arise from conduct occurring in, and causing injury in, Texas.

7.    This Court has personal jurisdiction over all Defendants. Defendant Shoffner directed fraudulent conduct toward Texas and specifically toward Plaintiff in Travis County, Texas, causing injury in Texas. Defendants Sherwood Southwest, LLC and CVB Inc. operate substantial business facilities within this District. Defendant West Creek Financial, Inc. conducts extensive business in Texas through thousands of merchant partnerships and financing relationships, including the financing relationship with Plaintiff that is central to this lawsuit. All Defendants' contacts with Texas are sufficient to satisfy due process requirements for personal jurisdiction.

PARTIES

8.    Plaintiff JAMES DE LOS SANTOS is an individual residing in Travis County, Texas. He is a single father and small business owner operating Lux Value Mattress, a private appointment-only mattress showroom in Austin, Texas.

9.    Defendant CHARLES EDWIN SHOFFNER is an individual residing in Greenville, South Carolina. He is the founder, owner, and controlling person of Mattress By Appointment LLC and has been the directing mind behind the business model and practices at issue in this case since at least 2014. He is sued in his individual capacity for his personal tortious conduct and for leading the conspiracy alleged herein.

10.    Defendant SHERWOOD SOUTHWEST, LLC is a Florida limited liability company registered to do business in Texas (SOS File #801820815) since July 18, 2013. Its principal place of business is 1000 Tempur Way, Lexington, Kentucky 40511. Its registered agent in Texas is Alton S. Hayden, 1825 W. Beltline Road, Carrollton, Texas 75006. Sherwood operates a large mattress manufacturing and distribution facility at 400A Tittle Drive, Lewisville, Texas 75056

(Denton County), located within the Northern District of Texas, Dallas Division. Sherwood is a wholly-owned subsidiary of Tempur Sherwood, LLC, part of the Tempur Sealy International, Inc. corporate group.

11.     Defendant CVB INC. is a Utah corporation (formerly known as CVBUT Inc. and doing business as Malouf Companies) with its principal place of business in Logan, Utah. Its registered agent in Texas is C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. CVB Inc. operates a major 1 million square foot distribution center in Midlothian, Texas (Ellis County), located within the Northern District of Texas, Dallas Division. CVB Inc. conducts substantial business throughout Texas. On June 24, 2022, the Texas Comptroller of Public Accounts forfeited CVB Inc.'s Texas certificate of authority for failure to file franchise tax returns and pay franchise tax. CVB Inc. operated in Texas while forfeited from June 24, 2022 through October 24, 2023. Despite operating illegally while forfeited, CVB Inc. continued to hold itself out as an authorized supplier to MBA dealers, maintained its exclusive dealing arrangement with MBA, and concealed its forfeited status from Plaintiff and other dealers.

12.     Defendant WEST CREEK FINANCIAL, INC. is a Virginia corporation doing business as Koalafi, with its principal place of business in Richmond, Virginia. Its registered agent in Texas is C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. West Creek Financial provides consumer financing services and maintains an extensive network of thousands of merchant partners in Texas, including mattress retailers.

---

## FACTUAL ALLEGATIONS

### I. The Genesis of the Fraudulent Enterprise: The 2000 Trade Secret Theft

13.     The fraudulent business system at the heart of this case originated with trade secret theft in the year 2000. Darren Conrad, while employed by Power Marketing Direct, Inc., stole PMD's proprietary business methodology, including its recruitment tactics, advertising scripts, training manuals, and dealer control mechanisms.

14.     In January 2009, the Franklin County Court of Common Pleas (Ohio) entered judgment against Conrad in Power Marketing Direct, Inc. v. Darren Conrad, Case No. 04CVH-02-1519,

finding him liable for misappropriation of trade secrets under Ohio's Uniform Trade Secrets Act. The court awarded PMD $180,000 in damages and entered a permanent injunction prohibiting Conrad from using PMD's stolen system.

15. The Ohio court specifically found that PMD's methodology—including its unique 3-5 line classified ad system, verbatim phone scripts, training manuals, and dealer management systems—constituted protected trade secrets. The court found that Conrad had "essentially conceded that he had established a competing business which mirrored the program established at PMD."

16. This 2009 judgment established conclusively that the business system which Defendant Shoffner would later acquire and operate as MBA was, from its inception, stolen intellectual property adjudicated as such by a court of law.

## II. Defendant Shoffner's Knowing Acquisition of the Stolen System

17. Defendant Charles Edwin Shoffner was not an innocent subsequent purchaser but a knowing participant in this fraudulent scheme from its earliest days. As early as 2009, immediately following the Ohio trade secret judgment, Shoffner became financially involved with Conrad's stolen-trade-secret operation.

18. In Shoffner's own sworn 2011 statement, he admitted: "In 2009, after the Franklin County Court of Common Pleas entered an injunction against Darren Conrad, I, along with other officers of Park Place Corporation, spoke with Conrad and we advised him to fully comply with the terms of the injunction."

19. This admission proves Shoffner had actual knowledge in 2009 that Conrad's business system was the subject of a court judgment for trade secret theft. Despite this knowledge, Shoffner chose to deepen his involvement rather than distance himself from the fraudulent enterprise.

20. Shoffner hired Conrad as a sales representative for his company, Park Place Corporation, a mattress manufacturer. Through this relationship, Shoffner structured financial arrangements where he would receive percentages of sales from Conrad's dealer network—profiting directly from the stolen trade secret operation.

21.    In 2011, Shoffner went further: he personally loaned money to Conrad to create Carolina Bedding Direct, LLC. In Shoffner's own words: "In 2011, I loaned Darren Conrad money to create Carolina Bedding Direct, LLC." This loan made Shoffner an active financier of the fraudulent enterprise, providing capital to expand a business he knew was built on adjudicated trade secret theft.

22.    By 2013, Shoffner purchased a 45% ownership share of Carolina Bedding Direct, LLC, becoming a co-owner of the stolen system. Then, in 2014, following Conrad's bankruptcy, Shoffner purchased the remaining 55% share, gaining complete control of the fraudulent enterprise.

23.    Conrad's sworn affidavit from 2015 federal litigation confirms Shoffner's knowledge: "Mr. Shoffner knew about the company's business model at the time he became an owner. He also knew about PMD's prior lawsuit and injunction against me, and he knew that my business continued to use the detailed sales system that I helped develop at PMD."

24.    Conrad further confirmed: "The system of selling mattresses has changed very little since my time at PMD. Each of my companies has used that same system, which is almost entirely based on the sales system developed at PMD."

25.    After acquiring full control in 2014, Shoffner renamed the operation Mattress By Appointment LLC but retained the core illegal mechanisms of the stolen system: (a) financially trapping dealers through substantial upfront investments required before full disclosure of operational restrictions; (b) mandatory exclusive dealing with designated suppliers; and (c) retaliatory enforcement through systematic litigation and termination threats against dealers who resist or question the scheme.

The systematic nature of mechanism (c) is proven by Exhibit K, a National Litigation Tracker compiled by Plaintiff from public court records. Despite limited resources, Plaintiff identified and verified 62 civil cases involving MBA from 2014-2024, showing MBA filed 61 enforcement actions as plaintiff against dealers compared to only 1 case where MBA was sued as a defendant—an extraordinary 61:1 plaintiff ratio that demonstrates MBA's business model relies on systematic legal enforcement and intimidation rather than voluntary dealer compliance. As documented in Exhibit K's litigation timeline chart (page 2), enforcement actions continued after

2019, the same year Defendant Charles Edwin Shoffner personally signed a Washington State Consent Order (Exhibit H). In that Order, MBA agreed to cease and desist from violations of Washington's Business Opportunity Fraud Act, including failure to provide required disclosures and making earnings claims without basis. The Order explicitly warned Shoffner that **"WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE."** Despite this warning, MBA continued its systematic litigation campaign against dealers, as documented in Exhibit K. This continuation of the same enforcement tactics after being formally ordered to stop deceptive practices—and after being put on notice of criminal liability for doing so—demonstrates knowing, willful, and bad-faith continuation of the same unlawful conduct.

26.    This timeline establishes that Shoffner's fraudulent conduct began not with the 2019 Washington admission (discussed below), but at least a decade earlier when he knowingly invested in, financed, and ultimately acquired a business built on stolen intellectual property.

### III. The Mastermind Repeats the Fraud: Operation of MBA

27.    Operating under the MBA name, Shoffner implemented the stolen Carolina Bedding playbook across multiple states. The core fraudulent and anti-competitive components remained unchanged: (a) bait-and-switch recruitment promising "independent dealerships"; (b) mandatory exclusive purchasing from designated suppliers; (c) Shoffner's personal markup on supplier goods; and (d) the use of arbitration clauses and inflated claims to retaliate against questioning dealers.

### IV. The 2015 Judicial Perjury: Shoffner Lies Under Oath to Conceal the Stolen Playbook

28.    In 2015, when challenged in federal court over his acquisition and use of the stolen Carolina Bedding system (Retail Service Systems, Inc. v. Mattress By Appointment, LLC, S.D. Ohio Case No. 2:15-cv-02769), Defendant Shoffner committed perjury to conceal his fraudulent enterprise.

29.    In his sworn affidavit filed with the federal court, Shoffner made six materially false statements, each contradicted by official corporate records, including:

a. He swore his South Carolina entity was formed "around September 2014" when official South Carolina Secretary of State records show it was formed August 29, 2014;

b. He swore his South Carolina entity was "always non-operational" from 2014-2015, when official records show a 17-page employment agreement for a Vice President of Operations dated September 15, 2014;

c. He swore "no money or assets were transferred" between his Florida and South Carolina entities, when official records show his Florida LLC filed a Certificate of Authority to transact business in South Carolina;

d. He swore the "Mattress By Appointment" name was not used until December 2013, when official Florida records show Articles of Amendment changing the legal name on January 27, 2014;

e. He claimed operational control and knowledge of all filings, yet Darren Conrad executed the name-change filing and correspondence shows Conrad was managing corporate strategy;

f. He swore there was only a single South Carolina entity, when official records show two distinct South Carolina LLCs formed within months: MBA LLC (8/29/14) and MBA of Greenville LLC (1/8/15).

30.    Each false statement was material and designed to defeat personal jurisdiction and prevent the court from examining Shoffner's theft and use of the stolen Carolina Bedding playbook. Official state corporate records filed with the South Carolina and Florida Secretaries of State contradict every material statement in his sworn federal court affidavit.

31.    This 2015 perjury demonstrates Shoffner's willingness to lie under oath in federal court proceedings to protect his fraudulent scheme. The same fraudulent playbook Shoffner was defending with perjury in 2015 is the identical playbook he would later admit was fraudulent in his 2019 Washington Consent Order, and the identical playbook he used to defraud Plaintiff in 2024.

32.    This documented pattern of perjury in federal proceedings renders any contract signed by Shoffner, including any delegation clause, void under the "void for illegality" doctrine. A confessed perjurer and fraudster cannot use an arbitration clause to shield himself from accountability for continuing criminal conduct. Moreover, Shoffner's established pattern of lying

under oath destroys any credibility he might claim in challenging Plaintiff's allegations or supporting any motion to compel arbitration.

## V. The 2019 Admission: Shoffner Confesses to Fraud in Washington State

33.    In December 2019, the State of Washington investigated MBA's business practices. The investigation concluded that Shoffner and MBA had violated Washington's Business Opportunity Fraud Act.

34.    Defendant Shoffner personally signed a Consent Order (Exhibit H) with the Washington Department of Financial Institutions to resolve the state's investigation. In the Order, MBA agreed to cease and desist from violations of Washington's Business Opportunity Fraud Act, including operating an unregistered business opportunity, making earnings claims without a disclosed basis, and failing to provide required disclosures to purchasers. MBA paid $5,000 in investigation costs.

35.    The Consent Order explicitly warned Shoffner that "WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE." Despite signing this Order and agreeing to stop these deceptive business opportunity practices, Shoffner continued to operate MBA using the same fraudulent playbook in other states, including Texas.

## VI. The 2024 Fraud Against Plaintiff: The Scheme Comes to Texas

37. In early 2024, Defendant Shoffner, through MBA, recruited Plaintiff James De Los Santos in Austin, Texas. During recruitment calls, MBA representatives **explicitly told Plaintiff** that as an MBA dealer, he could sell mattresses at **"50-80% off"** retail prices, a claim Plaintiff verified by reviewing existing MBA dealers' advertisements. This specific promise attracted Plaintiff, who sought to build a business providing genuine value to Texas consumers. MBA's business opportunity materials and Shoffner's agents made additional representations, including that by owning an MBA dealership, Plaintiff would **"be his own boss"** and **"own his own business,"** with the potential to **"earn up to $150,000 per year"** through a **"proven business model"** with **"low overhead,"** where he could **"set his own hours.**

38. Defendant Shoffner owed Plaintiff a duty, as a prospective purchaser of a business opportunity, to disclose all material facts affecting the value, risk, and legality of the MBA dealership. Shoffner breached this duty by concealing the following material facts:

(a) The 2009 Ohio judgment (Exhibit G) establishing that the business model MBA used was built on adjudicated trade secret theft;

(b) Shoffner's own knowing acquisition and financing of that stolen system from 2009-2014, as documented in his sworn statements (Exhibit H) and Conrad's affidavit (Exhibit G);

(c) Shoffner's 2015 materially false sworn statements in federal court (Exhibit F) concerning his operation and control of the business; and

(d) The 2019 Washington State Consent Order (Exhibit D), in which MBA agreed to cease and desist from violations of business opportunity fraud laws, including failure to provide required disclosures.

39. Shoffner required Plaintiff to make substantial financial commitments before disclosing the material restrictions that would govern his business. Plaintiff signed a commercial lease for his store location on or about September 30, 2024, committing to substantial monthly rent. Immediately thereafter, Plaintiff began placing mandatory inventory orders with MBA's designated suppliers. From October through December 2024, Plaintiff paid over $92,500 in upfront lease deposits, inventory purchases, and training fees to MBA and its affiliated vendors. Throughout this period of continuous financial commitment—and before Plaintiff could fully operate or understand the true nature of the restraints—MBA concealed the material terms of the relationship, including the mandatory exclusive dealing requirements, supplier restrictions, and the control mechanisms that form the basis of Plaintiff's antitrust claims.

40. The reality of the MBA system fundamentally contradicted Shoffner's representations of independence. Upon commencing operations, Plaintiff discovered he did not own or control his own business. MBA exerted complete control: it dictated advertising content and scripts; required the use of MBA-owned Google and Facebook business pages that Plaintiff funded but could not own; mandated store layout and operational protocols; and prohibited deviation from its prescribed sales script. Plaintiff was informed by his assigned MBA "coach" that he was prohibited from sourcing products from any supplier other than those designated by MBA (Exhibit A), a requirement enforced with threats of termination.

**41. The Financial Trap for Dealers.** The financial structure of this controlled system ensured MBA's profit at the dealer's expense. The wholesale price MBA charged Plaintiff for Sherwood mattresses was inflated by Shoffner's personal markup, leaving an unsustainable margin that made honest profitability impossible. MBA assumed no inventory risk and bore no store operational costs; it profited from markups on forced purchases, while Plaintiff bore all financial risk.

**41A. The Documented Bait-and-Switch Scheme.** The deceptive nature of this pricing model is proven by Exhibit L. MBA provided dealers with an internal price sheet showing artificially inflated "MSRPs" for Sherwood mattresses—such as listing a 4-inch foam queen mattress with an $799 MSRP to justify a "$150 clearance" sale price. Critically, MBA's own supplier website listed these "discounted" models as permanently "SOLD OUT," making them unavailable for purchase. MBA's Coach David explicitly instructed Plaintiff via text that the "$150 mattress" was **"for display only"** and was **"bait"** to lure customers into the showroom, where the sales tactic was to immediately switch them to higher-priced models financed through Koalafi. This coordinated bait-and-switch scheme was a core, deceptive component of the exclusive dealing arrangement and demonstrates that the entire enterprise was designed not to help dealers succeed honestly, but to force them to participate in consumer fraud while MBA and its co-conspirators profited from the deception.

42. The mechanisms used to defraud and control Plaintiff in 2024—the concealment of material restrictions, the extraction of substantial upfront financial commitments before their disclosure, and the imposition of a controlled, exclusive dealing system enforced by threats—were not new. They were the same core fraudulent and anti-competitive mechanisms that have defined the enterprise since Shoffner acquired it in 2014 (¶25), that were central to the facts he misrepresented under oath in 2015 (¶¶28-31), and that were targeted by the 2019 Washington Consent Order (¶34).

VII. The Conspiracy to Restrain Trade: Documentary Evidence of the Enterprise-Wide System

A. Prong One: Exclusive Dealing with Defendant Sherwood Southwest

43. As a condition of being an MBA dealer, Plaintiff was required to purchase mattresses exclusively from Defendant Sherwood Southwest. This was a uniform, non-negotiable rule imposed on all new MBA dealers nationwide—a direct continuation of the exclusive supplier requirements that may be part of the stolen PMD playbook. This mandate was integral to the controlled system: dealers were barred from sourcing for better quality, price, or availability, and were forced to sell Sherwood products at prices based on MBA's fabricated MSRPs.

44. This arrangement guaranteed Sherwood a captive customer base of hundreds of dealers and foreclosed competition from other mattress suppliers. The conspiracy was profitable for both Shoffner and Sherwood: Sherwood secured guaranteed bulk sales, and Shoffner extracted a personal markup on each sale, as he admitted under oath in prior litigation: "I put the prices on the items that I got from Serta and then charged my stores my price.

B. Documentary Evidence of the Exclusive Dealing Requirements

45.     **The Opening Order Email.** On October 23, 2024, Defendant Shoffner personally sent Plaintiff an email titled "Opening Order selections" stating: "There are a couple of options for your opening order. We can go through these on our first call. Once selected you can place your order. Typically, the turnaround time is about 2 weeks. Being in Texas, could make that happen sooner since the plant closest to you is also in Texas." Attached to this email was a spreadsheet titled "Revised Opening Order_Sherwood.xlsx" containing multiple opening order options for new MBA dealers. Every option contained: (a) Sherwood mattresses across 10 product "slots"; (b) Sherwood foundations (box springs and platform bases); (c) Malouf accessories (bed frames and mattress protectors); and (d) no other mattress brands or alternative suppliers. One calculated opening order option totaled $15,388.06 ($13,161 for Sherwood products and $2,227.06 for Malouf products). This email and attached spreadsheet prove that MBA: (a) controls which suppliers dealers must use from the outset; (b) provides opening order "options" only within the two designated suppliers (Sherwood and CVB Inc./Malouf); (c) does not offer dealers the option to source from alternative suppliers; and (d) requires substantial upfront investment exclusively with the designated suppliers. Whether a dealer's final order matches the spreadsheet exactly is irrelevant. The spreadsheet demonstrates MBA's systematic practice of directing all new dealers to purchase exclusively from Sherwood and Malouf, with no alternative sourcing permitted.

46.     Verbal Threat of Termination. Plaintiff was explicitly told by 'Coach David,' an MBA coach/representative, that if Plaintiff ordered **products** from **any supplier other than the designated suppliers**, Plaintiff would be terminated and would lose his store. This threat was used to enforce the exclusive dealing arrangement and prevent Plaintiff from sourcing products from alternative suppliers even when the designated suppliers could not fulfill orders.

47.     **Evidence of Exclusive Dealing Enforcement.** Following this threat, during a critical inventory shortage, Plaintiff texted his MBA coach, "Joe": **"I just sold my last Queen Highrise, what do I do now? Can I order from Amazon?"** Coach Joe responded: **"No,"** and instructed Plaintiff to instead **"Order some extra box springs" from Malouf**—the very supplier that could not fulfill the order. (Ex. A) This exchange confirms MBA actively enforced its exclusive dealing arrangement, preferring to leave a dealer without inventory rather than permit sourcing from an available alternative.

48.     **Plaintiff's Request for Written Clarification and MBA's Coordinated Refusal.** On March 5, 2025, Plaintiff sent a detailed email to MBA executives seeking written clarification on the exclusive dealing requirements that were crippling his business, explicitly quoting the verbal threats he had received: **"I was also told by both Joe and David via text (which I have saved) that: I cannot sell anything from Amazon or any other supplier in my store. I am limited to purchasing only MBA and Malouf products. Is this correct? Because if so, I need to urgently address my lack of Malouf high-rises."** (Exhibit E). This request followed Plaintiff's earlier email of February 25, 2025, in which he raised specific legal concerns about MBA's business model. MBA's in-house counsel, David Shiroff, refused to engage, directing Keith Mackey to inform Plaintiff that **"he acknowledges receipt of your email, as well as its content, but believes it would not serve the interests of MBA to engage in legal correspondence with you at this time."** When Plaintiff persisted, Mackey responded on March 7, 2025, again refusing to provide answers in writing, stating: **"As for in writing, the terms of your agreement will detail your answers. Please refer to that,"** and then announced, **"However, myself and David will be disengaging at this point."** (Exhibit E). This pattern—where legal counsel declares it is not in MBA's "interests" to respond to legal questions, and executives then disengage and refuse to put restrictive policies in writing—demonstrates a conscious strategy to avoid creating a discoverable record of their unlawful restraints while continuing to enforce them through intimidation and operational control.

49.    Refusal to Allow Alternative Sourcing Despite Supplier Failures. Plaintiff has contemporaneous email records showing: (a) CVB Inc./Malouf's repeated out-of-stock notices for essential products; (b) Plaintiff's requests for permission to source equivalent products from available suppliers; and (c) MBA's (Shoffner's) repeated refusals to allow alternative sourcing. This refusal had no legitimate business justification. A business acting in the dealers' interests would allow alternative sourcing when the designated supplier cannot fulfill orders. The refusal demonstrates that MBA's exclusive dealing arrangement served not the dealers' interests, but the financial interests of MBA, Sherwood, and CVB Inc. in maintaining their captive customer base

C. Enterprise-Wide Policy: Testimony from Multiple Dealers

50.    The exclusive dealing requirements, supplier restrictions, and threats of termination described above were not unique to Plaintiff. These restrictions constitute an enterprise-wide policy applied to all MBA dealers, particularly those in their first year of operation.

51.    Plaintiff has identified three former MBA dealers who are prepared to testify under oath that they experienced the same pattern of deception and control alleged herein, including: (a) misrepresentations during recruitment about dealer independence and earning potential; (b) mandatory exclusive dealing with MBA-designated suppliers; (c) threats of termination for attempting to source from alternative suppliers; (d) discovery that they owned and controlled nothing despite representations of "independent dealership" ownership; (e) systematic restrictions on supplier sourcing that caused financial harm; and (f) threats of litigation upon questioning MBA's practices or attempting to exit the system.

52.    If required to establish the systematic nature of these restrictions, Plaintiff will subpoena current MBA dealers, including those in their first year of operation, to testify under oath. Upon information and belief, current MBA dealers—even those still operating under the MBA system—will confirm these facts when required to testify truthfully under penalty of perjury.

53.    The consistency of experience across multiple dealers over multiple years establishes that the conduct alleged herein is not an isolated incident but rather a systematic pattern and practice of anticompetitive restraint affecting all MBA dealers and constituting a per se violation of federal and state antitrust laws.

D. Prong Two: CVB Inc./Malouf's Illegal Operations and Exclusive Dealing

54.    Defendants further required MBA dealers to purchase accessory products exclusively from Defendant CVB Inc., operating as Malouf Companies, as demonstrated by the opening order spreadsheet (Exhibit B) and enforced by MBA coaches (Exhibit A).

55. Throughout Plaintiff's tenure. CVB Inc./Malouf was chronically unable to fulfill orders for essential products like bed frames ("high-rises") and mattress protectors. Plaintiff has contemporaneous email records showing repeated "out of stock" notifications and months-long waits for inventory, crippling his ability to make sales.

56. MBA enforced the exclusive dealing requirement even during these supply failures. When Plaintiff requested permission to source equivalent products from available suppliers like Amazon to complete sales, MBA repeatedly refused (see ¶47, ¶49).

57. During the factual investigation for this lawsuit. Plaintiff discovered through Texas Comptroller public records that **CVB Inc.'s certificate of authority to transact business in Texas was forfeited from June 24, 2022, through October 24, 2023.** Under Texas law, a forfeited entity cannot maintain a legal presence or legally enforce contracts in the state.

58. Plaintiff's entire tenure as an MBA dealer (beginning in late 2024) occurred **after** this forfeiture period. However, the correlation between CVB Inc.'s loss of good standing and its chronic inability to supply MBA dealers—coupled with MBA's refusal to allow alternative sourcing—raises serious questions about the legality and operational integrity of the exclusive supplier arrangement during that time.

59. Defendant Shoffner, as the controlling person of MBA who mandated exclusive dealing with CVB Inc./Malouf, had a duty to ensure his designated supplier was legally authorized and capable of fulfilling orders. Whether through willful ignorance or deliberate disregard, the result was the same: MBA bound dealers to a supplier that could not perform, while prohibiting any competitive sourcing, resulting in direct harm to dealers like Plaintiff.

60. This arrangement—**tying dealers to a single, chronically failing supplier and prohibiting alternatives**—constitutes an unreasonable restraint of trade. It had no pro-competitive

justification and served only to insulate CVB Inc./Malouf from competition and shift all inventory risk onto dealers.

61.     This constitutes a per se unreasonable restraint of trade and, alternatively, an unreasonable restraint under the rule of reason with no pro-competitive justification.

E. Prong Three: Captive Financing & Retaliation via Defendant West Creek Financial

62. MBA directed its dealers, including Plaintiff, to use specific consumer financing providers, prominently featuring Defendant West Creek Financial, Inc. d/b/a Koalafi. Plaintiff applied independently and was approved for a merchant account in his own name and under his own Tax EIN.

63. The stark difference in treatment Plaintiff received upon leaving MBA is evidence of Koalafi's coordination with the scheme. When Plaintiff updated his business name with another MBA-promoted lender, **Snap Finance**, it was handled professionally and promptly. In contrast, Plaintiff's Koalafi account—managed by representative "Jay," who regularly participated in MBA coaching calls—was **abruptly closed without notice in the middle of a pending transaction**.

64. When Plaintiff repeatedly contacted Jay to demand an explanation and ask who authorized the closure, Jay became unresponsive. He promised a manager would call, but no call ever came. His direct line went unanswered, creating a communication blackout identical to MBA's own tactics (¶48). Koalafi's generic merchant support could only refer Plaintiff back to the silent Jay.

65. This pattern—sudden account termination by an MBA-linked representative followed by a complete refusal to communicate or provide a legitimate business reason—is wholly inconsistent with the conduct of a neutral financial services partner. When contrasted with Snap Finance's cooperative response, it supports a reasonable inference that Koalafi, through its MBA-facing representative, acted in concert with or at the behest of MBA to punish a dealer for exiting the controlled system and to deter others from doing the same.

66. Koalafi's integration with MBA's operations was routine and systematic. MBA's "Coach David" instructed Plaintiff via text to use a $150 "hook" mattress—a low-quality 4-inch foam product MBA did not expect customers to buy—as bait to lure customers into the store, where

the primary sales tactic was to immediately switch them to higher-priced models and push them toward Koalafi financing. Koalafi's representative, "Jay," was a regular participant in MBA's dealer coaching calls, where financing strategies and sales tactics were coordinated. This close operational relationship underscores that Koalafi was not an arm's-length vendor but an embedded partner in MBA's controlled sales and financing ecosystem.

67. By integrating its services into MBA's network and then taking unexplained punitive action against a departing dealer while mirroring MBA's strategy of silence, West Creek Financial acted as a functional component of the control apparatus, using essential financing as a tool within the unlawful scheme.

## VIII. Critical Distinction: Independent Torts, Not Contract Disputes

68.     The wrongs alleged in this Complaint are not breaches of contract but rather personal tortious conduct by Defendant Shoffner and conspiratorial acts by all Defendants.

69.     These claims would exist even if Plaintiff had never signed any agreement with Mattress By Appointment LLC:

a. Fraud: Defendant Shoffner's misrepresentations and concealment (including the 2009 trade secret theft, his knowing acquisition, his 2015 perjury, and his 2019 Washington admission) constitute common law fraud regardless of any contract.

b. Conspiracy: The agreement among Shoffner, Sherwood, CVB Inc./Malouf, and West Creek Financial to restrain trade through exclusive dealing and financing control is an independent tort.

c. Antitrust Violations: The Sherman Act and Texas Antitrust Act prohibit restraints of trade regardless of whether those restraints are embodied in a contract.

d. Tortious Interference: Defendants' interference with Plaintiff's business relationships is actionable as an independent tort.

70.     These are not contract interpretation issues. These are independent legal wrongs for which Defendants are personally and jointly liable.

## IX. Plaintiff's Position on Arbitration

71.    Mattress By Appointment LLC has filed arbitration proceedings against Plaintiff with the American Arbitration Association. Plaintiff has withdrawn any consent to participate in those proceedings and does not consent to arbitration of any claims.

72.    This federal lawsuit is entirely separate from any arbitration involving Mattress By Appointment LLC. The arbitration involves different parties (MBA LLC, not the Defendants named herein) and different issues.

73.    This lawsuit concerns: (a) Defendant Shoffner's personal fraud and conspiracy (sued individually); (b) Sherwood, CVB Inc./Malouf, and West Creek Financial's participation in restraint of trade (non-signatories to any arbitration agreement); (c) federal and state antitrust violations (non-arbitrable public rights); and (d) independent torts that exist regardless of any contract.

74.    These claims are not subject to arbitration and must be resolved by this Court.

75.    **Plaintiff's Limited Appearance to Challenge Arbitration Jurisdiction.** Plaintiff appeared at preliminary arbitration hearings solely to preserve jurisdictional challenges to the arbitration of the independent tort and antitrust claims asserted in this federal action. As documented in the arbitrator's own Order No. 3 (attached as Exhibit J), Plaintiff expressly stated that his appearance was "without waiver to any of their challenges to this proceeding" and noted his intention to raise jurisdictional issues. Plaintiff filed objections pursuant to AAA Commercial Rule R-7. As documented in Order No. 6 (also attached as Exhibit J), Plaintiff left the proceedings and will not participate further.

76.    **The Arbitration's Gag Order: An Unconstitutional Attempt to Suppress Evidence of Criminal Enterprise.** Following Plaintiff's jurisdictional objections, the arbitrator, at MBA's request, imposed a sweeping Confidentiality Order (Exhibit I) that would prohibit Plaintiff from disclosing any evidence of the underlying fraudulent and anticompetitive conduct—the very subject of this federal antitrust action. This order, and MBA counsel's subsequent demand to 'confer' regarding it, demonstrates that the arbitration is being used not to adjudicate disputes, but to suppress evidence of ongoing illegal conduct from public and regulatory scrutiny. Plaintiff cannot be compelled to participate in a process designed to conceal the crimes he is alleging in this Court.

77.    **Plaintiff's Position on Parallel Proceedings.** Plaintiff has fulfilled his procedural obligations by appearing to challenge the arbitrator's jurisdiction over the independent tort and antitrust claims asserted herein. Plaintiff will not participate further in arbitration proceedings that: (a) would require him to sign

an unconstitutional gag order; (b) are inherently unfair and biased; and (c) are designed to suppress evidence of criminal enterprise. Should the arbitrator issue any award, Plaintiff reserves all rights to challenge such award through vacatur proceedings in federal court based on fraud, unconscionability, and violation of public policy. These federal proceedings must proceed irrespective of any parallel arbitration, as they involve different parties (including non-signatory Defendants Sherwood, CVB Inc., and West Creek Financial), different claims (federal antitrust violations and independent torts), and seek different relief (injunctive relief against ongoing criminal enterprise). Plaintiff's withdrawal from the rigged arbitration system does not constitute consent to arbitrate the claims asserted in this federal action.

**77A.** Relationship to Pending Arbitration. MBA LLC has initiated a collateral arbitration proceeding relating to the dealer agreement. Plaintiff does not seek a stay of that proceeding in this filing. The claims in this federal action are independent of and distinct from any contract-based arbitration. The Sherman Act violations, fraud in the inducement, civil conspiracy, and tortious interference claims asserted herein: (a) arise from Defendant Shoffner's personal conduct and the coordinated acts of non-signatory Defendants Sherwood Southwest, CVB Inc., and West Creek Financial; (b) implicate federal antitrust law and Texas public policy that cannot be waived by private agreement; (c) involve rights and remedies that would exist even if no dealer agreement had been signed; and (d) require discovery from and adjudication against parties who are not bound by any arbitration clause. These are paradigmatic federal court questions involving restraints of trade, fraud-based tort claims, and conspiracies among multiple parties. The Court retains jurisdiction to adjudicate these public law violations regardless of any private arbitration proceeding concerning contract interpretation.

## X. The Enterprise and Pattern of Unlawful Conduct (Reserved for Future Amendment)

**78.** The conduct described above was not isolated. It was part of a pattern of unlawful activity conducted through an ongoing association-in-fact enterprise consisting of Shoffner, Sherwood, CVB Inc./Malouf, and West Creek Financial.

**79.** The alleged pattern involves multiple predicate acts, including but not limited to: **trade secret theft (Retail Services Inc. v. Mattress By Appontment), perjury (Shoffner's 2015 sworn statements in federal court), business opportunity fraud (the 2019 Washington Consent Order),** and the **wire fraud and mail fraud inherent in the nationwide recruitment of dealers through deceptive advertising and the interstate shipment of goods under the fraudulent bait-and-switch scheme.** This pattern of racketeering activity has spanned years and affected interstate commerce.

80.    Plaintiff expressly reserves the right to amend this Complaint to assert a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, upon completion of discovery into the full extent of the enterprise's operations, financial transactions, and interstate communications.

## XI. Damages Sustained by Plaintiff

**81. Plaintiff's Damages.** As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer severe economic injury and emotional distress.

### a. Economic Losses & Trapped Capital:

i. **Sunk Costs & Out-of-Pocket Losses:** Over $150,000 in documented, non-recoverable capital invested to launch the business under MBA's fraudulent inducement, including lease deposits, build-out costs, mandatory inventory purchases from designated suppliers, training fees, and other upfront expenditures.

ii. **Destruction of Digital Business Assets:** Plaintiff was required to fund and build the online presence for his store using MBA-controlled Google Business and Facebook pages. Upon his exit from the system, MBA seized control of these assets, destroying the customer goodwill, reviews, and search ranking Plaintiff had paid to establish, forcing a complete and costly rebrand from scratch.

iii. **Destroyed Business Value & Trapped Investment:** Defendants' fraudulent scheme and retaliatory acts destroyed the business as a viable going concern. Plaintiff is now trapped: he must continue operating the unprofitable, supply-constrained store to avoid total loss of his investment, or sell at a catastrophic loss. This represents the complete destruction of a business in which Plaintiff invested $150,000 and the loss of its future economic value.

iv. **Lost Business Opportunity:** Plaintiff dedicated his significant capital—initially $200,000 earmarked for a legitimate business venture—and his full-time labor to this enterprise. Defendants' fraud has foreclosed that market opportunity, wasted his time and capital, and prevented him from pursuing other gainful business endeavors.

v. **Anticompetitive Overcharges & Lost Profits:** Plaintiff was forced to pay supracompetitive prices due to Shoffner's secret markup and the exclusive dealing conspiracy. He also suffered specific, calculable lost sales due to CVB Inc./Malouf's chronic inventory failures and West Creek Financial's retaliatory termination of consumer financing.

**b. Emotional Distress:**

i. Severe emotional distress, anxiety, and mental anguish from being defrauded, witnessing the deliberate destruction of his business and life savings, and the aggressive seizure of his store's digital identity. This distress was acutely exacerbated when MBA initiated legal proceedings days after the death of Plaintiff's mother in June 2024.

ii. Significant stress from battling this litigation as a single father raising his four-year-old daughter.

**82. Calculation and Statutory Multipliers.** Plaintiff's damages are substantial and will be proven at trial. The core economic damages—the $150,000+ in sunk costs, the destruction of digital assets and goodwill, and the total loss of business value—are directly calculable from Plaintiff's financial and operational records. The full extent of lost profits, overcharges, and the complete value of the destroyed business will be established through expert testimony.

Under the Sherman Act (15 U.S.C. § 15) and Texas Antitrust Act (Tex. Bus. & Com. Code § 15.21), any damages awarded for the antitrust violations will be trebled. Plaintiff also seeks punitive damages, attorney's fees, and costs as provided by law.

**83. Punitive Damages Are Justified.** Defendants' conduct was malicious, fraudulent, and carried out with reckless disregard for the law. Defendant Shoffner knowingly acquired a business built on adjudicated trade secret theft, lied under oath in federal court to conceal the fraud, admitted to fraudulent conduct in a 2019 state consent order, and deliberately repeated the fraud against Plaintiff in 2024. CVB Inc. operated illegally in Texas while forfeited for over sixteen months and concealed this from dealers. This egregious, 15-year pattern of knowing wrongdoing justifies substantial punitive damages to punish Defendants and deter future conduct.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF SHERMAN ACT § 1

(Against All Defendants)

84.     Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

85.     Federal Antitrust Claims Are Not Subject to Arbitration. The Sherman Act creates federal statutory rights that involve public policy against restraints of trade. These rights cannot be waived or delegated to private arbitration. This claim must be heard by this Court.

86.     Defendants entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade or commerce among the several States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

87.     The conspiracy included: (a) exclusive dealing arrangements (mandatory purchasing from Sherwood Southwest for mattresses and CVB Inc./Malouf for accessories); (b) refusal to deal (enforced prohibition on alternative sourcing despite CVB Inc./Malouf's chronic inability to supply and illegal forfeited status); and (c) group boycott (the coordinated, retaliatory termination of West Creek Financial financing when Plaintiff left the system, which was effected by an MBA-linked representative after Plaintiff challenged the exclusive dealing arrangements).

88.     This conspiracy unreasonably restrained competition in: (a) the market for supplying mattresses and accessories to MBA-affiliated dealers; and (b) the downstream retail market for mattress sales to consumers.

89.     This restraint of trade is a per se violation of the Sherman Act because it involves horizontal and vertical agreements to foreclose competition, tie products, and impose group boycotts.

90.     In the alternative, this restraint is unreasonable under the rule of reason because it has no pro-competitive justification and causes substantial anticompetitive harm.

91.    As a direct and proximate result of this antitrust violation, Plaintiff suffered antitrust injury to his business and property, including foreclosed market access, supra-competitive pricing, inability to compete, and business destruction.

## COUNT II – VIOLATION OF SHERMAN ACT § 2

(Against All Defendants)

92.    Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

93.    Defendants, acting in concert, attempted to monopolize and/or conspired to monopolize trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

94.    Defendants possessed monopoly power or attempted to acquire monopoly power in the market for supplying mattresses and accessories to MBA-affiliated dealers.

95.    Defendants engaged in exclusionary conduct with the specific intent to monopolize, including exclusive dealing arrangements, refusal to deal, and coordinated retaliation against dealers who challenged the system.

96.    As a direct and proximate result, Plaintiff suffered antitrust injury.

## COUNT III – VIOLATION OF TEXAS FREE ENTERPRISE AND ANTITRUST ACT

(Against All Defendants)

97.    Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

98.    Defendants' conduct as described above constitutes a contract, combination, or conspiracy in restraint of trade or commerce in violation of the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.05.

99.    This conduct constitutes a per se violation of Texas antitrust law and, alternatively, an unreasonable restraint under the rule of reason with no pro-competitive justification.

100.    As a direct and proximate result, Plaintiff suffered injury to his business and property.

## COUNT IV – COMMON LAW FRAUD

(Against Defendant Shoffner)

101.    Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

102.    Personal Torts Committed by Individual Defendant. Defendant Shoffner is sued individually for his personal fraud, not as a representative of Mattress By Appointment LLC. An individual's tortious conduct is not shielded by arbitration clauses in contracts entered into by corporations he controls.

103.    Defendant Shoffner made material misrepresentations to Plaintiff, including but not limited to: (a) promising an "independent dealership" while intending to impose franchise-level control; (b) concealing the 2009 Ohio judgment establishing the playbook was stolen intellectual property; (c) concealing his knowing acquisition of stolen trade secrets; (d) concealing his 2015 federal court perjury (e) concealing the 2019 Washington Consent Order (Exhibit H) in which MBA agreed to cease and desist from violations of business opportunity fraud laws; (f) concealing the mandatory exclusive dealing requirements with Sherwood and CVB Inc./Malouf; (g) concealing CVB Inc./Malouf's forfeited status in Texas; (h) concealing his personal markup scheme on supplier products; and (i) misrepresenting the true costs and restrictions of the MBA dealer relationship.

103A. **Scheme to Defraud.** Alternatively, Defendant Shoffner engaged in a common plan, scheme, or course of conduct to defraud Plaintiff and other MBA dealers by concealing the illegal nature and true costs of the MBA system while extracting substantial upfront investments.

104.    Shoffner made these representations knowing they were false, or with reckless disregard for their truth.

105.    Shoffner made these representations with the intent to induce Plaintiff's reliance and to defraud Plaintiff into joining the MBA system.

106.    Plaintiff justifiably relied on these misrepresentations to his detriment.

107. As a direct and proximate result of Shoffner's fraud, Plaintiff suffered the damages alleged herein.

## COUNT V – FRAUD BY NONDISCLOSURE

(Against All Defendants)

108. Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

109. Defendants had a duty to disclose material facts to Plaintiff, including: (a) the 2009 Ohio judgment establishing the playbook was stolen; (b) Shoffner's knowing acquisition of stolen trade secrets; (c) Shoffner's 2015 federal court perjury; (d) the 2019 Washington Consent Order (Exhibit H) and its findings; (e) the mandatory exclusive dealing requirements; (f) CVB Inc./Malouf's forfeited status in Texas; (g) Shoffner's personal markup on supplier goods; and (h) the true nature of the dealer relationship as a controlled franchise rather than an independent business.

110. Defendants failed to disclose these material facts with intent to induce Plaintiff's reliance.

111. Plaintiff justifiably relied on Defendants' nondisclosure and suffered damages as a result.

## COUNT VI – CIVIL CONSPIRACY

(Against All Defendants)

112. Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

113. Defendants, with the specific intent to accomplish the unlawful objectives described herein (including fraud, restraint of trade, tortious interference, and unjust enrichment), agreed to and did commit overt acts in furtherance of the conspiracy.

114. Overt acts in furtherance of the conspiracy include: (a) implementing and enforcing the exclusive dealing arrangement with Sherwood; (b) implementing and enforcing the exclusive dealing arrangement with CVB Inc./Malouf despite its forfeited status; (c) refusing to allow alternative sourcing despite CVB Inc./Malouf's chronic inability to supply; (d) coordinating West

Creek Financial's retaliatory termination of Plaintiff's financing; (e) Shoffner's personal control over pricing and supplier access; (f) concealing the 2009 trade secret theft judgment from prospective dealers; (g) concealing Shoffner's 2015 perjury from prospective dealers; (h) concealing the 2019 Washington Consent Order and its findings from prospective dealers;

115. Defendants' acts were done with malice, intending to cause injury to Plaintiff and other similarly situated dealers.

116. As a direct result of this conspiracy, Plaintiff suffered damages.

## COUNT VII – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT

(Against All Defendants)

117. Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

118. Plaintiff was a "consumer" as defined by the DTPA, Tex. Bus. & Com. Code § 17.45(4), seeking goods and services for use in his business.

119. Defendants engaged in false, misleading, and deceptive acts or practices as defined by the DTPA, including: (a) misrepresenting the nature of the MBA dealer relationship; (b) failing to disclose material facts (2009 trade secret judgment, Shoffner's knowing acquisition, 2015 perjury, 2019 Washington Consent Order... (c) engaging in unconscionable conduct (enforcing exclusive dealing despite supplier inability to fulfill, operating while forfeited, retaliatory termination of financing).

120. Defendants' violations were committed knowingly and intentionally. Defendant Shoffner: (a) knowingly acquired stolen intellectual property in 2014; (b) lied under oath about it in 2015; (c) entered into a 2019 Consent Order agreeing to cease fraudulent business opportunity conduct; (d) deliberately repeated the identical conduct in 2024. CVB Inc./Malouf operated while forfeited for over sixteen months while concealing this status from dealers.

121. As a direct result, Plaintiff suffered economic damages and is entitled to treble damages under Tex. Bus. & Com. Code § 17.50(b)(1).

## COUNT VIII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

(Against All Defendants)

122.    Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

123.    Plaintiff had a reasonable probability of entering into beneficial business relationships with: (a) alternative mattress suppliers offering better pricing and quality; (b) alternative financing providers; and (c) customers requiring financing for purchases.

124.    Defendants willfully and intentionally interfered with these prospective relations through: (a) the exclusive dealing arrangements prohibiting alternative suppliers; (b) refusals to allow alternative sourcing despite supplier failures; and (c) the retaliatory cutoff of West Creek Financial financing despite the account being in Plaintiff's name.

125.    Defendants acted without justification or privilege.

126.    This interference proximately caused Plaintiff's damages, including lost business opportunities and business destruction.

## COUNT IX – UNJUST ENRICHMENT

(Against All Defendants)

127.    Plaintiff realleges and incorporates by reference **all preceding paragraphs** as if fully set forth herein.

128.    Defendants obtained benefits, monies, and profits under circumstances that make it inequitable for them to retain such benefits without paying for them.

129.    These benefits were conferred by Plaintiff and other similarly situated dealers as a direct result of Defendants' unlawful conduct, including: (a) Shoffner's receipt of upfront fees and ongoing markup profits; (b) Sherwood's receipt of guaranteed sales from captive dealers at supra-competitive prices; (c) CVB Inc./Malouf's maintenance of "approved supplier" status

despite chronic inability to supply and illegal forfeited operations; and (d) West Creek Financial's receipt of merchant fees from captive MBA dealer network.

130. It would be unjust for Defendants to retain these benefits obtained through fraud, conspiracy, restraint of trade, and illegal operations.

131. Plaintiff is entitled to disgorgement of Defendants' unjust profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JAMES DE LOS SANTOS prays for judgment against Defendants, jointly and severally, as follows:

A. For compensatory damages in an amount to be proven at trial, including but not limited to Plaintiff's sunk capital investment, destruction of business value and digital assets, lost profits, antitrust overcharges, and emotional distress;

B. For treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 15.21 of the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.21;

C. For treble damages for knowing violations of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.50(b)(1);

D. For punitive and exemplary damages;

E. For a declaratory judgment that any non-compete, non-solicitation, or confidentiality clause in any agreement between Plaintiff and any Defendant is void, unenforceable, and invalid as a product of fraud, illegality, and anticompetitive conduct;

F. For costs and reasonable attorney's fees as provided by the Clayton Act, the Texas Antitrust Act, the Texas DTPA, and other applicable law;

G. For pre-judgment and post-judgment interest at the highest lawful rate;

H. For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## EXHIBITS

The attached exhibits are offered not to enforce or interpret any contract, but to demonstrate a coordinated course of anticompetitive, deceptive, and retaliatory conduct undertaken in violation of independent federal and Texas statutory duties

**EXHIBIT A:** Text message exchange between Plaintiff and MBA representative "Coach Joe" showing explicit prohibition on sourcing from Amazon

**EXHIBIT B:** Email from Defendant Charles Edwin Shoffner to Plaintiff dated October 23, 2024, titled "Opening Order selections"

**EXHIBIT C:** Spreadsheet titled "Revised Opening Order_Sherwood.xlsx" attached to Exhibit B, showing opening order options containing only Sherwood and CVB Inc./Malouf products

**EXHIBIT D:** Washington State Consent Order signed by Defendant Charles Edwin Shoffner on December 23, 2019, admitting to violations of Washington's Business Opportunity Fraud Act

**EXHIBIT E:** Email exchange between Plaintiff and MBA Chief Sales Officer Keith Mackey dated March 5-7, 2025, showing Plaintiff's request for written clarification of exclusive dealing restrictions and MBA's refusal to answer in writing

**EXHIBIT F:** Shoffner's Contradictory Sworn Testimony – Official records from 2015 federal litigation showing multiple instances where C. Edwin Shoffner's sworn affidavit statements regarding corporate formation, operations, and asset transfers are inconsistent with contemporaneous Secretary of State filings and corporate documents.

**EXHIBIT G:** The 2009 Ohio judgment finding Darren Conrad liable for misappropriation of trade secrets and breach of non-compete agreements, and Conrad's subsequent 2015 affidavit detailing his use of the proprietary PMD system to establish competing ventures, including those later funded by Defendant Shoffner.

**EXHIBIT H:** Defendant Shoffner's sworn admission that he knew about the 2009 injunction against Darren Conrad for trade secret theft and personally funded Conrad's new company in 2011, proving willful continuation of an illicit business model.

**EXHIBIT I:** AAA Arbitration Secrecy Demand – Combined document showing: (1) The overly broad Confidentiality Order proposed by MBA, seeking to classify all arbitration information as secret; (2) The December 29, 2025 email from MBA counsel pressuring Plaintiff to agree to the order and a full arbitration schedule while jurisdictional challenges were pending; (3) The arbitrator's signed Confidentiality Acknowledgment form. This exhibit demonstrates Respondent's strategy to shroud these proceedings in secrecy.

**EXHIBIT J:** AAA Arbitration Orders Documenting Jurisdictional Challenge and Withdrawal – Combined document showing: (1) Order No. 3 (October 31, 2025) documenting Plaintiff's appearance "without waiver" and formal reservation of jurisdictional challenges; (2) Order No. 6 (January 5, 2026) documenting Plaintiff's statements of objection and subsequent departure from the proceedings. This exhibit proves Plaintiff has consistently contested the arbitral forum and did not voluntarily participate on the merits.

**EXHIBIT K: National Litigation Tracker** - National Litigation Tracker - Chart compiled from public court records showing Mattress By Appointment LLC filed 61 enforcement actions against dealers from 2014-2024, demonstrating a systematic practice of legal intimidation.

**EXHIBIT L: Bait-and-Switch Evidence** - Core Evidence of Fraudulent "Bait-and-Switch" Scheme – The internal price sheet used to fabricate "50-80% off" discounts, alongside contemporaneous text messages where an MBA coach explicitly describes the advertised $150 mattress as "bait" for upselling, proving the deceptive sales tactics at the heart of the business.

**EXHIBIT M: MBA's Texas Forum Hypocrisy** - EXHIBIT M: MBA's Texas Forum Hypocrisy - Official record from Mattress By Appointment LLC v. Jason Euler, Tarrant County, Texas, Case Filed March 8, 2024, showing MBA voluntarily invoked Texas jurisdiction to domesticate an arbitration award.

---

## VERIFICATION

I, James De Los Santos, declare under penalty of perjury under the laws of the United States that:

1. I am the Plaintiff in this action.

2. I have read the foregoing Verified Complaint.

3. The facts alleged in this Verified Complaint regarding my personal experiences, communications, and interactions with Defendants are true and correct based on my personal knowledge.

4. The facts alleged regarding the 2009 Ohio trade secret judgment, Darren Conrad's 2015 affidavit, and Shoffner's 2011 admission are based on official court records and sworn statements, copies of which are attached as exhibits.

5. The facts alleged regarding CVB Inc.'s forfeiture in Texas are based on official Texas Secretary of State records and Texas Comptroller documents.

6. The facts alleged regarding Shoffner's 2015 perjury are based on official federal court records and state corporate filings, copies of which are attached as exhibits.

7. The facts alleged regarding the conduct of other MBA dealers and the enterprise-wide nature of Defendants' exclusive dealing policies are stated on information and belief based on my communications with other dealers and my understanding of MBA's business practices, and I believe them to be true.

8. I am prepared to testify under oath at trial to all facts alleged herein based on my personal knowledge.

9. I have identified three former MBA dealers who are prepared to testify under oath to corroborate the exclusive dealing requirements, supplier restrictions, and threats of termination described in this Complaint.

10. If necessary to establish the systematic nature of Defendants' conduct, I am prepared to subpoena current MBA dealers, including those in their first year of operation, to testify under oath regarding the exclusive dealing policies and supplier restrictions imposed on all MBA dealers.

11. I understand that this Verification subjects me to penalties for perjury under federal and state law if any statement herein is false.

12. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of January, 2026, in Austin, Travis County, Texas.

JAMES DE LOS SANTOS

Plaintiff

NOTARIZATION

STATE OF TEXAS

COUNTY OF TRAVIS

Before me, the undersigned notary public, on this day personally appeared James De Los Santos, known to me to be the person whose name is subscribed to the foregoing Verification, and having been duly sworn, stated that the statements therein contained are true and correct.

Subscribed and sworn to before me this 14 day of Jan', 2026.

Notary Public, State of Texas

My Commission Expires: Feb 16 2026

[NOTARY SEAL]

MAHESH JOTWANI
My Notary ID # 133592833
Expires February 16, 2026

Respectfully submitted,

JAMES DE LOS SANTOS

Plaintiff, Pro Se

7801 N. Lamar Blvd., Ste. C71

Austin, TX 78752

(737) 775-6880

jmtexas3@gmail.com

# EXHIBIT A

**DESCRIPTION:** Screenshot of text message exchange between Plaintiff James De Los Santos and MBA "Coach Joe," dated January 2025.

**PURPOSE:** To demonstrate MBA's enforcement of exclusive dealing terms, wherein dealers are prohibited from purchasing necessary inventory (here, a bed frame) from third-party suppliers like Amazon, even when out of stock with MBA's approved vendor.

9:30



**Coach Joe ⟩**

I just sold my last Queen Highrise, what do I do now?

Can I order from Amazon?

No

What is y'all suggestion?

Order some extra box springs

I've only sold one set of box springs. I've only sold the high rises.

I push people towards them when I'm out

Just don't even mention the high-rise unless the customer says they need a frame sell your box springs at a discount when they buy it with a mattress

The way I do it is I sell my queen box springs for $150 but give them a $25 discount when they buy it as a set so I charge $125 extra for the box spring when purchased with a mattress

Text Message · SMS

# EXHIBIT B

**MBA'S MANDATORY, PRE-FILLED OPENING ORDER**

Source: Email from MBA Business Coach David Shoffner to Plaintiff James De Los Santos, dated October 23, 2024, with attached pre-filled opening order spreadsheet.

Contents:

1. Email: MBA coach transmits the mandatory opening order, stating "We will also edit the order depending on your credit card limits," confirming MBA's control over the selection and quantity of inventory.

2. Attachment ("Revised Opening Order_Sherwood.xlsx"): The attached spreadsheet, shown in PDF form here, is pre-filled by MBA with specific products and quantities a new dealer must order. All products are from MBA's approved vendors Sherwood and Malouf. No alternative suppliers are permitted.

Relevance: This exhibit establishes that from the outset, MBA unilaterally dictated Plaintiff's mandatory inventory purchase, controlling product selection, quantities, and suppliers—a key fact underlying claims of exclusive dealing, unfair restraint of trade, and franchise-like control.

 **Gmail**                              James De Los Santos <mbaaustin235005@gmail.com>

## Opening Order selections

**David Shoffner** <davidshoffner@mattressbyappointment.com>                    Wed, Oct 23, 2024 at 8:18 AM
To: James DeLos Santos <mbaaustin235005@gmail.com>

Good morning. There are a couple of options for your opening order. We can go through these on our first call.

Once selected you can place your order. Typically, the turnaround time is about 2 weeks. Being in Texas, could make that happen sooner since the plant closest to you is also in Texas.

We will also edit the order depending on your credit card limits. Please make sure your card companies know you are about to make a large purchase.

Talk with you soon!

► **David M. Shoffner**

► Business Coach

► **615.239.5644**

► https://calendly.com/davidshoffner

► www.mattressbyappointment.com

► davidshoffner@mattressbyappointment.com

(Please be advised all calls may be recorded and/or transcribed for training purposes)

**856 South Pleasantburg Drive**
**Greenville, SC 29607**

We are seeking individuals who are naturally motivated by success and recognize themselves as self-starters. We will provide all the tools necessary for you to be successful, but you must be willing to follow the business and marketing plan in order to have the best opportunity for similar results as our other owner/operators. Our company does not claim guaranteed income or results.

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

**Revised Opening Order_Sherwood.xlsx**
42K

# EXHIBIT C

ATTATCHMENT TO EXHIBIT B: MBA'S PRE-FILLED ORDER SPREADSHEET

Source: Converted PDF of the pre-filled Excel spreadsheet attachment ("Revised Opening Order_Sherwood.xlsx") sent by MBA Coach David Shoffner in the October 23, 2024 email (Exhibit B). (Converted to PDF for exhibit)

Contents: A clear, formatted view of the mandatory opening order pre-filled by MBA. The spreadsheet dictates the required minimum purchase amounts (Slot # min $2200 for mattresses, Malouf-min $1850 for accessories) and lists the specific products and quantities from MBA's approved vendors (Sherwood mattresses and Malouf bases/protectors) that a new dealer was required to purchase.

Relevance: This document provides the substantive detail of the mandatory, non-negotiable sourcing terms imposed by MBA. It proves Plaintiff's initial inventory investment was dictated by MBA, confined to its approved products at dictated price points and quantities, with no option to source comparable goods elsewhere—reinforcing claims of anti-competitive tying and exclusive dealing.

| 1st Order Slot # | Mattress Name | Cost | Qty. | Total |
|---|---|---|---|---|
| | min $2200 | | | |
| 1 | 4 Inch Foam Twin | 75 | 1 | 75 |
| | 4 Inch Foam Full | 90 | 1 | 90 |
| | 4 Inch Foam Queen | 105 | 1 | 105 |
| 2 | Palm ET Twin | 115 | 1 | 115 |
| | Palm ET Full | 149 | 1 | 149 |
| | Palm ET Queen | 172 | 1 | 172 |
| 3 | Hickory FmET Twin | 155 | 1 | 155 |
| | Hickory FmET Full | 197 | 1 | 197 |
| | Hickory FmET Queen | 227 | 1 | 227 |
| 4 | Cypress Pl ET Twin | 182 | 1 | 182 |
| | Cypress Pl ET Full | 233 | 1 | 233 |
| | Cypress Pl ET Queen | 266 | 2 | 532 |
| 5 | Maple SPT Full | 290 | 1 | 290 |
| | Maple SPT Queen | 336 | 2 | 672 |
| | Maple SPT King | 430 | 1 | 430 |
| 6 | Sycamore SPT Queen | 336 | 2 | 672 |
| | Sycamore SPT King | 430 | 1 | 430 |
| 7 | Dogwood Extra Firm Queen | 360 | 2 | 720 |
| | Dogwood Extra Firm King | 461 | 1 | 461 |
| 8 | Elm ET Queen | 446 | 2 | 892 |
| | Elm ET King | 579 | 1 | 579 |
| 9 | Spruce LxP Queen | 547 | 2 | 1094 |
| | Spruce LxP King | 735 | 1 | 735 |
| 10 | Angel Oak SPT Queen | 586 | 2 | 1172 |
| | Angel Oak SPT King | 758 | 1 | 758 |
| | Orthopedic 9" Twin Foundation | 68 | 2 | 136 |
| | Orthopedic 9" Full Foundation | 80 | 2 | 160 |
| | Orthopedic 9" Queen FDN | 85 | 10 | 850 |
| | Orthopedic 9" Twin XL FDN | 70 | 6 | 420 |
| | Orthopedic 5"LP Twin FDN | 68 | 1 | 68 |
| | Orthopedic 5"LP Full FDN | 80 | 1 | 80 |
| | Orthopedic 5"LP Queen FDN | 85 | 2 | 170 |
| | Orthopedic 5"LP Twin XL FDN | 70 | 2 | 140 |
| | Totals | | 58 | 13161 |
| | Malouf-min $1850 | | | |
| Best | Malouf HighRise LT Queen | 109.29 | 10 | 1092.9 |
| | Malouf HighRise LT King | 122.14 | 4 | 488.56 |
| | Tencel Smooth King-protector | 14.35 | 8 | 114.8 |
| | Tencel Smooth Queen | 12.82 | 16 | 205.12 |
| | Jersey Full-protector | 14.93 | 12 | 179.16 |
| | Jersey Twin | 12.21 | 12 | 146.52 |
| | | | 62 | 2227.06 |

**Grand Total with Best Option**                                    **15388.06**

# Exhibit D

**Washington Department of Financial Institutions**
**Consent Order No. S-17-2143-19-CO01 (2019)**

Official state enforcement action against Mattress By Appointment, LLC

Documented findings of deceptive business opportunity practices

Admissible as public record evidence under Fed. R. Evid. 803(8).

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**SECURITIES DIVISION**

| | |
|---|---|
| IN THE MATTER OF DETERMINING Whether there has been a violation of the Business Opportunity Fraud Act of Washington by: | Order No. S-17-2143-19-CO01 |
| | CONSENT ORDER |
| Mattress by Appointment, LLC, | |
| Respondent | |

## INTRODUCTION

Pursuant to the Business Opportunity Fraud Act of Washington, RCW 19.110, the Securities Division of the Department of Financial Institutions and Mattress by Appointment, LLC ("the Respondent") do hereby enter into this CONSENT ORDER in settlement of the matters alleged herein. Respondent neither admits nor denies the Findings of Fact and Conclusions of Law stated below.

## FINDINGS OF FACT

### I.  Respondent

1.    Mattress by Appointment, LLC, ("MBA") is a Florida limited liability company with a place of business at 10 Longview Terrace, Greenville SC  29605-1016. MBA is in the business of offering Mattress by Appointment dealerships that sell mattresses to the retail market. Edwin Charles Shoffner, a.k.a. Ed Shoffner, is the founder and governing member of MBA.

### II.    Nature of Offering

2.    MBA markets its mattress distributorships via the Internet through its website https://www.mattressbyappointment.com and other third party websites. The MBA website describes itself as a network of independent business owners. MBA offers prospective buyers the opportunity to start their own retail mattress business. MBA states that it provides the buyers with training, ongoing support and team

CONSENT ORDER

environment that has proven to make its opportunity one of the best in the nation. MBA represents that prospective buyers can earn $75,000 to $150,000 annually. MBA states that the nature of its opportunity provides its business owners a tremendous income and fast return on initial investment.

3.    In 2016, MBA offered and sold dealerships to at least seven Washington residents, most of whom, contacted it through the MBA website or a third party website such as www.FranchiseDirect.com. The residents did not own a retail mattress business at the time of their initial purchase of an MBA dealership. MBA represented to certain residents that they could earn $75,000 to $150,000 a year and that they could earn a fast return on their investment in the business. MBA offered the residents a territory that consisted of a fifteen mile radius from a store's location. MBA required the residents to lease a location that it had approved. MBA required some residents to pay a fee ranging from $99 to $299 to reserve a territory. MBA provided dealership buyers with a training manual, a daily action plan and a dealer checklist. MBA provided ongoing support to dealership buyers through conference calls. MBA sold several residents dealership territories. MBA sold one resident ("Resident") multiple MBA territories for a total of $598.

### III.    Disclosure Document

4.    MBA, in its offer and sale of dealerships, did not provide Washington residents with a disclosure document with material information regarding its dealership opportunity, such as information about litigation, information about dealership failures, and a current financial statement.

### IV.    Unlawful Acts

5.    MBA represented to Washington residents that they could earn $75,000 to $100,000 a year through an MBA dealership. MBA did not disclose the basis and assumptions for the projections to prospective buyers.

### V.    Registration Status

6.    Respondent MBA is not currently registered to sell MBA business opportunities in the state of Washington and have not previously been so registered.

CONSENT ORDER

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

2

Based upon the above Findings of Fact, the following Conclusions of Law are made:

## CONCLUSIONS OF LAW

### I.

The offer or sale of MBA dealership opportunities described above constitute the offer and/or sale of a business opportunity as defined in RCW 19.110.020(1) and RCW 19.110.030(1).

### II.

The offer or sale of said MBA dealership opportunities is in violation of RCW 19.110.050 because no registration for such offer and/or sale by Mattress by Appointment was on file with the Securities Administrator for certain time periods when offers and/or sales occurred.

### III.

The offer and/or sale of said business opportunities were in violation of RCW 19.110.070 because Respondent failed to provide purchasers with a disclosure document.

### IV.

The offer and/or sale of said business opportunities were in violation of RCW 19.110.120 because Respondent failed to provide offerees and purchasers with the basis and assumptions of earnings projections.

## CONSENT ORDER

Based upon the foregoing, IT IS AGREED AND ORDERED that Mattress by Appointment, LLC, its agents and employees, each shall cease and desist from offering or selling business opportunities in violation of RCW 19.110.050, the registration section of the Business Opportunity Fraud Act of the state of Washington.

IT IS FURTHER AGREED AND ORDERED that Respondent Mattress by Appointment, LLC, its agents and employees, each shall cease and desist from violating RCW 19.110.070, the disclosure section of the Business Opportunity Fraud Act of the state of Washington.

CONSENT ORDER

IT IS FURTHER AGREED AND ORDERED that Respondent Mattress by Appointment, LLC, its agents and employees, each shall cease and desist from violating RCW 19.110.120, the Unlawful Acts section of the Business Opportunity Fraud Act of the state of Washington.

IT IS FURTHER AGREED that the Securities Division has jurisdiction to enter this Order.

IT IS FURTHER AGREED that Respondent Mattress by Appointment, LLC, prior to the entry of this Consent Order, shall reimburse the Securities Division for the costs of the investigation in the amount of $5,000.

IT IS FURTHER AGREED that Respondent Mattress by Appointment, LLC enters into this Consent Order freely and voluntarily and with full understanding of its terms and significance.

IT IS FURTHER AGREED that, in consideration of the foregoing, Respondent waives its right to a hearing in this matter and judicial review of this order.

WILLFUL VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE.

SIGNED the __26th__ day of _____July_____ 2019.

Signed by:                                      Approved as to form:


_____/s/_____        _____
Mattress by Appointment, LLC By              Natalma M. McKnew, Attorney for Respondent
Edwin Charles Shoffner, Managing Member


SIGNED and ENTERED this ___5th___ day of _____August_____ 2019.


_____
William Beatty
Securities Administrator


CONSENT ORDER                                         DEPARTMENT OF FINANCIAL INSTITUTIONS
                                                                    Securities Division
                                                                    PO Box 9033
                                                                    Olympia, WA  98507-9033
                                                                    360-902-8760

4

Approved by:

_____
Suzanne Sarason
Chief of Enforcement

Reviewed by:

_____
Jack McClellan
Financial Legal Examiner Supervisor

Presented by:

_____/s/_____
Martin Cordell
Financial Legal Examiner

CONSENT ORDER

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA 98507-9033
360-902-8760

5

# EXHIBIT E

**BAD FAITH & REFUSAL TO CLARIFY CONTRACT TERMS IN WRITING**

**Source:** Email exchange between Plaintiff James De Los Santos and MBA Chief Sales Officer Keith Mackey (and others), dated March 5–7, 2025.

**Contents:** This exhibit documents Plaintiff's repeated, good-faith requests for written clarification of MBA's core operational policies—specifically, the minimum ordering requirements and exclusive sourcing restrictions—following a coach's threat to terminate his dealership.

MBA's senior leadership, through Mr. Mackey, explicitly refused to answer these critical questions in writing, directing Plaintiff instead to "refer to [his] agreement" and insisting on a phone call.

**Key Evidence of Bad Faith:**

- Plaintiff asks clear, reasonable questions about the rules governing his business and investment.

- MBA's executives refuse to provide written answers, creating deliberate ambiguity.

- This refusal follows a coach's threat to "take away [Plaintiff's] store" for not ordering— a threat MBA would not define in writing.

**Relevance:** This exchange proves MBA engages in deliberate opacity and unfair surprise. By refusing to confirm its own policies in writing, MBA retains the unilateral, unwritten power to interpret contract terms arbitrarily and threaten dealers with termination based on undefined standards. This conduct demonstrates bad faith, supports claims of unfair dealing and deceptive trade practices, and shows why arbitration would be fundamentally unfair in this context.

 **Gmail**                                            James De Los Santos <mbaaustin235005@gmail.com>

---

## Subject: Seeking Clarification & Offering Insights to Strengthen MBA's Business Model

---

**James De Los Santos** <mbaaustin235005@gmail.com>                    Wed, Mar 5, 2025 at 1:39 AM
To: David Shoffner <davidshoffner@mattressbyappointment.com>, Katie Hein <katiehein@mattressbyappointment.com>

**Dear David,**

I hope you are doing well sir; it has been some time since we have had a chat and I remember you stated if I ever needed you that I should reach out.  I am writing because **I am deeply invested in this business and its long-term success**—both for myself and for MBA. I have always succeeded in everything I have pursued, and I **fully intend to succeed here as well.**

However, as I continue to operate my dealership, I have encountered **some challenges and questions** that I wanted to bring directly to your attention. Rather than making assumptions, I wanted to ask for **clarification** and explore ways that we can work together to ensure that I—and other dealers—can be as successful as possible.

I appreciate the opportunity to be part of MBA and **hope this letter is taken in the constructive and forward-thinking spirit in which it is intended.**

---

### 1. My Investment & Vision for Growth

I have personally **invested $75,000 into this business.** While I understand that what MBA sees is only the **$30,000 in purchases,** I have made so far, my investment **goes far beyond just inventory.**

I chose to start this business **during the slow months,** fully aware that it would be a learning curve. I am **patient, strategic, and forward-thinking,** and I have big plans for how I will **scale this business.**

I have shared some of my vision with Katie, but I want to make sure you understand just **how committed I am**—because what I am working on will **revolutionize how MBA dealers do business.**

### The AI Project That Will Change MBA Forever

Remember I told you all I was bringing my brother along for the ride because he is a technical wizard, well he is in the process of developing **a fully automated AI-driven system** designed specifically for MBA dealers. **I am personally funding this project in the five-figure range,** and in just two weeks, we will launch the first **five AI-driven business tools**.

Imagine a system that takes all of **MBA's knowledge, strategies, and sales methods** and integrates them into:
- ☑ **A chatbot that handles customer inquiries and pre-qualifies leads**
- ☑ **A scheduling bot that automates appointments seamlessly**
- ☑ **An organizing assistant that tracks inventory, orders, and finances**
- ☑ **AI-driven marketing automation that maximizes ad spend ROI**
- ☑ **A system that increases sales conversion rates while reducing ad spend**

This isn't just for me. **Other dealers in Austin are already showing interest,** and I believe that once MBA sees what Anthony De Los Santos and his team have built, **this could become an essential tool for every**

**dealer nationwide.**

I am doing this **despite the challenges I have faced**—because I believe in the MBA brand.

## 2. Challenges with MBA's Business Model & Policies

### A. Joe's Threat & Lack of Mentorship

One of the reasons I have taken the time to review my contract thoroughly is **because of an interaction with Joe earlier this year.**

- **On a coach call in January, Joe threatened to take away my store simply because I had not placed an order that month.**

- **This was despite the fact that I had placed three orders in December, taking full advantage of MBA's specials.**

- After our call, **he sent me a text bragging about his own success in other businesses**, which I felt was unprofessional and unnecessary.

I know that all coach calls are recorded, and I encourage you to **listen to that call.**

**This incident made me realize that I needed to read my dealer agreement carefully** and fact-check certain policies. While I was able to move past this, I also believe that **MBA should take dealer mentorship seriously, as it directly impacts dealer success and retention.**

I want to be **very clear**—this is **not about Katie.** She has been **incredibly supportive, professional, and inspiring.** But **my experience with Joe made me question MBA's approach to dealer relations.**

### B. Exclusive Product Restrictions & Inventory Challenges

One of my biggest challenges has been the **limited product selection MBA allows me to order.**

- I have personally **had real buyers walk out**—not price shoppers, but real customers—because of the quality of the inventory available to me.

- I have requested **access to additional inventory options** but have been denied, despite having **plenty of funds available to invest.**

- I was able to **place a small order with Malouf** (8 inch all foam mattresses I priced at $300), and I sold **4 out of 6 mattresses quickly**—proving that **there is demand for products that aren't currently available to me.**

**If I had access to the full playbook of inventory options, I could significantly increase my sales and orders from MBA.**

Would MBA be open to:
☑ **Allowing dealers to select additional products that align with their market needs?**
☑ **Reevaluating the requirement that new dealers must hit a $50K threshold before unlocking better inventory options?**

## 3. Potential Legal Risks MBA May Wish to Review

I have also come across **several legal concerns** that MBA may wish to review internally.

☑ **FTC Franchise Laws** – MBA exerts **franchise-like control** over its dealers without providing a **Franchise Disclosure Document (FDD).** If MBA meets the **legal definition of a franchise**, there could be regulatory risks.

☑ **Texas Deceptive Trade Practices Act (DTPA)** – Limiting dealer product options **while marketing MBA as an independent opportunity** could raise concerns under this law.

☑ **Potential Restraint of Trade Laws** – Restricting independent dealers from selling non-MBA products **may** be considered an unfair trade restriction.

☑ **Unfair Business Practices** – If dealers **pay for their own advertising but MBA retains ownership of digital assets**, this could raise questions about fair business practices.

☑ **Possibly Illegal Non-Compete Enforcement** – If MBA requires **dealers to sign a lease but then prohibits them from using that location after leaving**, it could be seen as an unreasonable restriction.

☝ I wanted to share these concerns not as an accusation, but as something MBA may wish to review. Addressing these risks now could **help MBA avoid regulatory scrutiny and strengthen its dealer relationships.**

---

### 4. My Commitment to MBA & Request for Discussion

I am deeply invested **both financially and strategically** in MBA's success.

I would greatly appreciate the opportunity to:
☑ **Clarify MBA's policies around inventory selection, purchase requirements, and digital asset ownership.**
☑ **Understand MBA's perspective on the legal concerns outlined above.**
☑ **Work together to make MBA an even stronger, more competitive business model.**

Please let me know if you would be open to discussing these topics. I am committed to **making MBA as successful as possible** and look forward to working together to **maximize growth in 2025 and beyond.**

**Best regards,**
James De Los Santos

**P.S.** Please don't take this as frustration or an attempt to cause trouble—I have no intention of leaving MBA or jeopardizing my dealership in any way. I simply took the time to **read the contract carefully and leverage AI tools to analyze it**, which raised some concerns that I felt were worth discussing. **My goal is not to challenge MBA, but to better understand the reasoning behind these policies and explore ways I can maximize my potential within the system.** I truly believe that, if given more flexibility, I can take my business—and MBA's presence in Austin—to an entirely new level. I appreciate your time and look forward to your thoughts.

 Gmail                          James De Los Santos <mbaaustin235005@gmail.com>

## Response to Your Inquiry
4 messages

Keith Mackey <kmackey@mattressbyappointment.com>                Thu, Mar 6, 2025 at 3:40 PM
To: "MBAAustin235005@gmail.com" <MBAAustin235005@gmail.com>

Good afternoon James,

I hope this email finds you well. I have been closely following the ongoing discussions over the past few days and wanted to provide clarification and guidance regarding your requests, particularly in relation to your AI project.

Regarding your recent emails to our in-house counsel, Dave Shiroff, please note that he will not be responding. He asked me to convey to you that he acknowledges receipt of your email, as well as its content, but believes it would not serve the interests of MBA to engage in legal correspondence with you at this time.

Additionally, please note that while Mr. Shiroff does not participate in the selection/approval of authorized service providers, he did suggest that I refer you to two provisions in your MBA dealer agreement, that both forbid you from soliciting ANY MBA dealers with your AI products/services. Specifically, Sections 3.1 and 3.2 of the agreement provides that dealers may only use products and services from approved providers (in writing). Let me be very clear, MBA DOES NOT APPROVE of your AI products/services and you are NOT authorized to solicit any of our MBA dealers.

Moreover, in section 9.2 (v) of the dealer agreement you are prohibited from interfering in any way with the relationship between MBA and its dealers. Please consider this email as written notice that any attempt by you to offer any products or services, including any of your AI technologies to any MBA dealer, will be considered an interference with MBA's relationship.

With respect to your proposed suggestions and improvements to our program, Mattress by Appointment has successfully operated a well-established and proven business model for over 13 years. Our continued success is a direct result of ongoing adaptations and improvements where necessary. After careful review, we do not find that your email presents insights or recommendations warranting changes to our current methods, at this time. This includes your service-based AI software program proposal.

As this conversation has now been addressed among multiple individuals, we now consider the matter closed. Moving forward, any communication from our representatives will strictly focus on supporting the growth of your business within the structure of our existing business training and practices, specifically as outlined in our 8 Essentials Training program. We will not entertain further questions, concerns, or discussions regarding this subject or any other matters outside of the defined scope of our business operations.

To conclude, our goal remains to assist you in growing your business in alignment with our established business model. Any business initiatives or actions outside of our standard operating procedures should be managed independently within your location while ensuring compliance with the provisions and terms of your agreement.

Best Regards,

**Keith E. Mackey**
Chief Sales Officer
Email: kmackey@mattressbyappointment.com
Mobile: 615-701-8406

(Please be advised all calls may be recorded and/or transcribed for training purposes)

Calendly: Click to Schedule a Call
Web: www.mattressbyappointment.com

Careers: www.mattressbyappointmentcareers.com



**856 South Pleasantburg Drive**
**Greenville, SC 29607**

We are seeking individuals who are naturally motivated by success and recognize themselves as self-starters. We will provide all the tools necessary for you to be successful, but you must be willing to follow the business and marketing plan in order to have the best opportunity for similar results as our other owner/operators. Our company does not claim guaranteed income or results.

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

---

**James De Los Santos** <mbaaustin235005@gmail.com>                    Fri, Mar 7, 2025 at 3:41 AM
To: Keith Mackey <kmackey@mattressbyappointment.com>, dave@mattressbyappointment.com

### Subject: Seeking Clarification on Inventory, Ordering Requirements & Store Standing

**Dear Keith,**

I appreciate the time and effort you have put into addressing my concerns. I truly respect the success MBA has achieved and want nothing more than to **follow in that path and be a strong, successful dealer** within this organization. My intent has always been to **gain clarity** on MBA's business structure, expectations, and operational decisions that directly impact my ability to **compete effectively in my market.**

### Seeking Clarification on Inventory & Sales Strategy

I was not trying to challenge MBA's model but rather **expressing the reality of my specific market conditions.** In my area, there are **20 mattress stores within two miles of me.** I was merely trying to **find ways to compete and better serve customers** by requesting:

☑ **Better mattress options to retain real buyers**—I have had multiple customers walk out weekly due to product quality concerns.
☑ **Permission to temporarily source alternative accessories**—Malouf has been out of stock on essential items since I started in November.

☑ **A way to avoid losing customers due to incomplete packages**—I asked if I could **sell Amazon high-rises at cost, just to secure the mattress sale,** but was told no.

📌 **My only goal was to make MBA even stronger in the Austin area** by adapting to local competition while still operating under the MBA structure. I wasn't trying to challenge MBA's policies—just trying to survive and thrive.

## 2 Seeking Confirmation on My Store's Standing

I was particularly **concerned by Joe's statement in January** / February where he said I could **lose my store for not placing an order.** I was only a 2-3 months into my business at the time, and I had just placed multiple orders back-to-back in November and December. This statement took me by surprise, and it has remained **a lingering concern that directly affects my livelihood.**

Since MBA has decided not to respond to any legal questions, I understand and respect that. However, I kindly ask for **clarification on this one critical point:**

📌 **Can my store be taken away for not ordering regularly?**
📌 **If so, what are the expectations for order frequency and minimum order amounts?** (Monthly, bi-monthly, quarterly?)
📌 **Was Joe incorrect in saying that I could lose my store, or was this a company policy?**

These are **very straightforward questions** that directly affect my ability to **plan my finances and operate efficiently.** If there is an expectation for regular orders, I simply need to know what those expectations are so I can comply.

## 3 Confirmation on Inventory Restrictions

Additionally, I was also told **by both Joe and David via text** (which I have saved) that:

- **I cannot sell anything from Amazon or any other supplier in my store.**

- **I am limited to purchasing only MBA and Malouf products.**

📌 Is this **correct?** Because if so, I need to **urgently** address my lack of Malouf high-rises. **I have never had a Twin or Full in my store since day one.** I have been out of Queens for months, and **this is making it difficult to close bigger-ticket sales.**

📌 If I can only source high-rises through Malouf, but Malouf is out of stock, what options do I have?

I am **not trying to go against MBA in any way.** I am **fully committed to growing my store within MBA's model.** I just need **clarity on the rules** so I can focus on growth without uncertainty about my business standing.

I understand you have closed the discussion on broader concerns, but **this email is only asking for clarification on these key operational questions.** Please let me know where I stand.

**Best Regards,**

**James De Los Santos**

**P.S.**

I noticed that your last email primarily focused on my **AI project,** and I just wanted to clarify my intentions. I was **not** building this for my own financial benefit, nor was I trying to profit from MBA dealers. In fact, my plan was to offer this at **just $477**—a fraction of what dealers are currently spending on services like **Sell More Mattresses, Zeely, Pearl Diver, answering services, chatbots, and appointment setters, and**

Gmail - Response to Your Inquiry

**furthermore, my project when complete will what all those companies do in one.** If you don't believe my price point, you can ask the **Lakeway** and **Buda** stores—they were aware and eager to try, but as you wish, I will not be selling them anything.

This system would have **saved MBA dealers thousands of dollars per month** while offering a **more advanced, all-in-one solution** that integrates everything they already use. But no worries, if MBA doesn't see value in it, I'll **simply use it for other industries.** I already have a **law group, a real estate group, and an insurance company** waiting for the final product, and they see this as **a very valuable business and are interested in investing and helping it grow.**

I genuinely appreciate you even considering it. **Sorry for any confusion.  I promise, after this, you won't hear from me on anything again, I will just let the sales do the talking for myself.**

[Quoted text hidden]

---

**James De Los Santos** <mbaaustin235005@gmail.com>                    Wed, Jun 4, 2025 at 5:11 AM
To: "lvmappt@gmail.com" <lvmappt@gmail.com>

[Quoted text hidden]

---

**James De Los Santos** <mbaaustin235005@gmail.com>                    Wed, Jun 4, 2025 at 5:11 AM
To: "lvmappt@gmail.com" <lvmappt@gmail.com>

[Quoted text hidden]

10/25/25, 12:30 AM                    Gmail - Scheduling a Call to Discuss Training & Education Request

 Gmail                              James De Los Santos <mbaaustin235005@gmail.com>

## Scheduling a Call to Discuss Training & Education Request

**Keith Mackey** <kmackey@mattressbyappointment.com>                    Fri, Mar 7, 2025 at 11:45 AM
To: James De Los Santos <mbaaustin235005@gmail.com>, Katie Hein <katiehein@mattressbyappointment.com>, David
Shiroff <dave@mattressbyappointment.com>
Cc: Joe Ceres <joeceres@mattressbyappointment.com>

You corporate representatives, as stated, Katie and Joe are offering to work with you.


As for in writing, the terms of your agreement will detail your answers. Please refer to that. For you other
training and educational concerns, they are all in training sessions that have been developed.


It is certainly your option to get assistance for your coaching team. However, myself and David will be
disengaging at this point.


Thanks and have a great day!



**Keith E. Mackey**
Chief Sales Officer
Email: kmackey@mattressbyappointment.com
Mobile: 615-701-8406

(Please be advised all calls may be recorded and/or transcribed for training purposes)

Calendly:  **Click to Schedule a Call**
Web: www.mattressbyappointment.com

Careers: www.mattressbyappointmentcareers.com



**856 South Pleasantburg Drive**
**Greenville, SC 29607**


We are seeking individuals who are naturally motivated by success and recognize themselves as self-starters. We will provide all the tools necessary for you to be successful, but you must be willing to follow the business and marketing plan in order to have the best opportunity for similar results as our other owner/operators. Our company does not claim guaranteed income or results.

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

[Quoted text hidden]

 **Gmail**　　　　　　　　　　**James De Los Santos <mbaaustin235005@gmail.com>**

## Scheduling a Call to Discuss Training & Education Request

**Joe Ceres** <joeceres@mattressbyappointment.com>　　　　　　Fri, Mar 7, 2025 at 9:10 AM
To: James De Los Santos <mbaaustin235005@gmail.com>
Cc: Katie Hein <katiehein@mattressbyappointment.com>

Hi James,

I've received a copy of your request for training and education, and I'd love to set up a three-way call with you, myself, and Katie to go over everything in detail. I've copied Katie on this email for coordination.

During the call, we will address all your questions regarding:

- **Inventory management**
- **Sales strategy**
- **Store Standing**

Please let us know your availability, and we'll find a time that works for everyone. Looking forward to the conversation!

Best,


Joe Ceres
Development Coach
Email: joeceres@mattressbyappointment.com
Mobile: 252.382.0737
(Please be advised all calls may be recorded and/or transcribed for training purposes)
Calendly: https://calendly.com/joeceres-mattressbyappointment
Web: www.mattressbyappointment.com
Careers: www.mattressbyappointmentcareers.com

 Gmail

James De Los Santos <mbaaustin235005@gmail.com>

## Scheduling a Call to Discuss Training & Education Request

**James De Los Santos** <mbaaustin235005@gmail.com>                    Fri, Mar 7, 2025 at 9:22 AM
To: Joe Ceres <joeceres@mattressbyappointment.com>
Cc: Katie Hein <katiehein@mattressbyappointment.com>

Joe,

I'm requesting clarity from Corporate, I'll get back with you once they respond, thank you.


James
[Quoted text hidden]

 Gmail

James De Los Santos <mbaaustin235005@gmail.com>

## Scheduling a Call to Discuss Training & Education Request

**Katie Hein** <katiehein@mattressbyappointment.com>                           Fri, Mar 7, 2025 at 11:00 AM
To: James De Los Santos <mbaaustin235005@gmail.com>, Joe Ceres <joeceres@mattressbyappointment.com>

James,

I think it is best we schedule a call, and I will address all of your questions brought up in the email.

I am booked up all day today, Monday would be the earliest. I could do 1:30pm Central time if that works for both of you?


**Katie Hein**
Director of Dealer Development
Email: katiehein@mattressbyappointment.com
Mobile: 615-560-6385
(Please be advised all calls may be recorded and/or transcribed for training purposes)
Calendly: www.calendly.com/mattresslady
Web: www.mattressbyappointment.com
Careers: www.mattressbyappointmentcareers.com



**856 South Pleasantburg Drive
Greenville, SC 29607**

We are seeking individuals who are naturally motivated by success and recognize themselves as self-starters. We will provide all the tools necessary for you to be successful, but you must be willing to follow the business and marketing plan in order to have the best opportunity for similar results as our other owner/operators. Our company does not claim guaranteed income or results.

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

**From:** James De Los Santos <mbaaustin235005@gmail.com>
**Sent:** Friday, March 7, 2025 9:22 AM
**To:** Joe Ceres <joeceres@mattressbyappointment.com>
**Cc:** Katie Hein <katiehein@mattressbyappointment.com>
**Subject:** Re: Scheduling a Call to Discuss Training & Education Request

[Quoted text hidden]

 Gmail                                    James De Los Santos <mbaaustin235005@gmail.com>

## Scheduling a Call to Discuss Training & Education Request

**James De Los Santos** <mbaaustin235005@gmail.com>                        Fri, Mar 7, 2025 at 11:39 AM
To: Katie Hein <katiehein@mattressbyappointment.com>, dave@mattressbyappointment.com, Keith Mackey
<kmackey@mattressbyappointment.com>
Cc: Joe Ceres <joeceres@mattressbyappointment.com>

Katie,

I appreciate your sense of urgency in this matter but a call is something we can do later, I need in writing these details because as you know the threat of losing my store and my investment is on my mind therefore having this in writing will make me more confident in my next steps, plus I can program my ordering bot with the companies minimum ordering expectation as well as my maximum expectation based on a percentage of expected growth. I don't need strategy, I need clarity.

James De Los Santos
[Quoted text hidden]

1/11/26, 11:06 PM                           Gmail - Scheduling a Call to Discuss Training & Education Request

 Gmail                                    James De Los Santos <mbaaustin235005@gmail.com>

## Scheduling a Call to Discuss Training & Education Request

**Keith Mackey** <kmackey@mattressbyappointment.com>                     Fri, Mar 7, 2025 at 11:45 AM
To: James De Los Santos <mbaaustin235005@gmail.com>, Katie Hein <katiehein@mattressbyappointment.com>, David
Shiroff <dave@mattressbyappointment.com>
Cc: Joe Ceres <joeceres@mattressbyappointment.com>

You corporate representatives, as stated, Katie and Joe are offering to work with you.

As for in writing, the terms of your agreement will detail your answers. Please refer to that. For you other
training and educational concerns, they are all in training sessions that have been developed.

It is certainly your option to get assistance for your coaching team. However, myself and David will be
disengaging at this point.

Thanks and have a great day!

**Keith E. Mackey**
Chief Sales Officer
Email: kmackey@mattressbyappointment.com
Mobile: 615-701-8406

(Please be advised all calls may be recorded and/or transcribed for training purposes)

Calendly:  **Click to Schedule a Call**
Web: www.mattressbyappointment.com

Careers: www.mattressbyappointmentcareers.com



**856 South Pleasantburg Drive**
**Greenville, SC 29607**

We are seeking individuals who are naturally motivated by success and recognize themselves as self-starters. We will provide all the tools necessary for you to be successful, but you
must be willing to follow the business and marketing plan in order to have the best opportunity for similar results as our other owner/operators. Our company does not claim
guaranteed income or results.

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-
mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone.

[Quoted text hidden]

# EXHIBIT F

**PERJURY RECORD: C. EDWIN SHOFFNER**

*Retail Service Systems, Inc. v. Mattress By Appointment, LLC et al.*

S.D. Ohio Case No. 2:15-cv-02769

**Condensed Compilation – Original Source Documents Included**

**EXHIBIT F**

**PERJURY RECORD: C. EDWIN SHOFFNER**

*Retail Service Systems, Inc. v. Mattress By Appointment, LLC et al.*
S.D. Ohio Case No. 2:15-cv-02769
**Condensed Compilation – Original Source Documents Included**

**I. SUMMARY**

C. Edwin Shoffner submitted materially false sworn testimony to defeat personal jurisdiction in federal court.
Official corporate records contradict six specific sworn statements. Each contradiction is material. Each served
Shoffner's litigation strategy. The pattern is dispositive on credibility.

**II. CONTRADICTIONS**

| # | SWORN STATEMENT (¶) | OFFICIAL RECORD | SOURCE DOCUMENT |
|---|---|---|---|
| 1 | MBA(SC) formed "around" September 2014 ([13]1) | SC SOS: Entity organized August 29, 2014 | SC Corporate Filing – Page 8 |
| 2 | MBA(SC) "always non-operational" 2014-2015 ([13]5) | 17-page employment agreement for VP Operations, September 2014 | Employment Agreement – Pages 13–19 |
| 3 | "No money or assets transferred" FL→SC ([13]4) | FL LLC filed Certificate of Authority to transact business in SC, April 7, 2016 | FL Certificate of Authority – Page 10 |
| 4 | "Mattress By Appointment" not used until Dec 2013 ([12]7) | FL Articles of Amendment: Legal name change January 27, 2014 | FL Amendment Letter – Page 11 |

| # | SWORN STATEMENT (¶) | OFFICIAL RECORD | SOURCE DOCUMENT |
|---|---|---|---|
| 5 | Shoffner had "operational control" and knowledge of all filings | Darren Conrad executed name-change filing; Conrad's letter discusses strategy | Conrad Letter & Amendment – Pages 11–12 |
| 6 | Single SC entity for potential relocation | Two distinct SC LLCs: (1) MBA LLC 8/29/14; (2) MBA of Greenville LLC 1/8/15 | SC Corporate Filings – Pages 8–9 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RETAIL SERVICE SYSTEMS, INC.,      :

          **Plaintiff,**      :      CASE NO. 2:15-CV-02769

v.      :      **JUDGE SARGUS**

MATTRESS BY APPOINTMENT,      :      **MAGISTRATE JUDGE DEAVERS**
LLC, et al.,

                    :

          **Defendants.**

## SECOND AFFIDAVIT OF C. EDWIN SHOFFNER

BEFORE ME, the undersigned authority, personally appeared C. Edwin Shoffner who, after being first duly sworn, deposes and says:

1.    My name is C. Edwin Shoffner. I am over the age of twenty-one years, of sound mind, and I have never been convicted of a felony or crime of moral turpitude.

2.    I have personal knowledge of the matters set forth in this Affidavit and state as follows:

3.    I am a citizen of South Carolina. I reside at 10 Longview Terrace, Greenville, South Carolina, 29605.

4.    I am the President and C.E.O. of Mattress by Appointment, LLC, (referred to in Defendants' Motion to Dismiss as "MBA(FL)," and hereinafter "MBA(FL)II"), a Florida limited liability company with its principal place of business at 2817 Alaskan Way, Jacksonville, Florida.

5.    I am the President and C.E.O. of Mattress by Appointment, LLC, (hereinafter "MBA(SC)"), a South Carolina limited liability company.

6.    From April, 1997 until August, 2010, I was an officer for Park Place Corporation.



**EXHIBIT**

**E**

7.   Park Place Corporation is a manufacturer of mattresses.

8.   Upon information and belief, Power Marketing Direct ("PMD") is a retailer that sells mattresses to consumers.

9.   In 2009, after the Franklin County Court of Common Pleas entered an injunction against Darren Conrad, I, along with other officers of Park Place Corporation, spoke with Conrad and we advised him to fully comply with the terms of the injunction.

10.   On or around the time of this conversation with Darren Conrad in 2009, I offered Darren Conrad a job with Park Place Corporation as an independent-contractor, sales representative and he accepted the position.

11.   As a sales representative for Park Place Corporation, Conrad's job duties included managing a geographic territory and soliciting business from various mattress retailers within that territory in order to sell Park Place Corporation's mattresses at their retail locations.

12.   As a sales representative for Park Place Corporation, Conrad was compensated in accordance with a standard commission schedule.

13.   This standard commission schedule was no different than any other standard commission schedule used to compensate other Park Place Corporation sales representatives at the time.

14.   In 2011, I loaned Darren Conrad money to create Carolina Bedding Direct, LLC (hereinafter "Carolina Bedding (NC)").

15.   At the time I loaned Darren Conrad money to create Carolina Bedding (NC) in 2011, the terms and conditions of the Franklin County Common Pleas Court's 15-month permanent injunction against Darren Conrad had expired.

16. At the time I loaned Darren Conrad money to create Carolina Bedding (NC) in 2011, I had no ownership or managing interest in Carolina Bedding (NC).

17. In 2012, Darren Conrad relocated Carolina Bedding (NC) to Jacksonville, Florida.

18. Upon information and belief, in 2012, after Darren Conrad relocated Carolina Bedding (NC) to Jacksonville, Florida, he dissolved Carolina Bedding (NC) and created Carolina Bedding Direct, LLC (hereinafter "Carolina Bedding (FL)").

19. In approximately June or July of 2012, Darren Conrad and his Certified Public Accountant, Ed Williams, approached me seeking a second loan to rescue Carolina Bedding (FL) from insolvency (hereinafter "the second loan").

20. In approximately June or July of 2012, Darren Conrad, Ed Williams, and I agreed that I would provide Carolina Bedding (FL) a second loan in exchange for 45% of the company's shares and operational control of Carolina Bedding (FL).

21. At all times prior to the time of the second loan, I had no ownership or managing interest in Carolina Bedding (FL).

22. At the time of the completion of the second loan, in March of 2013, I became the 45% shareholder of Carolina Bedding (FL).

23. I required 45% operational control of Carolina Bedding (FL) as a condition of the 2012 loan so that I could operate Carolina Bedding (FL) in a manner that I believed would ensure that the company would not again face insolvency.

24. Additionally, in exchange for the second loan, Conrad also agreed to rename the company from Carolina Bedding Direct, LLC to Carolina Bedding Direct, LLC d/b/a Mattress By Appointment.

3

25.    I wanted the company name to be changed from Carolina Bedding Direct, LLC to Carolina Bedding Direct, LLC d/b/a Mattress By Appointment so that the company name would not have a regional connotation attached to it.

26.    Shawn McAllister was not tasked to build the Mattress By Appointment website until the second quarter of 2013.

27.    Mattress By Appointment was not used as a trade name until December of 2013.

28.    MBA(FL)II was formed on or about February 2014.

29.    At the time of the creation of MBA(FL)II, I owned 45% of the company's shares and Darren Conrad owned 55% of the shares.

30.    In September of 2014 I acquired Darren Conrad's 55% ownership of MBA(FL)II after Conrad filed for personal bankruptcy. As a result, I became the sole owner of MBA(FL)II.

31.    Around the time I became the sole owner of MBA(FL)II, in September 2014, I also created MBA(SC).

32.    I created MBA(SC) because my future goal is to relocate the company to my home state of South Carolina.

33.    To date, however, I have not transferred MBA(FL)II to MBA(SC).

34.    From the date of the creation of MBA(SC) in 2014 to the present, no money or assets have been transferred from MBA(FL)II to MBA(SC).

35.    From the date of the creation of MBA(SC) in 2014 to the present, MBA(SC) has always been a non-operational limited liability company.

36.    The employment agreement attached as Exhibit 10 to Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss is a hypothetical employment agreement, drafted

after I engaged in informal discussions with Kyle Sherratt about potential employment with MBA(SC), in order to memorialize the terms of the hypothetical employment agreement.

37.     The employment agreement was never finalized or signed by myself or Kyle Sherratt.

38.     At no time has Kyle Sherratt ever been an employee of MBA(SC).

39.     During all of my business dealings with Darren Conrad, he has always maintained that he created his own "playbook," from his own ideas, stemming from his time working at Vector Marketing.

40.     Nick Lyle was an independent, owner-operator dealer who owned and operated his own mattress retail store.

41.     Michael Wolfe is/was an independent, owner-operator dealer who owns/owned and operates/operated his own mattress retail store.

42.     At no time have Nick Lyle or Michael Wolfe ever been employed by MBA(FL)II or MBA(SC).

**FURTHER AFFIANT SAYETH NOT.**

_____
C. Edwin Shoffner

STATE OF South Carolina )
                                        )
COUNTY OF Greenville )

Before me, the undersigned, a Notary Public in and for said County and State, personally appeared C. Edwin Shoffner, known to me to be the person whose name is subscribed to the foregoing Affidavit and who at the time appeared and acknowledged that he signed this Affidavit of his voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this _____ day of November, 2015.

_____
Notary Public in and for the
State of South Carolina

LISA R. WILSON
Notary Public, State of South Carolina
My Commission Expires 6/28/2022

5

South Carolina Secretary of State

# Business Entities Online

File, Search, and Retrieve Documents Electronically

---

## MATTRESS BY APPOINTMENT, LLC

### Corporate Information

**Entity Id:** 00543927

**Entity Type:** Limited Liability Company

**Status:** Dissolved

**Domestic/Foreign:** Domestic

**Incorporated State:** South Carolina

### Important Dates

**Effective Date:** 08/29/2014

**Expiration Date:** N/A

**Term End Date:** 12/31/2064

**Dissolved Date:** 07/14/2021

### Registered Agent

**Agent:** EDWIN SHOFFNER

**Address:** 10 LONGVIEW TERRACE
GREENVILLE, South Carolina   29605

### Official Documents On File

| Filing Type | Filing Date |
| --- | --- |
| Articles of Termination | 07/14/2021 |
| Organization | 08/29/2014 |

---

For filing questions please contact us at **803-734-2158**

Copyright © 2025 State of South Carolina

South Carolina Secretary of State

# Business Entities Online

File, Search, and Retrieve Documents Electronically

---

# MATTRESS BY APPOINTMENT OF GREENVILLE LLC

## Corporate Information

**Entity Id:** 00531135

**Entity Type:** Limited Liability Company

**Status:** Dissolved

**Domestic/Foreign:** Domestic

**Incorporated State:** South Carolina

## Important Dates

**Effective Date:** 01/08/2015

**Expiration Date:** N/A

**Term End Date:** N/A

**Dissolved Date:** 10/06/2020

## Registered Agent

**Agent:** CHARLES EDWIN SHOFFNER

**Address:** 1310 GARLINGTON ROAD SUITES C AND D
GREENVILLE, South Carolina   29615

## Official Documents On File

| Filing Type | Filing Date |
| --- | --- |
| Articles of Termination | 10/06/2020 |
| Organization | 01/08/2015 |

---

For filing questions please contact us at **803-734-2158**

Copyright © 2025 State of South Carolina

South Carolina Secretary of State

# Business Entities Online

File, Search, and Retrieve Documents Electronically

## MATTRESS BY APPOINTMENT, LLC

Fictitious Name **MATTRESS BY APPOINTMENT FLORIDA, LLC**

### Corporate Information

**Entity Id:** 00477533

**Entity Type:** Limited Liability Company

**Status:** Good Standing

**Domestic/Foreign:** Foreign

**Incorporated State:** Florida

### Important Dates

**Effective Date:** 04/07/2016

**Expiration Date:** N/A

**Term End Date:** N/A

**Dissolved Date:** N/A

### Registered Agent

**Agent:** C. Edwin Shoffner

**Address:** 856 S Pleasantburg Drive
Greenville, South Carolina   29607

### Official Documents On File

| Filing Type | Filing Date |
|---|---|
| Notice of Change of Designated Office, Agent or Address of Registered Agent | 07/09/2021 |
| Notice of Change of Designated Office, Agent or Address of Registered Agent | 11/28/2017 |
| Fictitious Name | 04/07/2016 |
| Authority | 04/07/2016 |

For filing questions please contact us at **803-734-2158**                    Copyright © 2025 State of South Carolina

January 27. 2014

Registration Section
Division of Corporations
PO Box 6327
Tallahassee, FL 32314

To Whom It May Concern:

Enclosed with this letter is the articles of amendment for Carolina Bedding Direct, LLC to change the name to Mattress by Appointment, LLC. Currently there exists an active LLC with that exact name which is owned by the same owner as Carolina Bedding Direct. LLC. This letter is to clear up any confusion that might result with this filing. The LLC that is currently named Mattress by Appointment, LLC is not currently being used for any business purpose and is going to be let go by not filing the annual report so the entity will be dissolved by the department of revenue.

Feel free to contact me at my office at 904-222-0204 ext. 307 if there are any questions.

Sincerely,

Darren Conrad, Owner

# ARTICLES OF AMENDMENT
## TO
## ARTICLES OF ORGANIZATION
## OF

### CAROLINA BEDDING DIRECT LLC

(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on 04/11/2012 and assigned
Florida document number L12000049325 .

This amendment is submitted to amend the following:

**A. If amending name, enter the new name of the limited liability company here:**

### MATTRESS BY APPOINTMENT LLC

The new name must be distinguishable and end with the words "Limited Liability Company." the designation "LLC" or the abbreviation "L.L.C."

**Enter new principal offices address, if applicable:**     324 6TH AVENUE NORTH

*(Principal office address MUST BE A STREET ADDRESS)*     JACKSONVILLE BEACH, FL 32250

**Enter new mailing address, if applicable:**

*(Mailing address MAY BE A POST OFFICE BOX)*

**B.  If amending the registered agent and/or registered office address on our records, enter the name of the new registered agent and/or the new registered office address here:**

Name of New Registered Agent:     CONRAD, DARREN B

New Registered Office Address:     324 6TH AVENUE NORTH

*Enter Florida street address*

JACKSONVILLE BEACH , Florida 32250

*City*                                        *Zip Code*

**New Registered Agent's Signature, if changing Registered Agent:**

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

If Changing Registered Agent, **Signature of New Registered Agent**

Page 1 of 3

EXHIBIT

___A___

<u>THIS AGREEMENT IS SUBJECT TO ARBITRATION PURSUANT TO S.C. CODE SECTION 15-48-10
UNLESS THE UNITED STATES ARBITRATION ACT APPLIES</u>

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of September 15, 2014 (the "Effective Date") by and between Kyle Sherratt, an individual (the "Employee"), and Mattress By Appointment, LLC, a South Carolina limited liability company (the "Company").

WHEREAS, Employee had been performing work with Company as an independent contractor;

WHEREAS, Company now desires to enter into an employment relationship with Employee by adopting the terms and conditions set forth herein, with an anticipated start date of September 15, 2014; and

WHEREAS, Employee has agreed to accept such employment upon the terms and conditions as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Position</u>. Subject to the terms and conditions of this Agreement, the Company hereby employs the Employee and Employee hereby accepts such employment as Vice President, Operations or some equivalent title as bestowed upon the Employee by the Company.

2. <u>Duties</u>. During his employment with the Company, Employee shall perform the duties set forth on **Exhibit A**, and other tasks set forth by President/CEO or the Company from time to time. Employee agrees that during his employment with the Company, he will devote his full-time attention and energies to the diligent performance of his duties. Employee agrees to abide by all by-laws, policies, practices, procedures, or rules of the Company.

3. <u>Employment At-Will</u>. EMPLOYEE'S EMPLOYMENT WITH THE COMPANY SHALL BE AT-WILL AND MAY BE TERMINATED BY COMPANY OR BY THE EMPLOYEE AT ANY TIME, FOR ANY OR NO REASON, WITH OR WITHOUT NOTICE.

4. <u>Definitions</u>.

   4.1.    "Cause" shall mean:
   i.      fraud;
   ii.     embezzlement;
   iii.    conviction of the Employee of any felony while in the employ of the Company;
   iv.     a material breach of, or the willful failure or refusal by the Employee to perform and discharge the Employee's duties, responsibilities and obligations under, this Agreement or any other agreement entered into by Employee and the Company, as determined by the Company in its reasonable judgment, or the repeated failure of the Employee to follow (or insubordination concerning) reasonable directives and performance standards established by the Company;

Employee Initial _____

v.   any act of moral turpitude or willful misconduct or misappropriation by the Employee which is intended to result in personal enrichment of the Employee at the expense of the Company, or any of its affiliates, or which has a material adverse impact on the business or reputation of the Company (such determination to be made by the Company in its reasonable judgment);

vi.   intentional material damage to the property or business of the Company;

vii.   a material breach of this Agreement by Employee, and such breach is not cured within 30 days after written notice of such breach is given by Company to Employee;

viii.   death of the Employee;

ix.   the insolvency or bankruptcy of the Company or the discontinuation of Company's business for any reason; or

x.   Employee is unable or unwilling to perform the essential functions of his job, with or without reasonable accommodation.

4.2.   "Termination Date" is the date Employee's employment with the Company is terminated.

4.3.   "Unique Monthly Ordering Dealers" shall be defined as unique/different dealers (i.e., dealers who are not currently ordering from the Company as of the Effective Date) who regularly place mattress orders from the Company during a specific monthly period. For the purposes of incentives set forth in this Agreement, the Company is deemed to have a total of 60 monthly ordering dealers, meaning that incentives will kick in once the Company obtains 20 additional Unique Monthly Ordering Dealers (or a total of 80 monthly ordering dealers).

4.4.   "Gross Sales" shall be defined as the total amount of purchases (sales) from the Company by Unique Monthly Ordering Dealers.

5.   Compensation and Benefits. In consideration of Employee's services and covenants hereunder, Company shall pay to Employee the compensation and benefits described below:

5.1.   Monthly Compensation. On a monthly basis, Employee will receive the greater of his Base Salary or the Gross Sale Bonus.

5.1.1.   Base Salary. The Base Salary will be $6,000 per month (or $72,000 per year).

5.1.2.   Gross Sale Bonus. The Gross Sale Bonus shall be an a percentage of monthly Gross Sales as set forth below:

5.1.2.1. For monthly Gross Sales, an amount equal to 3% of monthly Gross Sales.

5.1.2.2. The Gross Sale Bonus, if applicable, is deemed to be earned at the end of the month in question and is due and payable on the next regularly scheduled paydate, which shall be no later than the 5th of each month, as part of the normal compensation and payroll practices of the Company.

5.2.   Incentive Pay. Employee is eligible for Incentive Pay of Five Thousand Dollars ($5,000.00) for each plateau of 20 Unique Monthly Ordering Dealers. The Incentive Pay shall be deemed to be earned upon the Company's receipt of the 20th Unique Monthly Ordering Dealer and due and payable on the next regularly scheduled paydate as part of the normal compensation and payroll practices of the Company. The Incentive Pay shall be earned and due only if Employee is employed in good standing with the Company when the Incentive Pay is earned. By way of example only, Employee will earn $5000 when Company obtains 80 monthly ordering dealers (20 Unique Monthly Ordering Dealers), and another $5000 when Company obtains 100 monthly ordering dealers (40 Unique Monthly Ordering Dealers).

Employee Initial _____

5.3. Benefits. Employee acknowledges that the Company currently provides no group pension or welfare benefit plans for its employees, including any medical, dental, prescription, or life insurance plans.

5.4. Other Policies.  Employee shall be subject to Company's policies for other matters as shall be applicable to similarly situated employees.

5.5. Payments.  All payments and compensation made hereunder shall be paid in accordance with the normal compensation practices of the Company and shall be subject to such deductions and withholdings as are authorized by the Employee or required by law or policies of the Company in effect from time to time.  Employee acknowledges that Employee is responsible for any and all taxes that may be due as a result of payments made herein and authorizes the Company to make any required deductions or withholdings as required for any W-2 employee.

5.6. Paid Leave.  Employee shall be entitled to paid time off ("PTO") of not more than twenty-eight (28) days per calendar year.  For any calendar year in which the Employee is not employed for the full 12 months, Employee is entitled only to a pro rata share of this annual PTO. The Employee shall schedule such PTO with the reasonable consent of the Company.  PTO cannot be carried over from year to year, and any PTO time accrued but unused by the end of the calendar year is forfeited and will not otherwise entitle Employee to additional PTO or other compensation. Upon termination of employment, for any or no reason, any accrued yet unused PTO will not be paid out to the Employee.

5.7. Other Business Expenses. Employee shall be reimbursed for legitimate and reasonable expenses incurred in the performance of Employee's duties under this Agreement.  Employee shall follow the procedures in place from time to time regarding expense reimbursement set forth by the Company. Expenses associated with travel using Employee's personal car shall be reimbursed at the current IRS stated rate.  All expenses must be supported with receipts, which shall be submitted along with each expense statement.  All reimbursement requests shall be submitted on an expense statement or other format established by the Company for review and approval.

5.8. Offset. The Company, in its sole discretion, may offset any sum due from Employee to the Company (at the end of the term of this Agreement or otherwise) against any amount which would otherwise be due to the Employee to the maximum extent permitted by law.  Such offset may include, but is not limited to, sums for theft, breakage, overpayment of any bonus, any loan, advances, or monies owed to the Company (including but not limited to the loss of or failure to return Company property and any other similar loss). The sources against which such offset may be made include, without limitation, wages, bonus, paychecks, and expense or other reimbursements.

6. Pay following Termination.

 6.1. Except as otherwise expressly provided in this Agreement, upon the Termination Date, Employee's right to receive salary and all benefits and incidents of employment hereunder shall cease, provided that Employee shall remain entitled to any compensation earned, as set forth in this Agreement, prior to the Termination Date.

 6.2. If and only if Company terminates Employee's employment without Cause:

  6.2.1. Company shall pay Employee one month's Base Salary.

Employee Initial _____

6.2.2.  Company shall pay Employee an additional one month's Base Salary for each plateau of 20 Unique Monthly Ordering Dealers.

6.2.3.  The payments under this Section 6.2 shall be called Termination Pay.  Company shall not be liable for and the Employee shall not be entitled to the Termination Pay under any other circumstance except as set forth in this Section 6.2.  Prior to and as a condition to receiving any Termination Pay, Employee agrees to (i) execute a general and complete release of any and all claims between Employee and Company in a form to be presented to Employee by Company at or near the Termination Date; (ii) affirm that Employee has returned all property belonging to Company; and (iii) reaffirm Employee's commitment to keep confidential any trade secrets or proprietary information belonging to Company and to abide by restrictive covenants set forth in the attachment to this Agreement.

7.  Non-Disclosure, Non-Competition, Non-Solicitation and Intellectual Property Assignment. Employee agrees to read, be bound by, and be subject to the obligations, covenants, and agreements set forth in the Company's Employee Non-Disclosure, Non-Competition, Non-Solicitation and Intellectual Property Assignment Agreement (attached hereto as **Exhibit B**), and agrees that Company agrees to the consideration and employment herein on condition of Employee's consent to the obligations, covenants, and agreements set forth in **Exhibit B**.

8.  Assignment. The parties acknowledge that this Agreement has been entered into due to, among other things, the special skills of Employee, and agree that Employee may not assign any of Employee's rights or delegate any of Employee's duties or obligations under this Agreement. The rights and obligations of Company under this Agreement shall inure to the benefit of and shall be binding upon the Company and its successors and assigns.

9.  Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given when received if delivered personally; deemed to have been duly given if sent by email with a copy sent by first-class mail; the next business day if sent for next business day delivery by a nationally recognized overnight courier service; or upon actual receipt of the notice.

10. Provisions Severable. If any provision or covenant, or any part thereof, of this Agreement should be held by any court to be invalid, illegal or unenforceable, either in whole or in part, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remaining provisions or covenants, or any part thereof, of this Agreement, all of which shall remain in full force and effect.  The parties in no way intend to include a provision that contravenes public policy.  Therefore, if any provision of this Agreement is unlawful, against public policy, or otherwise declared void or unenforceable, such provision shall be deemed excluded from this Agreement, which shall in all other respects remain in effect.

11. Waiver. Failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition. No waiver shall be valid unless in writing signed by the party sought to be bound.

12. Amendments and Modifications. This Agreement may be amended or modified only by a writing signed by all parties hereto. The parties hereby agree that this Agreement contains the entire agreement and understanding by and between the parties with respect to Employee's employment, and no representations, promises, agreements, or understandings, written or oral, relating to the employment of the Employee by the

Employee Initial _____

Company not contained herein shall be of any force or effect.

13. <u>No Strict Construction.</u>  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement, this Agreement shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

14. <u>Governing Law</u>. The validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of South Carolina, without giving effect to South Carolina's rules of conflicts law, and regardless of the place or places of its physical execution or performance.

15. <u>Successor Company</u>.  The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the Company and its successors and assigns.

16. <u>Captions</u>. The captions contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one instrument.

18. <u>Dispute Resolution.</u>
  18.1.   <u>Mediation.</u> If a legal claim (other than those excepted below) arises out of or in any way relates to this Agreement or Employee's employment or Employee's relationship with the Company, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation before resorting to arbitration, litigation, or some other formal dispute resolution procedure. Any such dispute shall be submitted to a mediator selected by mutual agreement of the parties. Unless the parties agree to an alternative arrangement, the mediator's fee and expenses shall be equally divided between the parties.

  18.2.   <u>Arbitration.</u> Should any legal claim (other than those excepted below) arising out of or in any way relating to this Agreement or Employee's employment or the termination of Employee's employment not be resolved by negotiation or mediation, it shall be subject to binding and final arbitration in Greenville County, South Carolina, pursuant to the Commercial Arbitration Rules of the American Arbitration Association, the cost of which shall be equally shared between the parties. Unless otherwise provided herein, the arbitration shall be conducted by a single arbitrator in accordance with the Employment Arbitration Rules and Mediation Procedures published by the American Arbitration Association. The arbitration shall be conducted in Greenville, South Carolina. If the arbitrator selected as set forth herein determines that this location constitutes a significant hardship on the Employee and constitutes an impermissible barrier to Employee's efforts to enforce Employee's statutory or contractual rights, such arbitration may be conducted in some other place determined to be reasonable by the arbitrator. The arbitrator shall be selected by mutual agreement of the parties. If the parties cannot agree on an arbitrator within thirty (30) days after written request for arbitration is made by one party to the controversy, a neutral arbitrator shall be appointed according to the procedures set forth in the American Arbitration Association Employment Arbitration Rules and Mediation Procedures. In rendering the award, the arbitrator shall have the authority to resolve only the legal dispute between the parties, shall not have the authority to abridge or enlarge substantive rights or remedies available under existing law, and shall determine the rights

Employee Initial _____

and obligations of the parties according to the substantive and procedural laws of South Carolina. In addition, the arbitrator's decision and award shall be in writing and signed by the arbitrator, and accompanied by a concise written explanation of the basis of the award. The award rendered by the arbitrator shall be final and binding, and judgment on the award may be entered in any court having jurisdiction thereof. The arbitrator is authorized to award any party a sum deemed proper for the time, expense, and trouble of arbitration, including arbitration fees and attorneys' fees.

18.3.    Types of Claims. All legal claims brought by Employee against Company related to this Agreement, the employment relationship, terms and conditions of employment, and/or termination from employment are subject to this dispute resolution procedure. These include, by way of example and without limitation, any legal claims based on alleged discrimination or retaliation on the basis of race, sex (including sexual harassment), religion, national origin, age or disability, whether based on state or federal law; payment of wages or commissions; workers' compensation retaliation; defamation; invasion of privacy; infliction of emotional distress and/or breach of an express or implied contract. The above terms notwithstanding, any legal claim brought by Employee or Company for or relating to workers' compensation, unemployment compensation benefits, breach, violation or misappropriation of Company's trade secrets, provisions of any confidentiality agreements or noncompete agreements or other restrictive covenants, and claims alleging status or membership with regard to any employment benefit plan governed by the Employee Retirement Income Security Act, and/or charges filed with the National Labor Relations Board, U.S. Department of Labor, or Equal Employment Opportunity Commission are not subject to this dispute resolution procedure.

18.4.    Class Action. Employee expressly agrees not to commence or file any class action, including any class arbitration against Company, or serve in any representative capacity in any class action, including class arbitration, against or involving the Company.

Employee Initial _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

Witness                                    EMPLOYEE – Kyle Sherratt


_____                    _____

                                           Address: 12 Quaker Lane
                                                    Swansea, Massachusetts 02777

                                           Mattress By Appointment, LLC

_____              By:   _____
                                           Edwin Shoffner
                                     Its:  President/CEO
                                     Address: PO Box 8560
                                              Greenville, South Carolina 29604-8560

Employee Initial _____

EXHIBIT

10

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| RETAIL SERVICE SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  2:15-CV-02769 |
| | ) | |
| v. | ) | |
| | ) | |
| MATTRESS BY APPOINTMENT, LLC, | ) | Judge Sargus |
| et al., | ) | |
| | ) | Magistrate Deavers |
| Defendants. | ) | |
| | ) | |

### AFFIDAVIT OF KYLE SHERRATT

Kyle Sherratt, after being duly sworn states as follows:

1. I was formerly employed by Mattress By Appointment, LLC, a Florida limited liability company.

2. In September 2014, I received an employment agreement ("Employment Agreement") from Edwin Shoffner related to a prospective employment relationship with Mattress By Appointment, LLC, a South Carolina limited liability company.

3. A true and accurate copy of the Employment Agreement is attached to this affidavit as Exhibit A.

FURTHER AFFIANT SAYETH NOT.

## DECLARATION OF JAMES DE LOS SANTOS

My name is James De Los Santos. I am over eighteen years of age, of sound mind, and competent to make this declaration. I have personal knowledge of the facts stated herein and they are true and correct.

**1. Compilation of Exhibit A.** I personally compiled Exhibit A, entitled **"Perjury Record: C. Edwin Shoffner,"** by condensing the original federal court exhibit and supporting documents into a single, continuous PDF for use in the present action. All relevant source documents from the original record are included herein in their entirety.

**2. Source and Authenticity of Documents.** All documents contained in this exhibit are true and correct copies obtained from the following official sources:
(a) Federal court records from *Retail Service Systems, Inc. v. Mattress By Appointment, LLC et al.*, S.D. Ohio Case No. 2:15-cv-02769, obtained through PACER;
(b) South Carolina Secretary of State corporate filings;
(c) Florida Division of Corporations corporate filings.
All documents were obtained on or about December 1–9, 2025.

**3. Accuracy of Contradictions.** The contradictions between C. Edwin Shoffner's sworn testimony and official corporate records, as identified and presented in Exhibit A, are accurately transcribed and fairly represented.

**4. No Alteration.** No document in this exhibit has been altered, modified, or edited except for the addition of highlighting or marginal notations to direct the Court's attention to relevant portions. All highlighting and notations are my own and do not appear in the original documents.

**5. Purpose.** This exhibit is submitted to demonstrate to the Court that C. Edwin Shoffner has a documented federal record of providing materially false sworn testimony in judicial proceedings, which is directly relevant to his credibility and to the validity of any contract bearing his signature, including the delegation clause at issue in this case.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

EXECUTED on this 13th day of January, 2026, in Austin, Travis County, Texas.

**JAMES DE LOS SANTOS**
Address: 1905 Willkomen Way
Pflugerville, TX 78660
Telephone: 737-775-6880

# EXHIBIT G

*2009 Judgment & Conrad's Theft Admission*

Case 2:13-cv-00994-EAS-EPD Doc #: 140-19 Filed: 05/02/16 Page: 2 of 20 PAGEID #: 4474
Case: 2:13-cv-00994-GCS-MRA Doc #: 1-2 Filed: 10/04/13 Page: 2 of 20 PAGEID #: 7074

D8623 - R69

## COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO
### CIVIL DIVISION

Power Marketing Direct, Inc ,

           Plaintiff,

        -vs-

Darren Conrad,

          Defendant & 3rd Party Plaintiff,

        -vs-

Jeffrey Hosking,

          Third Party Defendant

CASE NO 04CVH-02-1519

**JUDGE FAIS**

2009 JAN 26 AM 11: 18  CLERK OF COURTS  FILED COMMON PLEAS COURT FRANKLIN CO OHIO

## <u>DECISION AND ENTRY GRANTING PLAINTIFF'S REQUEST FOR PERMANENT INJUNCTION AND DAMAGES AGAINST DEFENDANT DARREN CONRAD</u>

Rendered this **26**th day of January, 2009

FAIS, J

### I.    INTRODUCTION

This matter came before the Court pursuant to a trial on the merits on April 14, 2008, as it relates to Plaintiff Power Marketing Direct, Inc ("Plaintiff" or "PMD") and Defendant Darren Conrad ("Defendant") Plaintiff seeks a permanent injunction and damages against Defendant Plaintiff's Second Amended Complaint, filed in September 2004, alleges the following causes of action as they relate to Defendant breach of contract, violation of Uniform Trade Secrets Act, tortious interference with contractual and business relationships, civil conspiracy, and a claim for attorney's fees



Case 2:13-cv-00994-GCS-MRA Doc #: 112 Filed: 10/04/13 Page: 3 of 20  PAGEID #: 1175

D8623 - R70

Plaintiff produced the following witnesses at trial Defendant (on cross), Joseph Arnetta, and Jeffrey Hosking Defendant, who represented himself, produced the testimony of Joel Bergeson

## II.    BACKGROUND

On October 5, 2004, Magistrate Thompson issued a decision sustaining Plaintiff's Motion for a Preliminary Injunction after a five-day hearing in which he heard evidence and witnesses presented by both parties On February 18, 2005, this Court approved and adopted the decision of the Magistrate and overruled Defendant's objections

On February 4, 2008, the Court granted default judgment against Defendant Melissa Conrad The issue of damages remains pending

On April 2, 2008, the Court granted Plaintiff's Motion for Partial Summary Judgment Against Defendant Darren Conrad on his Counterclaim and Third-Party Complaint

Finally, on April 11, 2008, a Notice of Voluntary Dismissal as to Defendant Paul Kuproski was filed by Plaintiff

Therefore, the matter currently to be addressed by the Court is limited to the claims set forth in the Second Amended Complaint against Defendant Darren Conrad

## III.    ANALYSIS AND FINDINGS OF THE COURT

A preliminary injunction is issued "to preserve a status between the parties pending a trial on the merits " *Procter & Gamble Co v Stoneham* (2000), 140 Ohio App 3d 260, 267  The party requesting a preliminary injunction is required to show that "(1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction " *Id*

2

D8623 - R71

A permanent injunction, on the other hand, "is issued after a hearing on the merits in which a party has demonstrated a right to relief under the applicable substantive law." *Id.* The party seeking a permanent injunction must show that it is necessary "to prevent irreparable harm and that the party does not have an adequate remedy at law." *Id.*

In general, the party seeking injunctive relief has the burden of showing actual irreparable harm. *Levine v. Beckman* (1988), 48 Ohio App. 3d 24, 27. Actual irreparable injury is usually not presumed, but instead must be proved. *Id.* To the extent that irreparable harm is actually threatened, injunctive relief may be available and the existence of an actual threat of irreparable injury may be established by showing that the employee possessed knowledge of the employer's trade secrets. *Id.* relying on *Arthur Murray Dance Studios v. Witter* (1952), 62 Ohio Law Abs. 17, 41-58.

### A.    Breach of Contract Claim

To recover upon a breach of contract claim, a plaintiff must prove the following: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, (4) and damage or loss to the plaintiff. See *Powell v. Grant Med. Ctr.*, 148 Ohio App. 3d 1, 10, 2002 Ohio 443, quoting *Nilavar v. Osborn* (2000), 137 Ohio App. 3d 469, 483. See, also, *Doner v. Snapp* (1994), 98 Ohio App. 3d 597, 600.

It is well established under Ohio law that non-competition agreements contained within employment contracts are enforceable. *Rogers v. Runfola & Associates, Inc.* (1991), 57 Ohio St. 3d 5, 8. However, since a non-compete clause prohibiting a former employee from conducting competing business against his former employer amounts to a restraint of trade, such clauses will be enforced only to the extent that the restraints imposed thereby are reasonably

Case 2:13-cv-00994-EAS-EPD Doc #: 140-19 Filed: 05/02/16 Page: 5 of 20 PAGEID #: 4377

D8623 - R72

necessary to protect the employer's legitimate business interests *Brentliner Enterprises v Curran* (2001), 141 Ohio App 3d 640, 645

The Supreme Court of Ohio has concluded that a covenant not to compete imposing unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests *Raimonde v Van Vlerah* (1975), 42 Ohio St 2d 21, 25  In determining the crucial element of reasonableness, various factors are considered, including the agreement's geographic and time limitations  *Id*  Furthermore, a covenant restraining an employee from competing with his former employer upon termination of his job is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public  *Id* at 26

The License Agreement executed by Defendant on March 26, 2003 states in pertinent part

19 **Covenant Against Competition**  Licensor and Licensee recognize and agree that Licensor has a legitimate interest in protecting its business, customer base, dealer base, and business techniques and processes, and that Licensee's employment or affiliation with a competitor, or its action as a competitor would harm such interests and would inevitably result in the disclosure or use of confidential business information originating with Licensor  At all times during the existence of this License Agreement and for a period of two (2) years after the termination of this Agreement (for whatever reason and irrespective of whether said termination is voluntary or involuntary), Licensee agrees that he or she will not, in any way or in any capacity, either directly or indirectly, and whether for Licensee's own account or as an employee, partner, franchisee, officer, agent, investor, or otherwise for or with any other person, firm, corporation, or entity

(i) engage in or be associated in any way in any business or other activity related to the sale of retail furniture or bedding, including products competitive with those offered by the Licensor, where Licensee's activity occurs, or the result or effect of Licensee's activity occurs, within a radius of one hundred (100) miles from any territory serviced by Licensor as of the date of the termination of this Agreement, or any territory in which Licensor has planned or taken steps to service through a License and/or Dealer Agreement, and/or

4

D8623 – R73

(ii) engage in or be associated in any business or activity that provides products directly or indirectly, to any persons or entities who are or were customers and/or dealers of the Licensor at any time during the two (2) year period immediately preceding the termination of this Agreement, and/or

(iii) directly or indirectly induce any customers and/or dealers of the Licensor to patronize any other business similar to that of the Licensor, or canvass, solicit, or accept any business from customers and/or dealers of the Licensor, whether or not Licensee personally provided any services directly to such customers and/or dealers, and/or

(iv) directly or indirectly purchase goods or conduct any business with the suppliers of Licensor's products

Contemporaneous with his departure at PMD, Defendant executed a Separation Agreement, which includes the following provision

In exchange for the promises set forth in paragraph 1 above, Distributor reaffirms the validity and enforceability of the noncompetition provisions contained in his License Agreement with PMD  In particular, Distributor agrees that he will not for a period of three (3) years following the execution of this Agreement engage in any of the following activities

(a) Undertake planning for or organization of any business activity competitive with the Company's business or combine or conspire with others for the purposes of organizing any such competitive business activity

(b) Directly or indirectly or by any action in concert with others, induce or influence any person or entity who is engaged as an employee, agent, independent contractor or the Company to terminate or in any way compromise his or her business relationship with the Company

(c) Call upon any business contacts of the Company for the purposes of soliciting or selling competitive products or services

(d) Divert to, solicit, or in any other way attempt to take away business contacts, clientele or customers of the Company and place said business with any other business that may compete with the business of the Company

(e) Directly or indirectly compete with the business of the Company

While Defendant contends that he was under duress when he signed both agreements, during the preliminary injunction hearing, the Magistrate found no credible evidence presented by Defendant or any other witness to support these assertions  In ruling on Defendant's objections to the Magistrate's findings and conclusions, this Court also found no credible

5

D8623 - R74

evidence regarding the existence of duress   Furthermore, this Court finds no such credible evidence of duress was presented during the trial on the merits either   Defendant has simply repeated his testimony from the preliminary injunction hearing, claiming he was coerced into signing the license and dealer agreement in order to receive his paycheck   Therefore, the Court finds Defendant's argument regarding duress to be without merit

The test to determine whether a covenant not to compete is enforceable is one of reasonableness   *Raimonde v  Van Vlerah* (1975), 42 Ohio St 2d 21, 25   A court should consider the following factors when determining whether a covenant not to compete may be enforced

> The absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer, whether the employee is possessed with confidential information or trade secrets, whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition, whether the covenant seeks to stifle the inherent skill and experience of the employee, whether the benefit to the employer is disproportional to the detriment to the employee, whether the covenant operates as a bar to the employee's sole means of support, whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment, and whether the forbidden employment is merely incidental to the main employment

*Raimonde*, 42 Ohio St 2d at 25, citing *Extine v  Williamson Midwest* (1964), 176 Ohio St  403

The Ohio Supreme Court then held

> [A] covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the  extent necessary to protect the employer's legitimate interests  A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public  Courts are empowered to modify or amend employment agreements to achieve such results

*Raimonde*, 42 Ohio St 2d at 26

In general, Ohio courts uphold an employer's right to restrict its employees from competing with its business once the employee leaves  In *UZ Engineered Products v  Midwest*

D8623 - R75

*Motor Supply* (2001), 147 Ohio App 3d 382, 397, the Tenth District Court of Appeals held that "an employer has a legitimate interest in preventing a former employee from using the skill, experience, training and confidential information the former employee has acquired during the employee's tenure with his employer "

In addition, Ohio courts have held that nationwide and worldwide restrictions are at times appropriate and reasonable  See *Ganguly v Mead Digital Systems* (Sept 20, 1984), 2nd Dist No 82-1499   However, courts have also determined that certain restrictions are overbroad and therefore, the terms of the non-competition clause must be modified  See *Duracote Corporation v Ryan* (April 15, 1983 11th Dist ), No 1247, 1993 Ohio App  LEXIS 15123, at *6

Upon review of the evidence presented by both parties at the trial on the merits, Plaintiff has a legitimate business interest in protecting itself against competition from Defendant  Plaintiff spent significant resources in training Defendant, from the use of its training manuals to attendance at various seminars and conferences, to formal training   Plaintiff also disclosed its proprietary information to Defendant, including information to which Defendant was exposed as a District Manager  Furthermore, the evidence suggests that Defendant made significant efforts to conceal his intention of establishing a competing business from Plaintiff  Therefore, the Court finds Plaintiff's non-competition agreements are a legitimate way to protect its business interests

Based upon the evidence presented at the preliminary injunction hearing, both the Magistrate and the Court found that Defendant essentially conceded that he had established a competing business (or businesses) which mirrored the program established at PMD  The Court reaches the same conclusion here, based on the evidence set forth at the trial on the merits  Defendant admits that he asked Paul Kuproski, the controller for PMD at the time, to send him a training manual from PMD, to be used in Defendant's new business, Carolina Direct  Defendant

D8623 - R76

also admits that Paul Kuproski did in fact send him that training manual, along with a sample dealer license agreement form to use with the new business  Defendant further admits Carolina Direct's dealer agreement is very similar to PMD's dealer license agreement   The same information was then subsequently used in Defendant's second business venture, Carolina Bedding and Furniture

The Court further finds that Defendant had or has established competing dealers within a 100 mile radius in Charleston, South Carolina, Charlotte, North Carolina, Wilmington, North Carolina, Myrtle Beach, South Carolina, Ft Lauderdale, Florida, Fayetteville, North Carolina, Jacksonville, Florida, and Knoxville, Tennessee and possibly other locations where PMD dealerships either existed at the time of Defendant's separation or were in the planning stages at the time the Separation Agreement was executed, which in turn violated the terms of the License Agreement  The evidence presented at the trial on the merits also demonstrated that Defendant initiated a plan for business activity that was competitive with Plaintiff and either directly or indirectly competed with Plaintiff's business  As a result of this activity, Plaintiff has suffered damages

After reviewing the evidence presented at the trial on the merits, as well as the history of this case as a whole, the Court finds Defendant did engage in business activity that either indirectly or directly competed with Plaintiff's business in violation of the non-compete provisions in both agreements  Defendant also established competing dealers within a 100-mile radius of several of Plaintiff's dealerships  These actions violated Defendant's non-compete agreements with Plaintiff, and thus, the Court finds Defendant breached its contract with Plaintiff

Case: 2:13-cv-00994-GCS-MRA Doc #: 1-2 Filed: 10/04/13 Page: 10 of 20 PAGEID #: 78

D8623 - R77

### B.    Uniform Trade Secrets

Ohio has adopted the definition of trade secrets contained in the Restatement of Torts

Revised Code §1333 61 provides the following definition in pertinent part

> (D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use   (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy

The factors to be considered when determining whether information and evidence qualifies as a trade secret are  (1) the extent to which the information is known outside of the business, (2) the extent to which the information is known to those inside the business, i e  by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information   *Pyromatics v  Petruziello* (1983), 7 Ohio App  3d 131, followed in *Murray v  Bank One* (1994), 99 Ohio App  3d 89   To qualify as a trade secret under R C §1333 61(D), a movant must prove that the alleged trade secret possesses independent economic value not readily ascertainable and that reasonable steps have been taken to maintain the secrecy of the material

Defendant contends that Plaintiff's methods and business information are not protected trade secrets  However, this Court, both previously and presently, continues to disagree

D8623 - R78

Jeffrey Hosking and Joseph Armetta testified at the trial on the merits that Plaintiff's methodology is novel and distinct. There were also others who testified to this at the preliminary injunction hearing, such as Greg Cristell and Bert Harbin. During the trial on the merits, Mr. Armetta described the sales process in great detail. He explained that it involves running unique, three to five-line classified ads in print periodicals with general topics, but using some very specific information, such as price and a contact phone number, along with a brief description of the product. He also described a very specific phone script that was to be used verbatim to set up an appointment when potential buyers call the number in the advertisement.

While the use of basic marketing principles from publicly available sources is an important tool in building Plaintiff's methodologies, it is their specific application that makes these processes unique to PMD. Plaintiff's sales and marketing practices vary significantly from traditional retailers and rely primarily on advertising placed in the classified ads of newspapers. Plaintiff's practice of selling through the classifieds is based on the following elements: the specific nature of Plaintiff's advertising, which includes price points, phraseology, length and catch-words, the creation of urgency to potential buyers, the ability to eliminate shoppers, tracking of certain business statistics, identification of select manufacturers that are willing to do business with this type of operation, and product-specific sales techniques.

Mr. Hosking testified that there are no other competitors who are as tough as someone using the PMD program against PMD. Although he conceded that PMD has competitors in almost every market, he further stated that PMD dominates the market, unless PMD has a competitor using the PMD methodology. He described that type of situation as one where "it's like putting two piranhas in a very small fish bowl." He further explained that is the reason PMD makes sure not to place its dealers too close to each other. He also testified that at least

D8623 – R79

two PMD dealers had quit due to competition from Defendant using the PMD method where the contact between the competing dealers had actually gotten physical

Finally, Mr Hosking also testified that previous courts have found the PMD methodology to be unique and proprietary

As to taking steps to protect the confidential proprietary nature of its information, both Mr Armetta and Mr Hosking testified as to the considerable effort PMD has taken to maintain and guard the secrecy of it proprietary information This includes devices such as the execution of the aforementioned license agreements, which include non-compete clauses preventing employees from using or duplicating its training programs, manuals, and business practices Furthermore, there was also testimony regarding the use of similar agreements for candidates who are simply interviewing and considering or exploring a relationship with PMD

For all of the foregoing reasons, and based upon the information set forth in Part A above, this Court finds PMD's business materials and methodologies are trade secrets and Defendant has therefore violated the Uniform Trade Secrets Act

**B.     Tortious Interference**

Plaintiff alleges Defendant Darren Conrad, along with Defendants Paul Kuproski and Melissa Conrad, "have tortiously, intentionally, and without privilege interfered with PMD's existing contractual and business relationships by soliciting each other, and other PMD dealers to leave PMD in direct violation of their License Agreement with PMD and soliciting furniture and bedding vendors to terminate their relationship with PMD " Second Amended Complaint, ¶ 41

The elements of a tortious interference with contract claim are as follows (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting

11

D8623 - R80

damages " *Walter v ADT Security Systems, Inc* (10th Dist, No 06AP-115), 2007 Ohio 3324, citing *Fred Siegle Co v Arter & Hadden* (1999), 85 Ohio St 3d 171, paragraph one of the syllabus

"Tortious interference with contract requires an actor to improperly interfere with the performance of a contract between two other persons" *Emergency Preemption, Inc v Emergency Preemption Sys, Inc* (8th Dist, Aug 14, 1997), No 71350, 1997 Ohio App LEXIS 3691

The elements of a tortious interference with a business relationship are "(1) a business relationship, (2) the tortfeasor's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom" *Walter*, supra, at *P31, quoting *Diamond Wine & Spirits v Dayton Heidelberg Distributing Co, Inc*, 148 Ohio App 3d 596, 2002 Ohio 3932 at *P23

The Court finds Plaintiff has presented sufficient evidence to demonstrate that it is entitled to judgment with respect to this particular cause of action as it relates to the claim of tortious interference with a business relationship as it applies between Defendant Darren Conrad and Defendant Paul Kuproski There is sufficient evidence to show that Defendant Darren Conrad solicited Defendant Paul Kuproski, the controller for PMD who had executed a consulting agreement with PMD that contained confidentiality language, to go into business with him and to send him a copy of PMD's training materials Such an act violates Defendant Conrad's Separation Agreement Said Agreement prohibits Defendant from inducing other employees or independent contractors of PMD to compromise his/her business relationship with PMD Clearly Mr Kuproski owed at a minimum a fiduciary duty to PMD not to disclose its confidential and proprietary business information Such a solicitation and the response that

D8623 - R81

resulted, which included further work by Mr Kuproski on behalf of the company the two of them worked to create, interfered with PMD's business relationship with Mr Kuproski

As to the remaining allegations contained in ¶ 41 of the Second Amended Complaint, the Court finds there is insufficient evidence to support those allegations

### D.    Civil Conspiracy Claim

The elements of a civil conspiracy are   (1) a malicious combination, (2) of two or more persons, (3) resulting in injury to person or property, and (4) the existence of an unlawful act independent of the actual conspiracy  *Mitchell v Mid-Ohio Emergency Services, LLC* (10th Dist , No  03AP-981), 2004 Ohio 5264 at P29, citing *Davidson v BP Am Inc* , (1997), 125 Ohio App 3d 643  A civil conspiracy requires a viable claim which is distinct from the conspiracy itself  *Id*

Civil conspiracy has also been defined as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages" *Williams v Aetna Finance Co* (1998), 83 Ohio St 3d 464, 475, quoting *Kenty v Transamerica Premium Ins  Co* (1995), 72 Ohio St 3d 415, 419, quoting *LeFort v Century 21-Maitland Realty Co* (1987), 32 Ohio St 3d 121, 126  (Further citations omitted )

An underlying unlawful act is required before a claim for civil conspiracy can succeed *Williams*, supra   The malice involved is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another " *Williams*, at 475, quoting *Pickle v Swinehart* (1960), 170 Ohio St  441, 443   See, also, *Gosden v Louis* (1996), 116 Ohio App 3d 195, 219-220, (" 'malice,' then, would be inferred from or imputed to a common design by two or more persons to cause harm to another by means of an underlying tort, and need not be proven separately or expressly")

13

D8623 - R82

Here, the Court finds there has been sufficient evidence to establish that Defendant Darren Conrad and Defendant Paul Kuproski both planned to establish a business that would and did compete with PMD  See e-mails exchanged between D  Conrad and Kuproski, *Plaintiff's Exhibits* 17, 18 and 34  Both were obviously aware of the restrictions on Defendant Darren Conrad's conduct, as well as the proprietary nature of the training materials which were ultimately provided by Kuproski to Darren Conrad at Conrad's request, in violation of Conrad's agreements and of the Uniform Trade Secrets Act  Furthermore, as previously set forth above, and as will be set forth in more detail below, PMD suffered -damages with respect to the dissemination of its proprietary training information, its loss of dealers and/or resulting loss of business, among other damages

Therefore, the Court finds Plaintiff has established the elements necessary to prove its claim of civil conspiracy

### E.    Damages & Other Relief

Plaintiff introduced evidence at the trial on the merits establishing that it will suffer irreparable harm if a permanent injunction is not issued  First, Plaintiff demonstrated that Defendant possesses knowledge of Plaintiff's trade secrets and proprietary information that will irreparably harm Plaintiff's business if Defendant is allowed to continue to disseminate or use the information competitively

Second, Mr  Hosking testified that the presence of Defendant's competing dealers in territories serviced by Plaintiff has significantly reduced profitability and has even resulted in physical confrontation, as well as the loss of PMD dealers

Finally, the value of the loss of Plaintiff's proprietary information is difficult if not impossible to calculate, which demonstrates that Plaintiff would have no adequate remedy at law

14

D8623 - R82

D8623 – R83

if the injunctive relief were not granted  *See Jaussen v  Fleming*, (11ᵗʰ Dist , May 12, 1995), No 93-T-4973, 1995 Ohio App  LEXIS 1998, at *6  Therefore, Plaintiff has established that it will suffer irreparable harm if the injunction is not granted

At the preliminary injunction stage, the following injunctive relief was granted   for a period of three years from the date of the Court's determination, Defendant Darren Conrad was preliminarily enjoined from the following  (1) engaging in or being associated, in any way, in any business or other activity related to the sale of retail furniture or bedding, that either directly or indirectly competes with the business of PMD and its dealers, within a radius of one hundred (100) miles from any territory serviced by PMD as of the date of the execution of the Separation Agreement, or any territory in which PMD had planned or taken steps to service through a License and/or Dealer Agreement as of the time of the execution of the Separation Agreement, (2) calling upon any business contacts of PMD for the purposes of soliciting or selling competitive products or services, (3) disclosing, using or training others to use the PMD program, (4) disclosing, using, reproducing or disseminating any or all of PMD's training materials, and (5) disclosing PMD's business plans, including but not limited to information indicating the geographic areas PMD has targeted for expansion

Furthermore, the terms of the covenant not to compete were modified to include a three year time period with a geographic restriction of 100 miles from Plaintiff's territory  Although the three year time period has now expired, it is clear to the Court that Defendant did not abide by the restrictions imposed by the preliminary injunction  Instead, Defendant's own testimony establishes that he continued to operate dealerships and/or indirectly compete with PMD by servicing dealerships in territories such as Charlotte, North Carolina (Defendant testified he had been working with that dealer, Mark Henderson, continuously since 2004)  Defendant further

15

Case: 2:13-cv-00994-EAS-EPD Doc #: 140-19 Filed: 05/03/16 Page: 17 of 20 PAGEID #: 8589

D8623 - R84

testified that he had a current business relationship with a company called Park Place, which, like PMD, sells mattresses from a storefront and markets their product through classified ads Defendant testified that in 2006 and 2007 he has assisted and trained dealers in the mattress business with respect to sales and marketing techniques  For example, Defendant testified that, at the time of the trial on the merits, he was working for Park Place, assisting dealers in selling mattresses in cities such as Jacksonville, Florida and Charlotte, North Carolina  Defendant testified that the Jacksonville dealer had been established only five weeks prior to the date of the trial

PMD requests an extension of the injunction period, despite the fact that the three year period since the Court's imposition of that restraint has expired  Because Defendant has continued to violate the restrictions imposed by the covenant and the preliminary injunction, the Court finds it is appropriate to award a permanent injunction and to extend the period of the injunction an additional 15 months from the date of this Decision  See *Columbus Medical Equipment v Watters* (1983), 13 Ohio App 3d 149, 152 (although the two-year limit on the covenant had expired, it would be inequitable to find that, since the two years had expired and defendant continued to work for a competitor while the case was on appeal, that the plaintiff had no recourse)  See also *Dottore v Atlas Electric Sewer Co* (8th Dist , Jan 15, 1981), No 42218, 1981 Ohio App LEXIS 14073, *9 ("it is equitable for a trial court to extend, for a reasonable period of time, the life of a restrictive covenant in an employment contract past its agreed termination date, where the former employee has breached the covenant")  See *Penzone v Koster*, 2008 Ohio 327, *P25 ("[t]he clear intent of these cases is that an injunction must account for periods of noncompliance in order to make judicial enforcement effective ")

16

D8623 - R85

As to the issue of damages, PMD requests damages based upon three other categories First, PMD argues the training materials copied and used by Defendant are part of the licensing fee charged by PMD  PMD requests a licensing fee of $30,000 to 35,000 for each time Defendant trained someone with the training manuals and materials  PMD asserts that Defendant trained at least twenty-four (24) dealers with these materials (See Plaintiff's Exhibit 50)

Second, PMD requests damages for having to replace dealers in territories where Defendant was competing  PMD argues it lost two dealers due to physical conflict with Defendant and asserts it had to "re-do" a dealer at least 10 times due to Defendant's competition

Third, PMD requests an award of punitive damages, based upon Defendant's deliberate violation of his Agreement and of the Court's preliminary injunction order because Defendant's violations were knowing and required a lot of time and effort on the part of PMD to attempt to "pin him down "

Defendant, on the other hand, argues that, in his opinion, he stayed well within the restrictions imposed at the preliminary injunction hearing  Defendant also continues to argue that nothing involved here is a trade secret and asks the Court not to even consider damages

Evidence has been submitted regarding the PMD program and how it operates  PMD currently charges a licensing fee of $35,000 for each new dealer  Over the years, that fee has ranged from $15,000 to $25,000 to the current rate  PMD has a mandatory training that dealers must participate in to be successful  Once a new dealer has signed a license agreement, he or she is provided with extensive materials and checklists and  trained via e-mail, telephone, and in face-to-face training with a manager  Dealers also attend various seminars and conferences  PMD has requested damages of $35,000 for each of the twenty-four dealers Defendant trained

17

D8623 - R86

with its materials, arguing that it lost out on those licensing fees  However, PMD has failed to provide sufficient information for this category of damages

It is obvious that the training materials are only part of $35,000 licensing fee  Yet PMD has failed to provide a breakdown as to the percentage of that fee that actually accounts for the training materials and checklists  Therefore, the Court will not award damages on this component, as PMD has not provided a calculatable number

As to damages for replacing dealers in territories where Defendant was competing, PMD requests $35,000 for each dealer  Testimony was provided to establish that the cost of placing a new dealer in a territory is about $35,000  This includes costs for transportation, recruiting, interviewing, and the like  Further testimony was provided to establish that at least two dealers left due to intimidation and physical conflict at the hands of Defendant or his employees  Mr Hosking also testified they had lost two dealers in Jacksonville, Florida due to activity from Defendant

Although counsel for PMD argued in closing that PMD had to "re-do" a dealer at least ten (10) times, the Court finds the evidence only supports a "re-do" for four (4) dealers  At $35,000 per dealer for four dealers, the Court finds damages for this component in the amount of $140,000

Given Defendant's flagrant, on-going competition with PMD, despite his License and Separation agreements and despite the preliminary injunction order put in place by this Court, all of which prohibit such conduct, the Court finds an award of punitive damages is appropriate  Given the number of territories in which Defendant continued to compete (including but not limited to territories in Charlotte, North Carolina and Myrtle Beach, South Carolina), and the fact

18

D8623 - R86

D8623 – R87

that Defendant continued to compete directly or indirectly in other ways, the Court awards punitive damages in the amount of $40,000

Finally, Defendant's Agreements provide that PMD is entitled to recover reasonable attorney's fees and other related costs incurred if it prevails. However, PMD has not provided any information with respect to attorney's fees and costs. Plaintiff is instructed to provide such information to the Court for its review if it wishes to recover for this

It is so ORDERED

_____
DAVID W FAIS, JUDGE

1-26-09

Copies to

Charles H Cooper, Esq
Sheila A Vitale, Esq
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio 43221
Counsel for Plaintiff

Darren Conrad
515 S 10th Avenue
Jacksonville Beach, Florida 32250
Defendant, *pro se*

Magistrate Myron A Thompson
375 S High Street, 6th Floor
Columbus, Ohio 43215

0A954 - P49

# EXHIBIT F

**State of Florida**

**County of** Duval

**BEFORE ME, the undersigned Notary,** Roswitha Kleber _____ [name of Notary before whom affidavit is sworn]_, on this ___20___ _[day of month]_ day of ___Jan.___ _[month]_, 20__09__, personally appeared Darren Conrad _____ [name of affiant]_, known to me to be a credible person and of lawful age, who being by me first duly sworn, on __his__ _[his or her]_ oath, deposes and says: To the best of my knowledge the following statements are true and accurate in regards to my personal experience:

1. Affiant was a PMD Dealer from approximately ___1/2000___ to ___3/2003___

2. Affiant originally helped Jeff Hosking move PMD's inventory from storage units and set up first PMD clearance center operated on Kenny Road.

3. Affiant was primarily responsible through his experience and contacts with Vector Marketing for the recruitment of Bert Harbin, Sarah Richard, and Joel Bergeson as PMD dealers.

4. Prior to being a PMD dealer affiant had experience as a District Manager with Vector Marketing.

5. Affiant was a part of PMD's original Management team/Key Staff in ___Columbus, OH___

6. PMD's original dealer group and management team/Key Staff consisted of the following persons: Jeff Hosking, Darren Conrad, Bert Harbin, Joel Bergeson, Sarah Richard, Brian Pentecost.

7. PMD's original dealer group and management team/Key Staff listed in 3 & 6 above all had experience as high level Vector Marketing managers as either District, Zone, or Division Managers.

8. Jeff Hosking and the Original Management team for PMD described herein was responsible for the recruitment of the original group of PMD dealers from the years 1998 -2000 and of those recruits, 80% or more had previous experience with Vector Marketing.

9. Jeff Hosking and the original Management team for PMD described herein used the same techniques, terminology, advertising and recruiting strategies, scripted processes, sales strategies, incentives programs for the development of PMD that were used and developed amongst experienced managers associated with Vector Marketing.

10. PMD's recruitment of dealers became similar if not identical to the style and type of recruitment used amongst Vector Marketing Managers.

0A954 - P50    Case Franklin County Clerk of Courts of the Common Pleas 2016 2PM 06 2004 194

11. As a former District Manager with Vector Marketing affiant became familiar with advertising in the Job section of various advertisement listings such as Newspapers and other Job posting mediums. Affiant has first hand knowledge that all District Managers as well as other upper level Vector Marketing managers were trained and had the same knowledge.

12. Affiant was witness while helping Jeff Hosking establish the first PMD Clearance Center and create PMD's recruiting strategy to Jeff Hosking having the same marketing and advertising knowledge as described in 11 herein.

13. Affiants were privy to meetings with Jeff Hosking and original PMD management team members named herein where discussions on dealer recruitment advertising for job positions that did not nor would not exist at PMD took place. These procedures for advertising jobs were similar if not identical to what was used by District managers with Vector Marketing.

14. Affiant knew of and knows of no PMD company owned dealerships run by PMD paid employees.

[signature of affiant]

Darren Conrad
[typed name of affiant]

515 10ᵗʰ Ave South
[address of affiant, line 1]

Jacksonville Beach, FL 32250
[address of affiant, line 2]

State of Florida
County of ____Duval____

Sworn to (or affirmed) and subscribed before me this __20__ day of __Jan.__ , __2009__ (year) by __Darren Conrad__ _____ (name of person making statement).

__Roswitha Kleber__
(Signature of Notary Public - State of Florida)

__Roswitha Kleber__
(Print, Type, or Stamp Commissioned Name of Notary Public)

Personally Known _____ OR Produced Identification ___✓___

Type of Identification Produced __FL Drivers License__



ROSWITHA KLEBER
Notary Public, State of Florida
Commission# DD728998
My comm. expires Jan. 15, 2012

**Bagnato, Marjorie**

| | |
|---|---|
| **From:** | darrenconrad40@gmail.com on behalf of Darren Conrad <dconrad@carolinabeddingdirect.com > |
| **Sent:** | Wednesday, December 04, 2013 9:46 AM |
| **To:** | Reid Penuel; Edwin Shoffner |
| **Subject:** | Fwd: Fw: 5pm Eastern |
| **Attachments:** | State of Florida Darren.doc |

- - - - - Forwarded message - - - - -
From: **Darren Conrad** <darren_conrad@yahoo.com>
Date: Wed, Dec 4, 2013 at 9:37 AM
Subject: Fw: 5pm Eastern
To: "darrenconrad40@gmail.com" <darrenconrad40@gmail.com>

Dream Big, Work Hard and Always Smile!

On Monday, January 12, 2009 6:09 AM, Scott Andrew <devmar@charternet> wrote:
Hey Darren

I touched base with Joel on Friday but it was not a good time to talk and I did not hear back from him over the weekend. Attached is a first draft of the type of information we need for the affidavit and our view of how PMD and Vector are connected. I will call for your help on getting it accurate.

Thanks Scott

   - - Original Message - -
   **From:** Darren Conrad [mailto:darren_conrad@yahoo.com]
   **Sent:** Wednesday, January 07, 2009 6:11 PM
   **To:** Joel bergeson; Cliff Mast
   **Cc:** devmar(acharter.net
   **Subject:** 5pm Eastern

   (218) 486-1600 Access # 620094

   *Carolina Bedding Inc. & Park Place Corp.*
   *Darren Conraddconrad@parkplacecorp.com*
   *515 10th Ave S.*
   *Jacksonville Beach, FL 32250*
   *(904) 307-1765*
   *"Think Big & Always Smile! ! ! "*

1

Case: 2:13-cv-00994-EAS-EPD Doc #: 140-12 Filed: 05/03/16 Page: 2 of 2  PAGEID #: 4196

"Dream Big, Work Hard and Always Smile"
- Darren Conrad
(904) 307-1765

**CarolinaBeddingDirect.Com**

**Facebook.com/CarolinaBeddingDirect.Com**

Case: 2:13-cv-00994-EAS-EPD Doc #: 4-1 Filed: 05/03/16 Page: 1 of 7 PAGEID #: 4197

EXHIBIT

1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| RETAIL SERVICE SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:13-cv-00994 |
| | ) | |
| v. | ) | Judge Smith |
| | ) | |
| CAROLINA BEDDING | ) | Magistrate Judge Deavers |
| DIRECT, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

STATE OF OHIO      )
                 ) ss
COUNTY OF FRANKLIN  )

### AFFIDAVIT OF DARREN BRETT CONRAD

PERSONALLY came and appeared before me, the undersigned Notary, the within named Darren B. Conrad, a resident of Jacksonville, Florida, and makes this his statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of his knowledge:

1.     My name is Darren Brett Conrad. I live at 136 19th Ave. N., Unit B, Jacksonville, Florida 32250. I have lived at this location since April 1, 2015.

2.     In April of 2000 I began working with Power Marketing Direct, Inc. ("PMD"). At PMD I worked to develop a system for profitably selling mattresses through classified advertising, detailed phone and sales scripts, and informal, appointment-based sales. I sold mattresses using this system and recruited others to do the same. Each of these dealers would purchase mattresses through PMD and sell them using PMD's sales system.

3.     From 2000 to 2003, I served in a number of different roles with PMD, both as an independent contractor and as an employee.

Case 2:13-cv-00994-EAS-EPD Doc #: 4-01B Filed: 05/03/16 Page: 2 of 7 PAGEID #: 4198
Case: 2:15-cv-02769-EAS-EPD Doc #: 8-1 Filed: 10/19/16 Page: 2 of 93 PAGEID #: 198

4.  In early 2003, I began planning to start a separate business extremely similar to PMD.

5.  In February of 2003, I resigned my position as District Manager for PMD to focus on my Columbus PMD dealership.

6.  On March 31, 2003, I left PMD entirely. On March 26, 2003, I signed a PMD License Agreement, and on the day I resigned, I signed a separation agreement.

7.  After I left PMD, I moved to Greenville, South Carolina and started a business named Carolina Bedding and Furniture, Inc. This business used the detailed sales system I helped develop at PMD to sell mattresses, as I had done at PMD. I also recruited dealers, who purchased mattresses through Carolina Bedding and Furniture, Inc. and used the sales system I had helped develop at PMD. I was the only owner of Carolina Bedding and Furniture, Inc.

8.  At Carolina Bedding and Furniture, Inc., I created a "playbook" to describe the detailed sales system I used to train my dealers. This playbook largely copied the system I developed at PMD and PMD's playbook.

9.  The document attached as Exhibit 1 to this affidavit is an accurate copy of one version of the "playbook" I created at Carolina Bedding and Furniture, Inc.

10.  I continued to use versions of this "playbook" in my future businesses, making only minor changes, such as to account for new advertising technologies (Craigslist in place of newspaper classified ads, for example) and to update the document's design. Exhibits 2 and 3 to this affidavit are two such versions of this "playbook."

11.  On Feb. 9, 2004, PMD sued me in the Franklin County Court of Common Pleas for breach of contract and for allegedly taking PMD's trade secrets. PMD asked the court to enjoin me from using PMD's sales system and from competing with it in my new business.

12.  Sometime between March and June of 2004, I moved to Florida, where I continued to sell mattresses and recruit and train dealers.

13.  The Franklin County court did not resolve PMD's lawsuit against me until January 26, 2009, when it granted an injunction against me for fifteen months, until June 26, 2010.

Case 2:13-cv-00894-EAS-EPD Doc #: 40-1 Filed: 05/03/16 Page: 3 of 7 PAGEID #: 1499

14. On April 1, 2009, PMD's attorney, Charles Cooper, sent a letter to me at 515 South 10th Avenue, Jacksonville Beach, Florida 32250, enclosing a copy of the Court's Order. On April 4, 2009, I faxed that letter and Order to Scott Andrew.

15. In April of 2009, due to the Court's injunction, I gave my dealers at Carolina Bedding and Furniture, Inc., to three people, Dan McDowell, Shannon Turner, and Mark Henderson (through his company, Henderson Wholesale). Each person got about a third of my dealers, becoming the supplier for 20-30 dealers each, though only Henderson Wholesale continued in business for a substantial time afterward.

16. During this time, I had set up a deal with Edwin Shoffner of Park Place Corporation, a mattress manufacturer I had been purchasing from. When Henderson Wholesale dealers purchased mattresses, I would personally receive a percentage of those sales, and Park Place would be responsible for collecting payments from the dealers.

17. This deal continued after I transferred my dealers to Henderson Wholesale, except that Park Place charged Henderson Wholesale a higher rate than Carolina Bedding and Furniture, Inc. had been paying. I then got a portion of that increased rate.

18. During this time, I worked to create a video to recruit new dealers to Carolina Bedding. When the Franklin County court's injunction ended in April 2010, Carolina Bedding launched that recruitment video.

19. On November 1, 2010, I moved to Charlotte, North Carolina, where I continued to do business with Mark Henderson, Carolina Bedding, and the dealers I had given Henderson in 2009.

20. In October 2011, I had a falling out with Mark Henderson when I asked to become an official owner of the company.

21. On October 18, 2011, I started a new company, called "Carolina Bedding Direct, LLC," in North Carolina. I was the sole owner of this company.

22. I operated Carolina Bedding Direct, LLC, the same as my previous businesses, recruiting dealers to buy mattresses through the company and to sell them using the detailed sales system that I had helped develop at PMD. Over the next year, I built this business up to over 100 dealers across the country, including in Ohio. During this time I and these dealers purchased mattresses through Five-Star/Serta, which had then hired Edwin Shoffner as a sales representative.

3

Case: 2:13-cv-00994-EAS-EPD Doc #: 44-1 Filed: 05/03/16 Page: 4 of 7 PAGEID #: 4800

23. At Carolina Bedding Direct, LLC, I continued to use versions of the "playbook" I had created at Carolina Bedding and Furniture, Inc., to train dealers to sell mattresses using the system I helped develop at PMD. The versions of the "playbook" I used at Carolina Bedding Direct, LLC, made only minor changes, such as to account for new advertising technologies (Craigslist in place of newspaper classified ads, for example) and to update the document's design.

24. Though this playbook took the sales system that I had been using since I helped develop it when I worked for PMD, as well as certain portions of PMD's playbook, I did not appreciate that the system and PMD's playbook were someone else's intellectual property and that I might not be allowed to use them in my new businesses.

25. In early 2012, I hired Shawn McAllister to create an online ordering system for dealers, based on my design.

26. In 2012, I personally moved to Florida, and I moved my company, Carolina Bedding Direct, LLC, to Florida as well. On April 11, 2012, I re-formed "Carolina Bedding Direct, LLC," as a Florida limited liability company ("Carolina Bedding (FL)"). I was the only owner of this company, and at first I used my home address as the company's office.

27. This new company was meant to continue in place of the North Carolina version of Carolina Bedding Direct, LLC ("Carolina Bedding (NC)"). I gave Carolina Bedding (FL) the dealers, employees, playbook, and online ordering system Carolina Bedding (NC) and continued to use the same bank accounts and EIN number for the new company. This was all informal. Carolina Bedding (FL) did not buy these assets or sign any contract for them. Because I was the only owner of both companies, I just transferred them from the old company to the new one.

28. Carolina Bedding (FL) continued to operate the North Carolina company's business, recruiting, training, and advising dealers on the sales system described in the playbook and taken from the detailed system I developed at PMD. The company's dealers continued to buy mattresses from Five-Star/Serta, and Five-Star/Serta paid Carolina Bedding (FL) based on the amount of those sales, just as it had paid Carolina Bedding (NC).

29. After this move, Carolina Bedding (NC) stopped doing business, because all of its assets and business operations were now with Carolina Bedding (FL).

30. On April 26, 2012, I dissolved Carolina Bedding (NC).

31. I kept running Carolina Bedding (FL), recruiting and training dealers nationwide to use the sales system that I had helped develop at PMD. Around this time the business had at least 50-60 dealers across the country, including in Ohio, and had millions of dollars of yearly sales.

32. On November 19, 2012, at the direction of Edwin Shoffner, I started a new company, "Mattress By Appointment, LLC," in Florida. I was the only owner of this new company. This company had been intended to continue the operations of Carolina Bedding (FL), but I never formally transferred the operations to this new company.

33. In March of 2013, Edwin Shoffner purchased a 45% ownership share of Carolina Bedding (FL). In exchange for this ownership, Mr. Shoffner was supposed to bring in several new mattress manufacturers and give me $100,000, but ultimately he only provided $60,000 in discounts on purchases from Five-Star/Serta. Based on our ownership interests, the $60,000 in discounts benefitted me $33,000 and benefitted Shoffner $27,000. Shoffner still owes me $67,000 of the $100,000 he agreed to pay.

34. Mr. Shoffner knew about the company's business model at the time he became an owner. He also knew about PMD's prior lawsuit and injunction against me, and he knew that my business continued to use the detailed sales system that I helped develop at PMD.

35. In October 2013, Retail Service Systems, Inc. ("RSS") sued Mattress By Appointment, LLC and Carolina Bedding (NC) in federal court in Ohio, claiming that they had improperly used PMD's trade secrets, which RSS now owned. I hired a Florida attorney, Reid Penuel, to defend that lawsuit. Later, Carolina Bedding (FL) hired an Ohio law firm, Vorys, Sater, Seymour and Pease LLP, to defend that lawsuit.

36. On February 4, 2014, Edwin Shoffner and I changed the name of our company, Carolina Bedding Direct, LLC, to "Mattress By Appointment, LLC." We did this, rather than begin using the version of "Mattress By Appointment, LLC" that had been created in November 2012, because that company had a different EIN number. Keeping the same EIN number and using the company that we believed had not been sued by RSS would allow us to continue our business under a new name without changing bank accounts or tax information and without getting involved in RSS's lawsuit against my old companies.

5

Case 2:13-cv-00994-EAS-EPD Doc #: 44-1 Filed: 05/03/16 Page: 6 of 7 PAGEID #: 4202

37. Mr. Shoffner and I were still the only two owners of this renamed company, which kept the dealers, employees, playbook, and online ordering system it had originally taken from Carolina Bedding (NC) and continued to use the same bank accounts and EIN number as both Carolina Bedding (NC) and Carolina Bedding (FL). Like the move from North Carolina to Florida, the renamed company did not buy these assets or sign any contract for them. Instead, it just continued using the assets under its new name, recruiting, training, and advising dealers on the sales system described in the playbook and taken from the detailed system I developed at PMD, just as it had done before the name change. I considered these to be all one continuing corporation, doing the exact same business with the same employees and generally the same dealers.

38. Mattress By Appointment, LLC, continued to use versions of the "playbook" I had created at Carolina Bedding and Furniture, Inc., to train dealers to sell mattresses using the system I helped develop at PMD. The versions of the "playbook" used at Mattress By Appointment, LLC, made only minor changes, such as to account for new advertising technologies (Craigslist in place of newspaper classified ads, for example) and to update the document's design.

39. Two days later, on February 6, 2014, the earlier version of "Mattress By Appointment, LLC" dissolved.

40. Around this time, Mr. Shoffner and I began having disputes about the business. In March of 2014, the company's Board of Trustees fired Mr. Shoffner as President, and in May of 2014, Mr. Shoffner instituted a provision in the company's ownership agreement that required me to buy his shares or him to buy mine.

41. Because of this provision, along with RSS's continued efforts to collect PMD's old court judgment from me, I filed for personal bankruptcy on July 3, 2014.

42. As part of this bankruptcy, Mr. Shoffner bought my 55% share of Mattress By Appointment, LLC. He continues to operate the company today, and has in fact sued me in Florida to prevent me from competing with his company or using what he claims is his intellectual property.

43. The system of selling mattresses has changed very little since my time at PMD. Each of my companies has used that same system, which is almost entirely based on the sales system developed at PMD, to train dealers to sell mattresses. I think this system is very valuable to anyone selling mattresses in the way that PMD, Carolina Bedding Direct, LLC, and Mattress By Appointment dealers sell mattresses, and I think that

without it, it is unlikely that new dealers would be able to make a profit at this
business. At no point did I understand that this system was someone else's
intellectual property and that I might not be allowed to use that system in my new
businesses.

FURTHER AFFIANT SAYETH NAUGHT.

DATED this the 30th day of June, 2015.



Signature of Affiant

SWORN to subscribed before me, this 30th day of June, 2015.

NOTARY PUBLIC

My Commission Expires:

_Never_

CARRIE M. LYMANSTALL
ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

7

# Exhibit H

*Shoffner's Admission*

7. Park Place Corporation is a manufacturer of mattresses.

8. Upon information and belief, Power Marketing Direct ("PMD") is a retailer that sells mattresses to consumers.

9. In 2009, after the Franklin County Court of Common Pleas entered an injunction against Darren Conrad, I, along with other officers of Park Place Corporation, spoke with Conrad and we advised him to fully comply with the terms of the injunction.

10. On or around the time of this conversation with Darren Conrad in 2009, I offered Darren Conrad a job with Park Place Corporation as an independent-contractor, sales representative and he accepted the position.

11. As a sales representative for Park Place Corporation, Conrad's job duties included managing a geographic territory and soliciting business from various mattress retailers within that territory in order to sell Park Place Corporation's mattresses at their retail locations.

12. As a sales representative for Park Place Corporation, Conrad was compensated in accordance with a standard commission schedule.

13. This standard commission schedule was no different than any other standard commission schedule used to compensate other Park Place Corporation sales representatives at the time.

14. In 2011, I loaned Darren Conrad money to create Carolina Bedding Direct, LLC (hereinafter "Carolina Bedding (NC)").

15. At the time I loaned Darren Conrad money to create Carolina Bedding (NC) in 2011, the terms and conditions of the Franklin County Common Pleas Court's 15-month permanent injunction against Darren Conrad had expired.

# EXHIBIT I

EXHIBIT I

COMBINED EVIDENCE OF ATTEMPT TO IMPOSE SECRECY ON ARBITRATION & THIS COURT

This exhibit combines three sequential documents demonstrating Mattress By Appointment LLC's strategy to impose blanket secrecy over all proceedings, including information relevant to the claims before this Court.

1.  MBA Counsel's Email (December 29, 2025): Attorney Matthew Goller transmits a proposed scheduling order and a broad Confidentiality Order, pressuring Plaintiff to agree while jurisdictional challenges are pending.

2.  The Proposed "Gag Order": The attached Confidentiality Order seeks to classify all arbitration information—pleadings, discovery, correspondence—as secret, preventing its disclosure "in any manner or via any medium," including to this Court.

3.  Arbitrator's Executed Order (January 5, 2026): The Arbitrator signed the Confidentiality Order without material change, demonstrating the active implementation of this secrecy regime.

RELEVANCE: This exhibit shows Respondent's bad-faith effort to use arbitral procedure to conceal the very business practices and contract terms at issue in this lawsuit, directly opposing the public's and this Court's interest in transparency and fair dealing.

 Gmail

James De Los Santos <jmtexas3@gmail.com>

## Mattress By Appointment LLC v. James De Los Santos, an individual - Case 01-25-0002-5774

**Matthew R. Goller** <mgoller@orrcook.com>                                    Mon, Dec 29, 2025 at 7:22 PM
To: James De Los Santos <jmtexas3@gmail.com>, Anthony De Los Santos <austinecomfast@gmail.com>
Cc: "Kevin B. Cook" <kcook@orrcook.com>, Kendall Greiner <kgreiner@orrcook.com>, Heidi Anderson
<handerson@orrcook.com>

Good evening,

Pursuant to the email below and Order No. 3 (attached hereto), Arbitrator Adams has directed that
we meet and confer regarding the matters set forth in Rules P-1 and P-2, AAA Commercial
Arbitration Rules and Mediation Procedures, and submit a proposed scheduling order by January
2, 2026.  In correspondence dated October 10, 2025 (attached hereto), the AAA provided a template
for a proposed scheduling order addressing the matters set forth in Rules P-1 and P-2.  MBA
proposes the following deadlines, dates, and other information in accordance with the template:

1. **Applicable law.**  In accordance with the parties' agreements, Florida substantive law shall
   apply to the Arbitration.  The Revised Florida Arbitration Code (Sections 682.01-.25, Florida
   Statutes) shall apply in the Arbitration, to the extent it is not in conflict with the Federal
   Arbitration Act (9 U.S.C. §§ 1-16).

2. **Parties.** All the necessary or appropriate parties are included in the arbitration.

3. **Claim/Counterclaim.**  MBA understands that Respondents have not asserted any claims or
   counterclaims against MBA in this arbitration proceeding.  We believe the deadline to assert
   any claims or counterclaims should be January 9, 2026.

4. **Additional Preliminary Matters.** There are no additional preliminary matters that need to be
   addressed by the Arbitrator.

5. **Dispositive Motions.**  In the event any party desires to file a dispositive motion, it may file
   and serve an opening letter or email on or before January 30, 2026, not to exceed five
   (5) pages in length stating the reasons it believes that a dispositive motion should be allowed
   by the Arbitrator(s). An opposing party may file and serve a letter in opposition, not to exceed
   five (5) pages in length, within seven (7) days of service of the opening letter. The Arbitrator
   will rule on the parties' letter submissions on or before February 13, 2026. If allowed,
   dispositive motions will be due fourteen (14) days after the Arbitrator's ruling allowing them,
   with responses due fourteen (14) days after the filing of the dispositive motion.  Dispositive
   motions and responses thereto shall not exceed twenty (20) double-spaced pages, excluding
   exhibits and copies of any authorities that the parties may submit at the same time.

6. **Motions.** Except for motions to compel discovery, motions may not be filed without the permission of the Arbitrator. Applications to file motions shall be filed with the AAA and the Arbitrator, by letter or email not exceeding five (5) pages, describing 1) the motion the party wishes to file, 2) the factual and legal basis for the motion, and 3) the reasons why the motion needs to be filed and how it will expedite resolution of the case or otherwise benefit the parties. An opposing party may submit a responsive letter, not to exceed five (5) pages, within seven (7) days of its receipt of a letter requesting a motion. Motions and responses thereto shall not exceed fifteen (15) double-spaced pages, excluding exhibits and copies of any authorities that the parties may submit at the same time.

7. **Hearing.** As currently pleaded, we anticipated the hearing will take two (2) full days, inclusive of arguments. We can be available on any of the following dates: March 30-31, April 1-2, and April 7-10, 2026. The location of the hearing should be in person in Jacksonville, Duval County, Florida in accordance with the parties' agreements, and any testimony must be presented in person.

8. **Additional Pre-hearing/Status Conference.** We believe an additional pre-hearing conference would be appropriate. Date to be decided, but approximately one (1) week prior to the final hearing.

9. **Exchange of Information/Discovery.**
   a. Written discovery requests must be exchanged by January 16, 2026. Each party may serve no more than ten (10) requests for production of documents and no more than ten (10) interrogatories to another party. Answers and objections to discovery requests are due within twenty-one (21) days of receipt of the requests, and all responsive documents must be produced within seven (7) days of the answer to the request for production.
   b. All depositions must be completed by March 6, 2026. In addition to the depositions of the parties themselves, each party shall be entitled to take one (1) deposition without further order of the Arbitrator.
   c. Discovery cutoff (i.e., the deadline to complete discovery, including filing motions to compel) is March 6, 2026.

10. **Confidentiality.** No change from attached template.

11. **Cybersecurity/Privacy.** We have attached in Word format a proposed confidentiality order for your review.

12. **Subpoenas.** Subpoenas to secure the appearance of non-party witnesses or documents will be issued by the Arbitrator(s). The party requesting the subpoena shall disclose the subpoena to and shall confer with all other parties prior to requesting its issuance and shall indicate if any party opposes the issuance. If any party objects to issuance of the subpoena or the content of any subpoena, such objection shall be presented to the Arbitrator(s) no more than five (5) business days after issuance is requested, unless a shorter time is ordered by the Arbitrator(s). Proposed subpoenas related to discovery shall be submitted to the Arbitrator(s) on or before February 17, 2026. Proposed subpoenas for the attendance of witnesses at the hearing shall be submitted no later than twenty-one (21) days prior to the date of the final hearing.

13. **Witness Disclosures**.
   a. The parties shall file a disclosure of all witnesses reasonably expected to be called at the final hearing ten (10) days prior to the date of the final hearing.
   b. On or before February 27, 2026, the parties shall file and serve their initial expert witness reports for expert witnesses, if any, that will testify at the final hearing. Expert reports shall set forth each expert's opinions and the bases for such opinions. The substance of each expert's direct testimony must fairly and reasonably be addressed in the expert's report. Each testifying witness may be deposed by the opposing party. There shall be no additional discovery of experts, except on good cause shown to the Arbitrator.

14. **Exhibits.** The parties shall exchange copies of all exhibits to be offered and all schedules, summaries, diagrams, and charts to be used at hearing not later than two (2) business days prior to the date of final hearing.

15. **Arbitration Hold.** No change from attached template.

16. **Stipulation of Uncontested Facts.** The parties shall file a stipulation of uncontested facts, if any, seven (7) days prior to the date of final hearing.

17. **Pre-Hearing Briefs.** No later than five (5) days prior to the final hearing, each party may serve and file a pre-hearing brief on all significant disputed issues, setting forth briefly the party's position and the supporting arguments and authorities. Briefs shall not exceed twenty-five (25) double-spaced pages, excluding exhibits and copies of any authorities that the parties may submit at the same time.

18. **Stenographic Record.** No change from attached template.

19. **Award.** We believe a reasoned award is appropriate.

20. **Mediation/Judicial Settlement Conference Services.** MBA is willing to participate in mediation in attempt to resolve this matter. If Respondents are also willing to participate in mediation, MBA would request that AAA provide a list of five (5) mediators and MBA would agree to allow Respondents to select the mediator from that list. MBA believes mediation should be conducted early to avoid the additional time, expense, and distractions associated with litigation.

21. **Communication.** The parties shall use the AAA WebFile® for submitting documents to the AAA and the Arbitrator in accordance with the ECF Guidelines. The parties may also email submissions to the AAA Case Manager (Paris Wilkerson: ParisWilkerson@adr.org). There shall be no direct oral or written communication between the parties and the Arbitrator except as contemplated by the scheduling order.

22. **Orders.** Not applicable, as there is only a single arbitrator.

23. **Disclosures of the Arbitrators.** No change from attached template.

24. **File Destruction.** The Arbitrator will destroy his files related to this matter sixty (60) days after the filing of the Award unless otherwise notified by the parties.

25. **Deadline Enforcement.** No change from attached template.

Please let us know if you have any revisions or proposals with respect to the proposed deadlines and other information to be included in the proposed scheduling order. If you have any proposed changes, please let us know what times you are available tomorrow (December 30) or Wednesday (December 31) to discuss the matters addressed in Rules P-1 and P-2.

Thank you,

**Matthew R. Goller**
ORR | COOK
The Veranda Building
818 A1A North, Suite 302
Ponte Vedra Beach, FL 32082
(904) 648-6110 (Direct)
(904) 358-8300 (Tel)
(904) 358-8303 (Fax)
mgoller@orrcook.com
www.orrcook.com

 Please consider the environment before printing this e-mail.

-

**Email Confidentiality Notice**

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by forwarding this e-mail to mgoller@orrcook.com, or by telephone at (904) 358-8300 and then delete the message and its attachments from your computer.

**From:** Bill Adams <Bill@adamsdisputeresolution.com>
**Sent:** Wednesday, December 24, 2025 8:39 PM
**To:** James De Los Santos <jmtexas3@gmail.com>
**Cc:** ParisWilkerson@adr.org <ParisWilkerson@adr.org>; arbitration_complaints@ftc.go <arbitration_complaints@ftc.go>; Thomas.Ventrone@adr.org <Thomas.Ventrone@adr.org>; Jillian Garrett <GarrettJ@adr.org>; legal@adr.org <legal@adr.org>; MediaRelations@adr.org <MediaRelations@adr.org>; MassArbitration@adr.org <MassArbitration@adr.org>; David Shiroff <dave@mattressbyappointment.com>; edwin@mattressbyappointment.com <edwin@mattressbyappointment.com>; Katie Hein <katiehein@ mattressbyappointment.com>; Sarah Collins <scollins@mattressbyappointment.com>; Abril Rivera <arivera@scottdoug.com>; Matthew R. Goller <mgoller@orrcook.com>; austinecomfast@gmail.com <austinecomfast@gmail.com>; Heidi Anderson <handerson@orrcook.com>; Kendall Greiner <kgreiner@orrcook.com>; Kevin B. Cook <kcook@orrcook.com>
**Subject:** Re: Mattress By Appointment LLC v. James De Los Santos, an individual - Case 01-25-0002-5774

[Quoted text hidden]

**3 attachments**

**2025-10-10 Set Prelim Hearing Enclose PHSOs.pdf**
627K

**Order No 3.pdf**
28K

**Proposed Confidentiality Order (MBA v. De Los Santos).docx**
30K

AMERICAN ARBITRATION ASSOCIATION

CASE NO.: 01-25-0002-5774

MATTRESS BY APPOINTMENT LLC, a
Florida limited liability company,

        Claimant,

v.

JAMES DE LOS SANTOS, an individual;
ANTHONY DE LOS SANTOS, an individual;
and PROCREATE LLC d/b/a LUX VALUE
MATTRESS, a Texas limited liability company,

        Respondents.

_____/

## CONFIDENTIALITY ORDER

Pursuant to the Rules R-24(a) and R-45(b) of the American Arbitration Association's ("AAA") Commercial Arbitration Rules, it is hereby ORDERED:

1.      This matter is likely to involve confidential, proprietary, trade secret, private, or privileged information, requiring special protection from public disclosure and from use for any purpose other than this arbitration. Thus, the Arbitrator enters this Confidentiality Order (the "Order").

2.      Except as otherwise provided in this Order, and absent any written agreement to the parties to the contrary, it is hereby ordered that the following information (collectively, the "Arbitration Information") will be kept confidential and not be used or disclosed, directly or indirectly, in any manner or via any medium (including but not limited to email, websites, message boards, blogs, or social media), outside this arbitration:

        a.      All pleadings, motions, briefs, and other filings.

b.      All documents and other materials obtained in the course of discovery, whether from another party to this arbitration or from third persons.

c.      All responses to discovery requests.

d.      All deposition testimony (including any video or audio recordings thereof), transcripts, and exhibits.

e.      All hearing testimony (including any video or audio recordings thereof), transcripts, and exhibits.

f.      All correspondence, oral discussions, and other information exchanged in connection with these proceedings (including all correspondence, documents, or other information that have already been exchanged in connection with these proceedings).

3.      Disclosure of Arbitration Information may be made:

a.      As is necessary to confirm or obtain compliance with any order or award, interim or final, issued in this arbitration.

b.      As is necessary in connection with court proceedings relating to any aspect of the arbitration, including but not limited to motions to confirm, modify, vacate, or enforce an order or award, interim or final, in this arbitration.

c.      As is necessary to comply with any subpoena, deposition, court order, or other compulsory legal process; provided, however, the party subject to such compulsory legal process shall provide the other party with prior written notice before making any such disclosure so that the other party may take any appropriate action to intervene, oppose, and/or seek to prevent such disclosure.

2

d.    In any future arbitration proceedings between the parties, provided such proceeding is governed by substantially similar restrictions on use or disclosure of information exchanged in the arbitration.

e.    To the parties' respective officers, members, directors, attorneys, or accountants.

f.    By order or award of the Arbitrator in this proceeding.

4.    For the purpose of conducting this arbitration, Arbitration Information may be disclosed as needed to appropriate to the following persons only:

a.    The AAA and its personnel.

b.    The Arbitrator or the Arbitrator's employees.

c.    Counsel and employees of counsel for the parties who have responsibility for the preparation, prosecution, and defense of the claims in this arbitration.

d.    The parties and the officers, members, directors, or employees of any party subject to this Order.

e.    Court reporters engaged for depositions or hearings and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents.

f.    Any deposition or hearing witness; provided, however, that such witness must agree to be bound by the terms of this Order as if that person were a party, and shall acknowledge by executing, prior to receipt of or access to Arbitration Information, the Acknowledgement attached hereto as **Exhibit A**.

g.    Consultants, investigators, or experts (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation, prosecution, and defense of the claims in this arbitration; provided, however,

that such expert must agreed to be bound by the terms of this Order as if that person were a party, and shall acknowledge by executing, prior to receipt of or access to Arbitration Information, the Acknowledgement attached hereto as **Exhibit A**.

 h. Other persons upon the written agreement of the parties or upon order of the Arbitrator, and only on such conditions as are agreed to or ordered.

5. All provisions of this Order restricting the use and disclosure of documents shall continue to be binding after the conclusion of the arbitration unless otherwise agreed or ordered.

6. This Order shall be subject to modification on motion of any party or any other person who may show an adequate interest in the matter to intervene for purposes of addressing the scope and terms of this Order. The Order shall not, however, be modified until the parties shall have been given notice and an opportunity to be heard on the proposed modification.

7. This Order shall take effect when entered and shall be binding upon the parties, including their officers, members, directors, employees, independent contractors, and agents.

8. The Arbitrator may enforce this Order via sanctions pursuant to Rule R-60, AAA Commercial Rules of Arbitration, in addition to any other remedies under the AAA Commercial Arbitration Rules or available at law or in equity, including but not limited to an injunction or other equitable relief. Nothing in this Order shall prohibit a party from seeking provisional remedies from a court of competent jurisdiction, including but not limited to emergency injunctive relief, pursuant to any applicable law.

9. This Order shall survive termination of the arbitration and subsequent legal proceedings related thereto and shall be incorporated in any final award.

Dated: _____

        _____
        William E. Adams, Jr.
        Arbitrator

**EXHIBIT A**

AMERICAN ARBITRATION ASSOCIATION

CASE NO.: 01-25-0002-5774

MATTRESS BY APPOINTMENT LLC, a
Florida limited liability company,

        Claimant,

v.

JAMES DE LOS SANTOS, an individual;
ANTHONY DE LOS SANTOS, an individual;
and PROCREATE LLC d/b/a LUX VALUE
MATTRESS, a Texas limited liability company,

        Respondents.

_____/

## CONFIDENTIALITY ACKNOWLEDGEMENT

The undersigned hereby acknowledges that he or she has read the Confidentiality Order

dated _____, 20__ in the above captioned arbitration, understands the terms thereof,

and agrees to be bound by such terms.  The undersigned submits to the jurisdiction of the

American Arbitration Association in matters relating to the Confidentiality Order and

understands that the terms of said order obligate him/her to use and disclose Arbitration

Information solely for the purposes of the above-captioned arbitration, and not to disclose any

such Arbitration Information to any other person.  **The undersigned acknowledges that**

**violation of the Confidentiality Order may result in sanctions or other penalties permitted**

**by applicable law.**

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

Date:_____          _____
                Signature

AMERICAN ARBITRATION ASSOCIATION

CASE NO.: 01-25-0002-5774

MATTRESS BY APPOINTMENT LLC, a
Florida limited liability company,

      Claimant,

v.

JAMES DE LOS SANTOS, an individual;
ANTHONY DE LOS SANTOS, an individual;
and PROCREATE LLC d/b/a LUX VALUE
MATTRESS, a Texas limited liability company,

      Respondents.

_____/

## CONFIDENTIALITY ORDER

Pursuant to the Rules R-24(a) and R-45(b) of the American Arbitration Association's

("AAA") Commercial Arbitration Rules, it is hereby ORDERED:

1.     This matter is likely to involve confidential, proprietary, trade secret, private, or

privileged information, requiring special protection from public disclosure and from use

for any purpose other than this arbitration. Thus, the Arbitrator enters this Confidentiality

Order (the "Order").

2.     Except as otherwise provided in this Order, and absent any written agreement to

the parties to the contrary, it is hereby ordered that the following information

(collectively, the "Arbitration Information") will be kept confidential and not be used or

disclosed, directly or indirectly, in any manner or via any medium (including but not

limited to email, websites, message boards, blogs, or social media), outside this arbitration:

    a.     All pleadings, motions, briefs, and other filings.

    b.     All documents and other materials obtained in the course of discovery, whether from another party to this arbitration or from third persons.

    c.     All responses to discovery requests.

    d.     All deposition testimony (including any video or audio recordings thereof), transcripts, and exhibits.

    e.     All hearing testimony (including any video or audio recordings thereof), transcripts, and exhibits.

    f.     All correspondence, oral discussions, and other information exchanged in connection with these proceedings (including all correspondence, documents, or other information that have already been exchanged in connection with these proceedings).

3.     Disclosure of Arbitration Information may be made:

    a.     As is necessary to confirm or obtain compliance with any order or award, interim or final, issued in this arbitration.

    b.     As is necessary in connection with court proceedings relating to any aspect of the arbitration, including but not limited to motions to confirm, modify, vacate, or enforce an order or award, interim or final, in this arbitration.

    c.     As is necessary to comply with any subpoena, deposition, court order, or other compulsory legal process; provided, however, the party subject to such compulsory legal process shall provide the other party with prior written notice before making any

2

such disclosure so that the other party may take any appropriate action to intervene, oppose, and/or seek to prevent such disclosure.

d. In any future arbitration proceedings between the parties, provided such proceeding is governed by substantially similar restrictions on use or disclosure of information exchanged in the arbitration.

e. To the parties' respective officers, members, directors, attorneys, or accountants.

f. By order or award of the Arbitrator in this proceeding.

4. For the purpose of conducting this arbitration, Arbitration Information may be disclosed as needed to appropriate to the following persons only:

a. The AAA and its personnel.

b. The Arbitrator or the Arbitrator's employees.

c. Counsel and employees of counsel for the parties who have responsibility for the preparation, prosecution, and defense of the claims in this arbitration.

d. The parties and the officers, members, directors, or employees of any party subject to this Order.

e. Court reporters engaged for depositions or hearings and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents.

f. Any deposition or hearing witness; provided, however, that such witness must agree to be bound by the terms of this Order as if that person were a party, and shall

3

acknowledge by executing, prior to receipt of or access to Arbitration Information, the Acknowledgement attached hereto as **Exhibit A**.

g.    Consultants, investigators, or experts (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation, prosecution, and defense of the claims in this arbitration; provided, however, that such expert must agreed to be bound by the terms of this Order as if that person were a party, and shall acknowledge by executing, prior to receipt of or access to Arbitration Information, the Acknowledgement attached hereto as **Exhibit A**.

h.    Other persons upon the written agreement of the parties or upon order of the Arbitrator, and only on such conditions as are agreed to or ordered.

5.    All provisions of this Order restricting the use and disclosure of documents shall continue to be binding after the conclusion of the arbitration unless otherwise agreed or ordered.

6.    This Order shall be subject to modification on motion of any party or any other person who may show an adequate interest in the matter to intervene for purposes of addressing the scope and terms of this Order. The Order shall not, however, be modified until the parties shall have been given notice and an opportunity to be heard on the proposed modification.

7.    This Order shall take effect when entered and shall be binding upon the parties, including their officers, members, directors, employees, independent contractors, and agents.

4

8.     The Arbitrator may enforce this Order via sanctions pursuant to Rule R-60, AAA Commercial Rules of Arbitration, in addition to any other remedies under the AAA Commercial Arbitration Rules or available at law or in equity, including but not limited to an injunction or other equitable relief.  Nothing in this Order shall prohibit a party from seeking provisional remedies from a court of competent jurisdiction, including but not limited to emergency injunctive relief, pursuant to any applicable law.

9.     This Order shall survive termination of the arbitration and subsequent legal proceedings related thereto and shall be incorporated in any final award.

Dated: Jan. 5, 2026

William E. Adams, Jr.
Arbitrator

5

**EXHIBIT A**

AMERICAN ARBITRATION ASSOCIATION

CASE NO.: 01-25-0002-5774

MATTRESS BY APPOINTMENT LLC, a

Florida limited liability company,

Claimant,

v.

JAMES DE LOS SANTOS, an individual;
ANTHONY DE LOS SANTOS, an individual;
and PROCREATE LLC d/b/a LUX VALUE
MATTRESS, a Texas limited liability company,

Respondents.

_____/

## CONFIDENTIALITY ACKNOWLEDGEMENT

The undersigned hereby acknowledges that he or she has read the Confidentiality Order

dated _____, 20__ in the above captioned arbitration, understands the terms thereof,

and agrees to be bound by such terms. The undersigned submits to the jurisdiction of the

American Arbitration Association in matters relating to the Confidentiality Order and

understands that the terms of said order obligate him/her to use and disclose Arbitration

Information solely for the purposes of the above-captioned arbitration, and not to disclose any

such Arbitration Information to any other person. **The undersigned acknowledges that**

**violation of the Confidentiality Order may result in sanctions or other penalties permitted**

**by applicable law.**

Name: _____

Job Title: _____

7

Employer:         _____

Business Address:    _____


Date:_____        _____
                 Signature

# EXHIBIT J

**NOTICE REGARDING PRIOR APPEARANCE UNDER PROTEST**

Plaintiffs James De Los Santos and Anthony De Los Santos submit this exhibit as part of the record in this action.

Plaintiffs note the following for clarity and completeness of the record:

1. Plaintiffs appeared for limited, preliminary telephone proceedings related to a separate arbitration matter solely to object to jurisdiction and preserve their rights.

2. Plaintiffs expressly did not consent to arbitration, did not participate on the merits, and exited those proceedings after stating their objections.

3. Plaintiffs have ceased all participation in arbitration and do not recognize arbitration as a proper forum for adjudication of the claims asserted herein.

4. This action is a separate civil case, asserting independent statutory and tort claims, and is not an appeal, continuation, or arbitration-related proceeding.

This notice is provided solely to avoid confusion in the record and is not intended as argument or briefing on arbitrability.

AMERICAN ARBITRATION ASSOCIATION

MATTRESS BY APPOINTMENT LLC,

    Claimant,

v.                                       Case No. 01-25-0002-5774

JAMES DE LOS SANTOS ET AL

    Respondents.

## ORDER NO. 3

A Preliminary Hearing was convened on October 31, 2025 at 10:30 a.m. via teleconference. Kevin Cook, Esq. and Matthew Goller, Esq. attended for Claimant, along with Edwin Schoffner and David Schiroff, Esq. Respondents James De Los Santos and Anthony De Los Santos appeared *pro se*. Respondent Procreate LLC d/b/a Lux Value Mattress did not appear through counsel. Paris Wilkerson and Erika Kleinschmidt, Esq. appeared on behalf of the AAA.

Respondents noted their intention to raise jurisdictional challenges to this proceeding during the call, with Respondents James De Los Santos and Anthony De Los Santos stating that their appearance was without waiver to any of their challenges to this proceeding.

Accordingly, to the extent that Respondents wish to raise any issue pursuant to Commercial Rule R-7, Respondents shall each file a single motion addressing all Rule R-7 issues on or before November 21, 2025. Claimant shall respond to such motions, if any, on or before December 5, 2025, with an order to follow on or before December 19, 2025.

In the event that no motions are filed, the parties shall meet and confer regarding the matters in Rules P-1 and P-2 on or before December 5, 2025, with a proposed scheduling order to be submitted to the AAA on or before December 12, 2025. If there are areas of disagreement, the proposed scheduling order should clearly identify them and an additional Preliminary Hearing will be held on December 19, 2025 at 10:30 a.m. to discuss and resolve all such issues.

In the event that motions are filed and any issues remain, the parties shall meet and confer regarding the matters in Rules P-1 and P-2 on or before December 31, 2025, with a proposed scheduling order to be submitted to the AAA on or before January 2, 2026. If there are areas of disagreement, the proposed scheduling order should clearly identify them and an additional Preliminary Hearing will be held on January 5, 2026 at 10:30 a.m. to discuss and resolve all such issues.

Respondent Procreate LLC d/b/a Lux Value Mattress is cautioned that, under Florida law, corporate entities may not be represented in arbitrations by non-lawyers. Should Respondent

Procreate LLC d/b/a Lux Value Mattress wish to be heard in this proceeding, counsel should promptly file their appearance with AAA.

Dated: October 31, 2025.

William E. Adams, Jr.
Arbitrator

AMERICAN ARBITRATION ASSOCIATION

MATTRESS BY APPOINTMENT LLC, a
Florida limited liability company,

      Claimant,

v.

JAMES DE LOS SANTOS, an individual;
ANTHONY DE LOS SANTOS, an individual;
and PROCREATE LLC d/b/a LUX VALUE
MATTRESS, a Texas limited liability company,

      Respondents.

Case Number: 01-25-0002-5774

_____/

## Preliminary Hearing and Scheduling Order # 6

Pursuant to the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association (AAA) effective September 1, 2022, a preliminary hearing was held on January 5, 2026, before Arbitrator William E. Adams, Jr.

**Preliminary Hearing Attendees:**

Claimant was represented by Kevin Cook, Matthew Goller, Ed Schoffner and David Schiroff.

Respondents Anthony De Los Santos and James De Los Santos each joined the hearing, made statements regarding their objections to the hearing, and left the hearing without participating further.

Paris Wilkerson attended for the AAA.

**By Order of the Arbitrator, the following is now in effect:**

1.      **Applicable Law:** Florida substantive law shall apply to the Arbitration. The Revised Florida Arbitration Code (Sections 682.01-.25, Florida Statutes) shall apply in the

Page 1 of 9

Arbitration, to the extent it is not in conflict with the Federal Arbitration Act (9 U.S.C. §§ 1-16).

2.　**Parties:** All the necessary or appropriate parties are included in the arbitration.

3.　**Claim/Counterclaim:** Pursuant to the direction of the Arbitrator, all parties shall amend/ specify claims and/or counterclaims by January 9, 2026. Responses, if any, are due by January 23, 2026.

4.　**Additional Preliminary Matters:** There are no additional preliminary matters that need to be addressed by the Arbitrator.

5.　**Dispositive Motions:** In the event that any party desires to file a dispositive motion, it may file and serve an opening letter on or before January 30, 2026, not to exceed five (5) pages in length inclusive of attachments, stating the reasons it believes that a dispositive motion should be allowed by the Arbitrator. An opposing party may file and serve its letter in opposition, not to exceed five (5) pages in length, within seven (7) days of service of the opening letter. The Arbitrator will rule on the parties' letter submissions on or before on or before February 13, 2026. If allowed, dispositive motions will be due fourteen (14) days after the Arbitrator's ruling allowing them, with responses due fourteen (14) days after the filing of the dispositive motion. Dispositive motions and responses thereto shall not exceed twenty (20) double-spaced pages, excluding exhibits and copies of any authorities that the parties may submit at the same time.

6.　**Motions:** Except for motions to compel discovery, motions may not be filed without the permission of the Arbitrator. Application to file motions shall be filed with the AAA and the Arbitrator, by letter or email not to exceed five (5) pages, inclusive of exhibits;

describing 1) the motion the party wishes to file, 2) the factual and legal basis for the motion, and 3) the reasons why the motion needs to be filed and how it will expedite resolution of the case or otherwise benefit the parties.

The submission shall contain a certification that the requesting party has in good faith conferred with the opposing party about the proposed motion prior to any party requesting that a Motion be filed. The certification shall state whether the relief sought by the motion has been agreed to by the parties or will be opposed. If no conference has occurred, the reason why must be stated. An opposing party may submit a responsive letter, not to exceed five (5) pages inclusive of exhibits, within seven (7) days of its receipt of a letter requesting a motion. Motions and responses thereto shall not exceed fifteen (15) double-spaced pages, excluding exhibits and copies of any authorities that the parties may submit at the same time. The parties are advised that it is unlikely that dispositive motions which require resolution of disputed facts without a hearing will be granted. All other applications or requests for advice or direction from the Arbitrator may be made informally by email or joint telephone conference. Formal motion procedure is not required, although it is allowed if the parties wish.

7. **Hearing:** An in-person final hearing in this matter will commence before the Arbitrator in Jacksonville, Duval County, Florida on April 9-10, 2026 at 9:30 a.m. The parties estimate that this case will require two (2) days of hearing time, inclusive of arguments. Approximate number of attendees at the hearing: 10.

8. **Additional Pre-hearing/Status Conference:** An additional pre-hearing or status conference call is scheduled for April 1, 2026 at 9:30 am before the Arbitrator. The parties shall confer regarding a proposed agenda and shall submit a proposed agenda for the call

no later than March 30, 2026. If no agenda is provided, the call will be cancelled. This call may also be cancelled upon the mutual agreement of the parties.

9.    **Exchange of Information/Discovery:**

a.    Written Discovery:

i.    Written discovery requests shall be exchanged by January 16, 2026. Each party may serve no more than ten (10) requests for production of documents and no more than ten (10) interrogatories to another party.

ii.    Answers and objections to discovery requests are due within twenty-one (21) days of receipt of the requests, and all responsive documents must be produced within seven (7) days of the answer to the request for production.

b.    Depositions. All depositions must be completed by March 6, 2026.  In addition to the depositions of the parties themselves, each party shall be entitled to take one (1) deposition without further order of the Arbitrator. With respect to all depositions, there shall be no speaking objections, or interference with the ability of counsel to elicit testimony from a witness, subject to privilege objections and instructions.

c.    Discovery cutoff is March 6, 2026.  Please be advised that late-filed motions to compel discovery or discovery disputes are insufficient to cause a postponement of the final hearing.

d.    Electronic Discovery:

i.    Clawback agreements shall be in place for all parties to allow for the retrieval of inadvertently disclosed attorney-client privileged documents.

ii.    If the cost of collection of any of the electronically stored data presents an

unreasonable cost for the producing party because the data is not readily accessible and the parties cannot reach an agreement on the handling of the cost, the arbitrator will decide if cost sharing or cost shifting is appropriate.

      iii.    If any party has documents that are confidential, the arbitrator will issue a protective order upon the receipt of a stipulation from the parties for such an order. If the parties cannot agree on the terms, the attached sample Stipulation for Protective Order may be used.

10. **Confidentiality:** A party may make a request to the Arbitrator for any measures required to protect confidential information.

11. **Cybersecurity/Privacy:** Having reviewed the AAA-ICDR Best Practices Guide for Maintaining Cybersecurity and Privacy and discussing what specific precautions might be required with regard to cybersecurity, privacy, and data protection in order to ensure an appropriate level of security for this case, the parties have submitted a proposed confidentiality order.

12. **Subpoenas:** Subpoenas to secure the appearance of non-party witnesses or documents will be issued by the Arbitrator. The party requesting the subpoena shall disclose the subpoena to and shall confer with all other parties prior to requesting its issuance and shall indicate if any party opposes the issuance. If any party objects to issuance of the subpoena or the content of any subpoena, such objection shall be presented to the Arbitrator no more than five (5) business days after issuance is requested, unless a shorter time is ordered by the Arbitrator. Subpoenas related to discovery shall be submitted to the Arbitrator on or before February 17, 2026. Subpoenas for the attendance of witnesses at the hearing shall be submitted no later than twenty-one (21) days prior to the date of the final hearing.

13.    **Witness Disclosures:**

a.    The parties shall file a disclosure of all witnesses reasonably expected to be called at the final hearing ten (10) days prior to the date of the final hearing.

b.    On or before February 27, 2026, the parties shall file and serve their initial expert witness reports for expert witnesses, if any, that will testify at the final hearing. Expert reports shall set forth each expert's opinions and the bases for such opinions. The substance of each expert's direct testimony must fairly and reasonably be addressed in the expert's report. Each testifying witness may be deposed by the opposing party. There shall be no additional discovery of experts, except on good cause shown to the Arbitrator.

14.    **Exhibits:** The parties shall exchange copies of all exhibits to be offered and all schedules, summaries, diagrams, and charts to be used at hearing not later than two (2) business days prior to the date of final hearing.

a.    The Association does not require a copy of the exhibits for our file.

b.    Each party shall bring sufficient copies to the hearing for opposing parties, the Arbitrator, and the witness.

c.    Each proposed exhibit shall be pre-marked for identification using the following designations:

| Party | Exhibit # | To Exhibit # |
|-------|-----------|--------------|
| Claimant | C1 | C____ |
| Respondent | R1 | R____ |

d.      The parties shall attempt to agree upon and submit a jointly prepared consolidated and comprehensive set of joint exhibits.  Joint Exhibits shall be numbered sequentially with the prefix J (J-1, J-2, J-3, etc.).

15.    **Arbitration Hold:** Counsel for the parties are directed to inform their clients that the Arbitrator has ordered an arbitration hold which applies to all documents and information relating to the claims and defenses in this matter.  All parties shall take all steps needed to prevent the destruction of any documents or information, both paper and electronic. If any party has an automatic document deletion/destruction program in place that system should be overridden until the case is completed.

16.    **Stipulation of Uncontested Facts:** The parties shall file a stipulation of uncontested facts, if any, seven (7) days prior to the date of final hearing.

17.    **Pre-Hearing Briefs:** No later than five (5) days prior to the final hearing, each party may serve and file a pre-hearing brief on all significant disputed issues, setting forth briefly the party's position and the supporting arguments and authorities.

a.      Briefs may be in summary form, including the use of bullet points rather than extensive text.

b.      Briefs shall not exceed twenty-five (25) double-spaced pages, excluding exhibits and copies of any authorities that the parties may submit at the same time.  The parties are invited to highlight any authorities as they deem appropriate.

18.    **Stenographic Record**: If both parties desire a stenographic record of the hearing, the parties will arrange between themselves of the presence of a court reporter. The cost of the court report will be divided evenly between the parties. Pursuant to the Rules, if the

parties are not in agreement, the requesting party or parties shall pay the cost of the court reporter and record.

19. **Award:** The award will be a reasoned award. Pursuant to the Rules, the award shall be made by the Arbitrator no later than thirty (30) days from the date of closing the hearing, or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statement and proofs to the Arbitrator.

20. **Mediation/Judicial Settlement Conference Services:**

    a.    Mediation and Judicial Settlement Conference Services are available from the AAA. There is no additional filing fee to initiate either service.

    b.    In accordance with Rule R-10, the parties shall mediate their dispute by February 13, 2026 pursuant to AAA's Commercial Arbitration Rules and Mediation Procedures, or as otherwise agreed upon by the parties, in accordance with the Rules.

21. **Communication:** The parties shall use the AAA WebFile® for submitting documents to the AAA and the Arbitrator in accordance with the ECF Guidelines. The parties may also email submissions to the AAA Case Manager (Paris Wilkerson: ParisWilkerson@adr.org). There shall be no direct oral or written communication between the parties and the Arbitrator except as contemplated by the scheduling order.

22. **Disclosures of the Arbitrator:** Each counsel and party has a continuing obligation to protect the integrity of the arbitration proceeding by promptly providing the Arbitrator the information necessary to allow him/her to comply with his/her ongoing duties of disclosure pursuant to the Code of Ethics for Arbitrators in Commercial Disputes and the American Arbitration Association. Counsel, for themselves and for each of their clients,

acknowledge the continuing obligation to supplement the identification of potential fact and expert witnesses, consulting experts, counsel participation and representation in any capacity, and any other individual or entity interested in the outcome of the arbitration. Any issues concerning disqualification of the Arbitrator shall be raised promptly with the AAA.

23. **File Destruction:** The Arbitrator will destroy his files related to this matter sixty (60) days after the filing of the Award unless otherwise notified by the parties.

24. **Deadline Enforcement:** All deadlines stated herein will be strictly enforced and adhered to in order to avoid unnecessary delay and to ensure an expedient and fair resolution of this matter. This order shall continue in effect unless and until amended by subsequent order of the Arbitrator.

Dated: <u>January 5, 2026</u>

Arbitrator Signature: _____

# ❖ EXHIBIT K ❖
## NATIONAL LITIGATION TRACKER



Nationwide Civil Litigation History (2014-2024)

| TOTAL CASES TRACKED | MBA AS PLAINTIFF | MBA AS DEFENDANT | PLAINTIFF RATIO |
|---|---|---|---|
| 62 | 61 | 1 | 61:1 |

**CRITICAL FINDING:** Edwin Shoffner signed 2019 Washington State Consent Order admitting Business Opportunity Fraud Act violations. Cases filed AFTER this admission demonstrate **knowing, continued fraud** using identical tactics.

## VISUAL EVIDENCE OF SYSTEMATIC ENFORCEMENT

### MBA LITIGATION PATTERN: 61-TO-1 PLAINTIFF RATIO



## LITIGATION TIMELINE: CONTINUED AFTER 2019 CONSENT ORDER



## CASE OUTCOMES: ENFORCEMENT PATTERN EVIDENCE





**GEOGRAPHIC CONCENTRATION: FORUM MANIPULATION EVIDENCE**

## PATTERN ANALYSIS: SYSTEMATIC ENFORCEMENT MODEL

- **Litigation Dominance:** 61 plaintiff actions vs. 1 defendant action demonstrates systematic enforcement machinery

- **Consolidation Strategy:** Master case 14-CA-7243 consolidated 12+ dealer enforcement actions in 2015

- **Geographic Concentration:** 93% of cases filed in Florida, suggesting forum manipulation for strategic advantage

- **Outcome Pattern:** High rates of default judgments, injunctions, and dismissals suggest intimidation tactics

- **Post-Consent Order Activity:** 20+ cases filed AFTER 2019 Washington State admission of fraud violations

- **Entity Manipulation:** Repeated use of Florida LLC entity with typographical variants ('Lic' vs 'LLC')

## LEGAL SIGNIFICANCE

This litigation pattern demonstrates MBA's business model relies on systematic legal enforcement rather than voluntary compliance. The 61:1 plaintiff ratio is statistically extraordinary and evidences a business structure designed around litigation intimidation.

The continued filing of enforcement actions AFTER Edwin Shoffner's 2019 admission of Business Opportunity Fraud Act violations demonstrates knowing fraud. A confessed fraudster cannot use arbitration clauses to conceal ongoing criminal conduct.

Geographic concentration in Florida courts suggests systematic forum manipulation, while the master consolidation case (14-CA-7243) shows sophisticated orchestration of multiple simultaneous enforcement actions against dealers.

## COMPLETE CASE LISTING (62 VERIFIED CASES)

### ORIGINAL VERIFIED CASES (44)

| # | Case Name | Case No. | Status |
|---|---|---|---|
| 1 | MBA v. Sobala | 16-2022-CA-002001 | Closed |
| 2 | MBA v. Dearie | 16-2019-CA-009005 | Closed |
| 3 | MBA v. Hodge et al. | 16-2019-CA-003098 | Final Judgment |
| 4 | MBA v. Meath | 16-2015-CA-001530 | Dismissed w/prej |
| 5 | MBA v. Randall | 16-2015-CA-001531 | Dismissed w/prej |
| 6 | MBA v. Meyer | 16-2020-CA-000995 | Final Judgment |
| 7 | MBA v. Penuel Firm | 16-2015-CA-003955 | Voluntary Dismiss |
| 8 | MBA (Master Case) | 14-CA-7243 | Consolidated |
| 33 | MBA v. Edenfield | 16-2019-CA-000314 | Default Judgment |
| 34 | MBA v. Galvan et al. | 16-2018-CA-003956 | Voluntary Dismiss |
| 35 | MBA v. Leos | 16-2020-CA-002790 | Final Judgment |
| 36 | MBA v. Ugo | 16-2018-CA-003985 | Bankruptcy |
| 37 | MBA v. Coyier | 16-2020-CA-005782 | Voluntary Dismiss |
| 38 | MBA v. Clarke | 16-2015-CA-001534 | Default Judgment |
| 39 | MBA v. Faus | 16-2015-CA-001535 | Dismissed w/prej |
| 40 | MBA v. Christenson | 16-2021-CA-004838 | Voluntary Dismiss |
| 41 | MBA v. Ada | N21M-08-086 (DE) | Closed |
| 42 | Fresno v. MBA (DEF) | 18-dcv-258102 (TX) | Want of Pros |
| 43 | MBA v. Webb et al. | 16-2015-CA-001510 | Dismissal |
| 44 | MBA v. Butson | 16-2015-CA-001558 | Dismissed w/prej |

### NEWLY DISCOVERED CASES (18)

| # | Case Name | Case No. | Status |
|---|---|---|---|
| 45 | MBA v. Faith Furniture | 16-2018-CA-003537 | Settlement |
| 46 | MBA v. Nestor | 16-2018-CA-003545 | Dismissed w/prej |
| 47 | MBA v. Carlson | 16-2016-CA-005239 | Lack of Pros |
| 48 | MBA v. Sherratt | 16-2015-CA-001562 | Dismissed w/prej |
| 49 | MBA v. Segura | 16-2020-CA-005611 | Dismissed w/prej |
| 50 | MBA v. Gallo | 16-2015-CA-001536 | Consolidated |
| 51 | MBA v. Toler et al. | 16-2017-CA-007659 | Voluntary Dismiss |

| # | Case Name | Case No. | Status |
|---|-----------|----------|--------|
| 52 | MBA v. Carson | 16-2015-CA-001532 | Dismissed w/prej |
| 53 | MBA v. Zachynski | 16-2015-CA-001540 | Dismissed w/prej |
| 54 | MBA v. Cornell | 16-2021-CA-005009 | Dismissed w/prej |
| 55 | MBA v. Love | 16-2018-CA-004054 | Final Judgment |
| 56 | MBA v. Bultman | 16-2018-CA-004000 | Final Judgment |
| 57 | MBA v. Wuensch | 16-2020-CA-000672 | Default Judgment |
| 58 | MBA v. Gruber et al. | 16-2017-CA-003854 | Dismissed w/prej |
| 59 | MBA v. Swanson | 16-2015-CA-001561 | Abatement |
| 60 | MBA v. Taylor | 16-2015-CA-001554 | Dismissed w/prej |
| 61 | MBA v. Larivee | 16-2015-CA-001523 | Consolidated |
| 62 | MBA v. Smith | 16-2018-CA-001003 | Voluntary Dismiss |

## MBA AS DEFENDANT (1 CASE ONLY)

| Case Name | Case No. | Status |
|-----------|----------|--------|
| Royer v. MBA | 16-2023-CA-000815 | Dismissed w/prejudice |

Compiled from State Court Dockets, PDF Filings, and Public Records | Document Generated: December 10, 2025 | Page counts exclude continuation sheets

## Exhibit L – Bait-and-Switch & False Advertising Proof

All images in this exhibit were taken directly from MBA's official supplier website, *Lunessence.com*. These listings have continuously shown "SOLD OUT" status since I joined MBA in October 2024 and have remained that way throughout my entire tenure — and as of the current date, June 8, 2025. This demonstrates that the advertised "$150 mattresses" used in MBA's promotions were never actually available for sale, confirming the existence of a bait-and-switch marketing strategy.  Link here: https://www.lunessencesleep.com/collections/forest-series



4" model shown with fake 'discount' and listed as sold out        5" model shown with fake 'discount' and listed as sold out





Cypress Plush model shown with fake 'discount' and listed as sold out

Maple Super Pillow Top model shown with fake 'discount' and listed as sold out

13



Sycamore Euro Top model shown with fake 'discount' and listed as sold out



Dogwood Extra Firm model shown with fake 'discount' and listed as sold out

14





Spruce Luxury Plush model shown with fake 'discount' and and listed as sold out    listed as sold out

Angel Oak Extra Firm model shown with fake 'discount' and listed as sold out

Actual picture of the 4" foam mattress I had displayed in my store that is listed as 4"promo in the Lunnesance pic above.  The main advertising teachings that embarrassed me every time I showed it.



Image: MBA internal price sheet used to support "50–80% off" advertising claims. Prices are artificially inflated to create a false sense of discount — e.g., listing a 4" foam queen mattress with a fake MSRP of $899 to justify a "sale" price of $150. This mattress was never intended to be sold and was marked 'Sold Out' on the website when customers inquired.

DECLARATION REGARDING FRAUDULENT ADVERTISING

I joined Mattress By Appointment believing I was bringing honest savings to my community — selling quality mattresses at 50–80 percent off retail, just as MBA advertised. Those claims were what convinced me to invest $75,000+, sign a three-year commercial lease, and leave my prior employment.

But once I was inside the program, I discovered those discounts were fabricated. The "$150 mattress" used in training and advertisements was a four-inch foam piece never meant for sale — only for display to lure customers into the showroom. Every higher-end model shown as "on sale" was permanently listed as "Sold Out" on MBA's own supplier website, Lunessence.com.

I now realize I signed up for a system of lies that embarrassed me in front of the very people I wanted to help. The 50–80 percent-off promise — the heart of why I joined MBA — was never true. This exhibit documents that systematic deception.

The following pages show screenshots taken directly from Lunessence.com between October 2024 and June 2025, demonstrating that the advertised "$150 mattresses" were never actually available for purchase and remained marked "SOLD OUT" throughout my entire tenure as an MBA dealer.

*James De Los Santos*

# Mattress By Appointment

**Lunnessence Core - Sherwood 2024**

| Stock # | Product | MSRP Pricing | Clearance $ Mattress |
|---|---|---|---|
| **Slot 1- 4 Inch Foam** | | | |
| SWT-M75-S143 | 4 Inch Foam Twin | $ 399.00 | $ 100.00 |
| SWF-M90-S170 | 4 Inch Foam Full | $ 599.00 | $ 140.00 |
| SWQ-M105-S190 | 4 Inch Foam Queen | $ 799.00 | $ 150.00 |
| SWK-M155-S295 | 4 Inch Foam King | $ 1,099.00 | $ 275.00 |
| **Slot 2 - Palm EuroTop** | | | |
| SWT-M115-S183 | Palm ET Twin | $ 599.00 | $ 175.00 |
| SWF-M149-S229 | Palm ET Full | $ 749.00 | $ 225.00 |
| SWQ-M172-S257 | Palm ET Queen | $ 899.00 | $ 250.00 |
| SWK-M243-S383 | Palm ET King | $ 1,249.00 | $ 450.00 |
| **Slot 3 - Hickory Firm Eurotop** | | | |
| SWT-M155-S223 | Hickory FmET Twin | $ 799.00 | $ 275.00 |
| SWF-M197-S277 | Hickory FmET Full | $ 999.00 | $ 325.00 |
| SWQ-M227-S312 | Hickory FmET Queen | $ 1,149.00 | $ 350.00 |
| SWK-M313-S453 | Hickory FmET King | $ 1,599.00 | $ 675.00 |
| **Slot 4 - Cypress Plush EuroTop** | | | |
| SWT-M182-S250 | Cypress Pl ET Twin | $ 1,049.00 | $ 375.00 |
| SWF-M233-S313 | Cypress Pl ET Full | $ 1,349.00 | $ 525.00 |
| SWQ-M266-S351 | Cypress Pl ET Queen | $ 1,549.00 | $ 550.00 |
| SWK-M368-S508 | Cypress Pl ET King | $ 2,049.00 | $ 775.00 |
| **Slot 5 - Maple Super Pillow Top** | | | |
| SWT-M227-S295 | Maple SPT Twin | $ 1,149.00 | $ 475.00 |
| SWF-M290-S370 | Maple SPT Full | $ 1,499.00 | $ 625.00 |
| SWQ-M336-S421 | Maple SPT Queen | $ 1,699.00 | $ 650.00 |
| SWK-M430-S570 | Maple SPT King | $ 2,199.00 | $ 975.00 |
| **Slot 6 - Sycamore Super Pillow Top** | | | |
| SWT-M227-S295 | Sycamore SPT Twin | $ 1,149.00 | $ 575.00 |
| SWF-M290-S370 | Sycamore SPT Full | $ 1,499.00 | $ 725.00 |
| SWQ-M336-S421 | Sycamore SPT Queen | $ 1,699.00 | $ 750.00 |
| SWK-M430-S570 | Sycamore SPT King | $ 2,199.00 | $ 1,075.00 |
| **Slot 7 - Dogwood Extra Firm** | | | |
| SWT-M247-S315 | Dogwood EF Twin | $ 1,249.00 | $ 675.00 |
| SWF-M322-S402 | Dogwood EF Full | $ 1,649.00 | $ 825.00 |
| SWQ-M360-S445 | Dogwood EF Queen | $ 1,849.00 | $ 850.00 |
| SWK-M461-S601 | Dogwood EF King | $ 2,349.00 | $ 1,175.00 |
| **Slot 8 - Elm EuroTop** | | | |
| SWT-M315-S383 | Elm ET Twin | $ 1,599.00 | $ 800.00 |
| SWF-M408-S488 | Elm ET Full | $ 2,099.00 | $ 925.00 |
| SWQ-M446-S531 | Elm ET Queen | $ 2,249.00 | $ 950.00 |
| SWK-M579-S719 | Elm ET King | $ 2,949.00 | $ 1,275.00 |

| | Slot 9 - Spruce Luxury Plush | | | | |
|---|---|---|---|---|---|
| SWT-M391-S459 | Spruce LxP Twin | $ | 1,999.00 | $ | 850.00 |
| SWF-M485-S568 | Spruce LxP Full | $ | 2,449.00 | $ | 1,125.00 |
| SWQ-M547-S632 | Spruce LxP  Queen | $ | 2,799.00 | $ | 1,150.00 |
| SWK-M735-S875 | Spruce LxP King | $ | 3,699.00 | $ | 1,575.00 |
| | Slot 10 - Angel Oak Super Pillow Top | | | | |
| SWT-M444-S512 | Angel Oak SPT Twin | $ | 2,249.00 | $ | 900.00 |
| SWF-M547-S627 | Angel Oak SPT Full | $ | 2,799.00 | $ | 1,325.00 |
| SWQ-M586-S671 | Angel Oak SPT Queen | $ | 2,949.00 | $ | 1,350.00 |
| SWK-M758-S898 | Angel Oak SPT King | $ | 3,849.00 | $ | 1,675.00 |
| | Boxsprings | | | | |
| SWT-B68-P512 | 9 or 5 Inch Twin | $ | 180.00 | $ | 125.00 |
| SWF-B80-P627 | 9 or 5 Inch Full | $ | 220.00 | $ | 140.00 |
| SWQ-B85-P671 | 9 or 5 Inch Queen | $ | 250.00 | $ | 150.00 |
| SWK-B140-P898 | 9 or 5 Inch King Set | $ | 360.00 | $ | 200.00 |
| | Platforms | | | | |
| SWT-P82-P512 | Highrise Twin | $ | 209.00 | $ | 150.00 |
| SWF-P103-P627 | Highrise Full | $ | 254.00 | $ | 165.00 |
| SWQ-P109-P671 | Highrise Queen | $ | 284.00 | $ | 175.00 |
| SWK-P122-P898 | HIghrise King | $ | 329.00 | $ | 225.00 |
| | Mattress Protectors | | | | |
| SWT-MP19-P512 | Prime Smooth Twin | $ | 49.00 | $ | 40.00 |
| SWF-MP23-P627 | Prime Smooth Full | $ | 59.00 | $ | 50.00 |
| SWQ-MP24-P671 | Prime Smooth Queen | $ | 64.00 | $ | 60.00 |
| SWK-MP28-P898 | Prime Smooth King | $ | 74.00 | $ | 70.00 |
| | Gelled Microfiber | | | | |
| SWQ-P25-P671 | Queen | $ | 59.00 | $ | 50.00 |



Coach David instructs: 4" foam mattress is for display only, not sale    permission to advertise honestly

You pushing back against deception and requesting



Your follow-up message shows discomfort and desire to sell ethically; Coach David calls the payment plan "bait" for upselling-confirming deceptive strategy

# EXHIBIT M

MBA'S TEXAS FORUM HYPOCRISY

MATTRESS BY APPOINTMENT LLC V. JASON EULER

Tarrant County, Texas | Case Filed: March 8, 2024

Source: Official court record showing MBA voluntarily invoked Texas jurisdiction,

hired Texas counsel (David W. Roth), and obtained Texas judgment to domesticate

Florida arbitration award - two months before terminating Plaintiff.

## MATTRESS BY APPOINTMENT LLC vs JASON EULER

On March 08, 2024 a foreign judgment case was filed by Mattress By Appointment Llc, represented by David W. Roth, against Jason Euler, in the jurisdiction of Tarrant County, TX. Judge Hrabal, Mike presiding.

### Case Details

**CASE NUMBER**
(Subscribe to View)  🔕

**FILING DATE**
March 08, 2024

**LAST REFRESHED**
March 12, 2024

**FILING LOCATION**
Tarrant County, TX

**FILING COURT**
Tarrant County

**JUDGE**
Hon. Hrabal, Mike  🔕

**COURT CATEGORY**
Civil - Other Civil

**PRACTICE AREA**
Creditor

**MATTER TYPE**
Judgment Enforcement

**CASE LAST UPDATE**
**1 Year Ago**

### Parties

Plaintiffs

Mattress By Appointment Llc

Attorneys For Plaintiffs

David W. Roth (Blenden Roth Law Firm)

👤 Attorney Analysis

Defendants

Jason Euler

Latest Case Changes ∨                                                    ADDED    REMOVED

Mar 12, 2024

(icon) **Attorneys**

*Added*

David W. Roth    **Attorney was added for the Plaintiff**

(icon) **Categories**

*Added*

Civil - Other Civil

(icon) **Judges**

*Added*

Hrabal, Mike

(icon) **Parties**

*Added*

Jason Euler    **Defendant**

Mattress by Appointment LLC    **Plaintiff**

## Case Events

March 08, 2024

Docket Event

Petition (Court Only)

March 08, 2024

Docket Event

Notice

March 08, 2024

Docket Event

Final Judgment

JS 44 (Rev. 08/18)

**ORIGINAL**    **CIVIL COVER SHEET** 3 - 26 CV - 122 - K

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS Charles Edwin Shoffner  SC (Greenville County) |
|---|---|
| James De Los Santos | Sherwood Southwest, LLC   Kentucky (Principal Place of Business)<br>CVB Inc. (d/b/a Malouf) Utah<br>West Creek Financial, Inc. (d/b/a Koalafi) Virginia |

**(b)** County of Residence of First Listed Plaintiff **Travis**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
PRO SE, 1905 Willkomen Way, Pflugerville, TX 78660 737-775-6880

Attorneys *(If Known)*

RECEIVED
JAN  6 2026
KCR
CLERK U.S. DISTRICT COURT

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☒ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: **28 U.S.C. § 1331**
Brief description of cause:
Sherman Antitrust Act, 15 U.S.C. §§ 1-2; Texas Antitrust Act; Fraud; Conspiracy; DTPA

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ 1 Million Expected to exceed
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Dear Clerk:

Enclosed please find for filing:



RECEIVED

JAN  6 2026

KCR

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3 - 26 C V - 1 2 2 - K

1. Two (2) complete sets, each containing:
- Civil Cover Sheet (Form JS-44)
- Verified Complaint
- Exhibits A through L
- Four (4) summons forms (AO 440) for the following defendants:
• Charles Edwin Shoffner
• Sherwood Southwest, Inc.
• CVB Inc. d/b/a Malouf Companies
• West Creek Financial, Inc. d/b/a Koalafi

2. Filing fee check in the amount of $405.00

3. Self-addressed stamped envelope for return of file-stamped copy

Please file the Complaint and issue summons for service on the defendants.

Thank you for your assistance.

Respectfully submitted,

James De Los Santos
1905 Willkomen Way

Pflugerville TX 78660
JmTexas3@gmail.com

737-775-6880
Pro Se Plaintiff



The UPS Store RFID Label

Tracking #

1Z0546X8194191 8250

RECEIVED

JAN 16 2026

NORTHERN DISTRICT OF TEXAS

JAMES DE LOS SANTOS
(737) 775-6880
1905 WILLKOMEN WAY
PFLUGERVILLE  TX 78660

6 LBS        1 OF 1
SHP WT  6 LBS
DATE  14 JAN 2026

SHIP  CLERK OF COURT
TO:  UNITED STATES DISTRICT COURT
     ROOM 1452
     1100 COMMERCE ST

DALLAS  TX 75242

TX 752 9-40

UPS 2ND DAY AIR A.M.    2A
TRACKING #: 1Z 054 6X8 19 4191 8250

BILLING: P/P
SIGNATURE REQUIRED